## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

QBE SPECIALTY INSURANCE COMPANY,

            Plaintiff,

vs.

CITY OF MIAMI; JOE CAROLLO; ARTHUR
NORIEGA; VICTORIA MENDEZ; RACHEL
DOOLEY; ASAEL MARRERO; DANIEL S.
GOLDBERG; WILLIAM ORTIZ; LUIS TORRES;
ADRIAN PLASENCIA; RENE DIAZ; YVONNE
BAYONA; ALTOS MEXICANO, LLC D/B/A
TAQUERIAS EL MEXICANO; BEATSTIK,
LLC; BRICKELL STATION, LLC; CALLE
OCHO MARKETPLACE, LLC; EL SHOPPING,
LLC; WILLIAM O. FULLER; FUTURAMA,
LLC; LA GRAN FIESTA, LLC; LHAB TRES,
LLC; LITTLE HAVANA ARTS BUILDING,
LLC;  LITTLE HAVANA ARTS BUILDING
TOO, LLC; LITTLE HAVANA BUNGALOWS,
LLC; PIEDRA VILLAS, LLC; EL SHOPPING,
LLC;  MARTIN  PINILLA,  II;  THE
BARLINGTON GROUP, LLC; THE MAD
ROOM LLC D/B/A BALL AND CHAIN; TOWER
HOTEL,  LLC;  VIERNES  CULTURALES/
CULTURAL  FRIDAYS,  INC.;  and  YO AMO
CALLE SIETE, LLC; and DENISE GALVEZ
TURROS,

            Defendants.

Case No. _____

---

### COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff QBE Specialty Insurance Company ("**QBE**") files its Complaint for Declaratory Judgment against Defendants, and alleges as follows:

### NATURE OF THE ACTION

1.    QBE seeks a declaratory judgment and other relief regarding its rights and obligations under: (a) certain Public Officials and Employment Practices Liability Policies of

Insurance, Policy Nos. QPO01103-00 ("**2016-2017 POL Policy**"), QPO01103-01 ("**2017-2018 POL Policy**"), QPO01103-02 ("**2018-2019 POL Policy**"), QPO01103-03 ("**2019-2020 POL Policy**"), QPO01103-04 ("**2020-2021 POL Policy**"), QPO01103-05 ("**2021-2022 POL Policy**") (**Exhibits A-1, A-2, A-3, A-4, A-5 and A-6**) (collectively, "**POL Policies**") and (b) certain Law Enforcement Liability Insurance Policies, Policy Nos. QLO01189-00 ("**2016-2017 LEL Policy**"), QLO01189-01 ("**2017-2018 LEL Policy**"), QLO01189-02 ("**2018-2019 LEL Policy**"), QLO01189-03 ("**2019-2020 LEL Policy**"), QLO01189-04 ("**2020-2021 LEL Policy**"), and QLO01189-05 ("**2021-2022 LEL Policy**") (**Exhibits B-1, B-2, B-3, B-4, B-5 and B-6**) (collectively, "**LEL Policies**").

2.      The POL Policies apply, if at all, on a "claims-made" basis, *i.e.*, coverage is triggered by claims first made against the insured and reported to QBE during the policy period. Under the LEL Policies, however, coverage is triggered by a "wrongful act" of an insured while "conducting law enforcement activities", occurring during the policy period, which results in "personal injury" caused by an "occurrence."

3.      Defendant, the City of Miami ("**City**"), is the Named Insured under the POL Policies and the LEL Policies.  Defendant, Joe Carollo ("**Carollo**"), and certain other defendants herein claim to be additional insureds under the POL Policies and/or LEL Policies.

4.      The following related lawsuits (the "**Underlying Lawsuits**") have been filed, and are pending:

a.      *William O. Fuller and Martin A. Pinilla v. Joe Carollo,* Case No.: 18-cv-24190, filed in the U.S. District Court for the Southern District of Florida ("**Fuller I Lawsuit**");[1]

b.      *The Mad Room LLC d/b/a Ball and Chain, Altos Mexicanos, LLC d/b/a*

---

[1] The Fuller Lawsuit plaintiffs William O. Fuller and Martin A. Pinilla are collectively referred to as the "**Fuller I Plaintiffs**".

*Taquerias El Mexicano, Little Havana Arts Building, LLC, and La Gran Fiesta, LLC, v. City of Miami,* Case No.: 21-cv-23485-RKA, filed in the U.S. District Court for the Southern District of Florida ("**Mad Room Lawsuit**");[2] and

        c.  *Tower Hotel, LLC, Piedra Villas, LLC, Beatstik, LLC, El Shopping, LLC, and Yo Amo Calle Siete, LLC v. City of Miami,* Case No.: 2022-CA-44, filed in the Eleventh Judicial Circuit Court in and for Miami-Dade County, Florida ("**Tower Lawsuit**").[3]

        d.  *William O. Fuller, et al. v. City of Miami, Joe Carollo, et al.*, Case No.: 1:23-cv-24251 (S.D. Fla.) ("**Fuller II Lawsuit**").[4]

        e.  *William Fuller and Martin Pinilla v. City of Miami and Joe Carollo*, Case No.: 24-793-CA-01 (11th Jud. Cir., Miami-Dade County, FL) ("**Fuller III Lawsuit**").

     5.    This action seeks a declaration that QBE has no duty under the POL Policies or the LEL Policies to defend the City, Carollo or any of the other individuals who are defendants in the Underlying Lawsuits (who are also made defendants herein).

---

[2] Plaintiffs in the Mad Room Lawsuit, The Mad Room LLC d/b/a Ball and Chain; Altos Mexicanos, LLC d/b/a Taquerias El Mexicano; Little Havana Arts Building, LLC; and La Gran Fiesta, LLC, are collectively referred to as the "**Mad Room Plaintiffs**".

[3] Plaintiffs in the Tower Lawsuit, Tower Hotel; LLC, Piedra Villas, LLC; Beatstik, LLC; El Shopping, LLC; and Yo Amo Calle Siete, LLC, are collectively referred to as the "**Tower Plaintiffs**".

[4] Plaintiffs in the Fuller II Lawsuit, Altos Mexicano, LLC d/b/a Taquerias El Mexicano; Beatstik, LLC; Brickell Station, LLC; Calle Ocho Marketplace, LLC; El Shopping, LLC; William O. Fuller; Futurama, LLC; La Gran Fiesta, LLC; LHAB Tres, LLC; Little Havana Arts Building, LLC;  Little Havana Arts Building Too, LLC; Little Havana Bungalows, LLC; Piedra Vilas, LLC; El Shopping, LLC; Martin Pinilla, II; The Barlington Group, LLC; The Mad Room LLC d/b/a Ball and Chain; Tower Hotel, LLC; Viernes Culturales/ Cultural Fridays, Inc.; and Yo Amo Calle Siete, LLC are collectively referred to as the "**Fuller II Plaintiffs**".  Defendants in the Fuller II Lawsuit, City of Miami; Joe Carollo; Arthur Noriega; Victoria Mendez; Rachael Dooley; Asael Marrero; Daniel S. Goldberg; William Oritz; Adrian Plasencia; Rene Diaz; and Yvonne Bayona are collectively referred to as the "**Fuller II Defendants**".

6.     The duty to defend is broader than the duty to indemnify.  As such, where there is no duty to defend, there can be no duty to indemnify.  Accordingly, QBE seeks a declaration that it has no duty to indemnify any insured in any of the Underlying Lawsuits.

7.     In the interest of obtaining a comprehensive adjudication of rights, QBE also raises additional reasons that it has no duty to indemnify any insureds in certain Underlying Lawsuits or portions thereof, which reasons are independent of a duty to defend.  To the extent that these independent indemnification issues are not ripe for adjudication due to the lack of a final, non-appealable judgment in an Underlying Lawsuit, QBE requests the Court to stay them pending adjudication of the principal issue of the duty to defend.

8.     The Fuller I Plaintiffs, Mad Room Plaintiffs, Tower Plaintiffs, Fuller II Plaintiffs and Fuller III Plaintiffs are joined to this action as required parties pursuant to Federal Rule of Civil Procedure 19.

## JURISDICTION AND VENUE

9.     This is an action for declaratory relief pursuant to 28 U.S.C. Section 2201.

10.     This Court has jurisdiction pursuant to 28 U.S.C. Section 1332(a)(1) based upon complete diversity of the citizenship between QBE and the Defendants and pursuant to the Federal Declaratory Judgment Act to declare the rights and obligations of the parties under the POL Policies and the LEL Policies.

11.     QBE and the Defendants dispute whether QBE has a duty to defend and indemnify the insureds in the Underlying Lawsuits.  The amount in controversy includes the cost of such defense, which exceeds $10 million to date, and the cost of indemnifying a judgment entered against Carollo in the Fuller I Lawsuit, for which the Fuller I Plaintiffs seek full policy limits of $5 million under each of five LEL Policies.  Thus, the amount in controversy exceeds this Court's minimum jurisdictional amount of $75,000, exclusive of interest, costs, and attorney's fees.

4

12.     Venue is appropriate in the Southern District of Florida because some of the acts underlying this Complaint occurred in this district, as well as the fact that the Underlying Lawsuits that are the subject of this action are pending in Miami-Dade County, Florida. Moreover, as alleged below, all the Defendants are residents of Miami-Dade County, Florida.

13.     All conditions precedent to the filing of this action have occurred or have been complied with.

## THE PARTIES

14.     Plaintiff QBE is and was at all times relevant to this action a North Dakota corporation with its principal place of business in Sun Prairie, Wisconsin. Accordingly, QBE is and was a citizen of North Dakota and Wisconsin.

15.     Defendant and named insured City of Miami is and was at all times relevant to this action a Florida municipal corporation, with its principal place of business located in Miami, Miami-Dade County, Florida. The City was (prior to its dismissal) a defendant in the Fuller I Lawsuit and is presently a defendant in the Mad Room Lawsuit, Tower Lawsuit, Fuller II Lawsuit and Fuller III Lawsuit.

16.     Defendant Joe Carollo is and was at all times relevant to this action a Florida resident, residing in Miami-Dade County, Florida. Carollo is a defendant in the Fuller I Lawsuit, Mad Room Lawsuit, Fuller II Lawsuit and Fuller III Lawsuit.

17.     Defendant Arthur Noriega ("**Noriega**") is and was at all times relevant to this action a Florida resident, residing in Miami-Dade County, Florida. Noriega is a defendant in the Fuller II Lawsuit.

18.     Defendant Victoria Mendez ("**Mendez**") is and was at all times relevant to this action a Florida resident, residing in Miami-Dade County, Florida. Mendez is a defendant in the Fuller II Lawsuit.

5

19.     Defendant Rachael Dooley ("**Dooley**") is and was at all times relevant to this action a Florida resident, residing in Miami-Dade County, Florida. Dooley is a defendant in the Fuller II Lawsuit.

20.     Defendant Asael Marrero ("**Marrero**") is and was at all times relevant to this action a Florida resident, residing in Miami-Dade County, Florida. Marrero is a defendant in the Fuller II Lawsuit.

21.     Defendant Daniel S. Goldberg ("**Goldberg**") is and was at all times relevant to this action a Florida resident, residing in Miami-Dade County, Florida. Goldberg is a defendant in the Fuller II Lawsuit.

22.     Defendant William Ortiz ("**Ortiz**") is and was at all times relevant to this action a Florida resident, residing in Miami-Dade County, Florida. Ortiz is a defendant in the Fuller II Lawsuit.

23.     Defendant Luis Torres ("**Torres**") is and was at all times relevant to this action a Florida resident, residing in Miami-Dade County, Florida. Torres was named as a defendant in the original complaint and amended complaint in the Fuller II Lawsuit but was not included as a defendant in the second amended complaint.

24.     Defendant Adrian Plasencia ("**Plasencia**") is and was at all times relevant to this action a Florida resident, residing in Miami-Dade County, Florida. Plasencia is a defendant in the Fuller II Lawsuit.

25.     Defendant Rene Diaz ("**Diaz**") is and was at all times relevant to this action a Florida resident, residing in Miami-Dade County, Florida. Diaz is a defendant in the Fuller II Lawsuit.

26.     Defendant Yvonne Bayona ("**Bayona**") is and was at all times relevant to this

1067352\321178653.v1

action a Florida resident, residing in Miami-Dade County, Florida. Bayona is a defendant in the Fuller II Lawsuit.

27.     Defendant William O. Fuller ("**Fuller**") is and was at all times relevant to this action a Florida resident, residing in Miami-Dade County, Florida. Fuller is a plaintiff in the Fuller I Lawsuit, Fuller II Lawsuit and Fuller III Lawsuit.

28.     Defendant Martin Pinilla, II ("**Pinilla**") is and was at all times relevant to this action a Florida resident, residing in Miami-Dade County, Florida. Pinilla is a plaintiff in the Fuller I Lawsuit, Fuller II Lawsuit and Fuller III Lawsuit.

29.     Defendant The Mad Room LLC d/b/a Ball and Chain ("**Mad Room**") is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the members of Mad Room are Charlie Licksterz LLC and BNZ Bar LLC, both of which are Florida limited liability companies with their principal places of business in Miami-Dade County, Florida. Upon information and belief, William O. Fuller is the sole member of Charlie Licksterz LLC, who is and was at all relevant times to this action a Florida resident, residing in Miami-Dade County, Florida. BNZ Bar, LLC is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the members of BNZ Bar, LLC are Benjamin Bush and Zachary Bush, both of whom are and were at all relevant times to this action Florida residents, residing in Miami-Dade County. Mad Room is a plaintiff in the Mad Room Lawsuit and the Fuller II Lawsuit.

30.     Defendant Altos Mexicano, LLC d/b/a Taquerias el Mexicano ("**Taquerias**") is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the members of

Taquerias are William O. Fuller, Benjamin Bush and Zachary Bush, all of whom are and were at all relevant times to this action Florida residents, residing in Miami-Dade County, Florida. Taquerias is a plaintiff in the Mad Room Lawsuit and the Fuller II Lawsuit.

31.    Defendant Little Havana Arts Building, LLC ("**LHAB**") is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, William O. Fuller is the sole member of LHAB, who is and was at all relevant times to this action a Florida resident, residing in Miami-Dade County, Florida. LHAB is a plaintiff in the Mad Room Lawsuit and the Fuller II Lawsuit.

32.    Defendant La Gran Fiesta, LLC ("**Fiesta**") is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the members of Fiesta are William O. Fuller and BNZ Fiesta, LLC. Fuller is and was at all relevant times to this action a Florida resident, residing in Miami-Dade County, Florida. BNZ Fiesta, LLC is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the owner of BNZ Fiesta, LLC is BNZ Real Estate, LLC, a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the members of BNZ Real Estate, LLC are Benjamin Bush and Zachary Bush, both of whom are and were at all relevant times to this action Florida residents, residing in Miami-Dade County. Fiesta is a plaintiff in the Mad Room Lawsuit and Fuller II Lawsuit.

33.    Defendant Tower Hotel, LLC ("**Tower Hotel**") is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the members of Tower Hotel are William O. Fuller

and Martin A. Pinilla II, both of whom are and were at all relevant times to this action Florida residents, residing in Miami-Dade County, Florida. Tower Hotel is a plaintiff in the Tower Lawsuit and Fuller II Lawsuit.

34.    Defendant Piedra Villas, LLC ("**Piedra**") is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the sole member of Piedra is Miriam M. Fuller, who is and was at all relevant times to this action a Florida resident, residing in Miami-Dade County, Florida. Piedra is a plaintiff in the Tower Lawsuit and Fuller II Lawsuit.

35.    Defendant Beatstik, LLC ("**Beatstik**") is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the members of Beatstik are William O. Fuller, Martin A. Pinilla II, and Benjamin Bush, all of whom are and were at all relevant times to this action Florida residents, residing in Miami-Dade County, Florida. Beatstik is a plaintiff in the Tower Lawsuit and Fuller II Lawsuit.

36.    Defendant El Shopping, LLC ("**El Shopping**") is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the members of El Shopping are William O. Fuller and Martin A. Pinilla II, both of whom are and were at all relevant times to this action Florida residents, residing in Miami-Dade County, Florida. El Shopping is a plaintiff in the Tower Lawsuit and Fuller II Lawsuit.

37.    Defendant Yo Amo Calle Siete, LLC ("**Calle Siete**") is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the members of Calle Siete are William O.

1067352/321178653.v1

Fuller and Martin A. Pinilla II, both of whom are and were at all relevant times to this action Florida residents, residing in Miami-Dade County, Florida. Calle Siete is a plaintiff in the Tower Lawsuit.

38.     Defendant Brickell Station, LLC ("**Brickell Station**") is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the members of Brickell Station are William O. Fuller and Martin A. Pinilla II, both of whom are and were at all relevant times to this action Florida residents, residing in Miami-Dade County, Florida. Brickell Station is a plaintiff in the Fuller II Lawsuit.

39.     Defendant Calle Ocho Marketplace, LLC ("**Calle Ocho**") is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the members of Calle Ocho are William O. Fuller and Martin A. Pinilla II, both of whom are and were at all relevant times to this action Florida residents, residing in Miami-Dade County, Florida. Calle Ocho is a plaintiff in the Fuller II Lawsuit.

40.     Defendant Futurama, LLC ("**Futurama**") is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the members of Futurama are William O. Fuller and Martin A. Pinilla II, both of whom are and were at all relevant times to this action Florida residents, residing in Miami-Dade County, Florida. Futurama is a plaintiff in the Fuller II Lawsuit.

41.     Defendant LHAB Tres, LLC ("**LHAB Tres**") is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the sole member of LHAB Tres is William O.

Fuller, who is and was at all relevant times to this action a Florida resident, residing in Miami-Dade County, Florida. LHAB Tres is a plaintiff in the Fuller II Lawsuit.

42.     Defendant Little Havana Arts Building Too, LLC ("**LHAB Too**") is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the sole member of LHAB Too is William O. Fuller, who is and was at all relevant times to this action a Florida resident, residing in Miami-Dade County, Florida.  LHAB Too is a plaintiff in the Fuller II Lawsuit.

43.     Defendant Little Havana Bungalows, LLC ("**Bungalows**") is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the sole member of Bungalows is William O. Fuller, who is and was at all relevant times to this action a Florida resident, residing in Miami-Dade County, Florida.  Bungalows is a plaintiff in the Fuller II Lawsuit.

44.     Defendant The Barlington Group, LLC ("**Barlington Group**") is and was at all times relevant to this action a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Upon information and belief, the members of Barlington Group are William O. Fuller and Martin A. Pinilla II, both of whom are and were at all relevant times to this action Florida residents, residing in Miami-Dade County, Florida.  Barlington Group is a plaintiff in the Fuller II Lawsuit.

45.     Defendant Viernes Culturales/Cultural Fridays, Inc. ("**Viernes Culturales**") is and was at all times relevant to this action a Florida corporation with its principal place of business in Miami-Dade County, Florida. Viernes Culturales Group is a plaintiff in the Fuller II Lawsuit.

46.     Defendant Denise Galvez Turros ("**Turros**") is and was at all times relevant to this action a Florida resident, residing in Miami-Dade County, Florida. Turros is a plaintiff in the Fuller

1067352\321178653.v1

III Lawsuit.

## UNDERLYING LAWSUITS

### Fuller I Lawsuit

47.    The Fuller I Lawsuit was filed on October 11, 2018, against multiple defendants, including Carollo, the City, and others. The Fuller I Plaintiffs thereafter filed an amended complaint, which the Court dismissed but permitted plaintiffs to file a second amended complaint. On June 28, 2019, the Fuller I Plaintiffs filed the operative second amended complaint, dropping the other defendants and leaving only Carollo as the remaining defendant. A true and correct copy of the operative second amended complaint in the Fuller I Lawsuit is attached as **Exhibit C-1** (Fuller Lawsuit D.E. 125). Carollo moved to dismiss the second amended complaint based on immunity, which the Court granted in part with respect to legislative immunity and denied in part with respect to qualified immunity. The Eleventh Circuit affirmed the Court's Order.

48.    The second amended complaint alleged that Carollo orchestrated a scheme to destroy the Fuller I Plaintiffs' businesses and reputations in retaliation for Plaintiffs exercising their First Amendment rights of free speech in the form of filing an ethics complaint against Carollo and supporting Carollo's opponent in a run-off election, all in violation of Plaintiffs' civil rights. The alleged scheme included:

- compiling a list of Plaintiffs' businesses to be targeted for heightened scrutiny (Fuller I 2nd Amend. Compl., ¶¶ 59, 62);

- causing false allegations of noise, parking and code violations to be made (*Id.*, ¶¶ 205, 191-196; 259);

- causing illegal surveillance, raids and searches to be performed (*Id.*, p. 2, ¶¶ 98-100, 102, 131, 132);

- sending City employees to Plaintiffs' places of business in order to intimidate customers or discourage them coming (*Id.*, ¶¶ 97-100);

1067352\321178653.v1

- providing the City Commission with false and misleading information about alleged Code violations on Plaintiffs' properties, thus causing special legislation to be enacted targeting Plaintiffs' businesses (*Id.*, ¶¶ 255-263);

- communicating directly with the subordinates of the City Manager in violation of the City Charter (*Id.*, ¶¶ 88, 312, 316);

- going on local radio shows and defaming Plaintiffs, falsely claiming they are associated with corrupt governments and investors (*Id.*, ¶¶ 225-236); and

- directing City officials to use City resources and funds to purchase properties Plaintiffs were attempting to purchase (*Id.*, ¶¶ 275-282).

49.     The second amended complaint in Fuller I alleged that Carollo engaged in willful, malicious and illegal conduct that was specifically intended to cause harm to Plaintiffs.   For example, it alleges that:

- "Carollo's stated intention is to drive Plaintiffs out of business even if he has to destroy the life savings and work of the businesses who rent from Plaintiffs."  (Fuller I 2nd Amend. Compl., Intro., pp. 2-3).

- "Carollo knows that such retaliation for exercising one's right to free speech is not only morally wrong but also illegal . . . ."  (*Id.*, Intro., p. 3).

- "Carollo put the City on notice of his intentions to selectively target and harass Plaintiffs as retaliation."  (*Id.*, 64).

- Each of Carollo's statements . . . was knowingly false, malicious, published widely to the community, and intended to harm Plaintiff Fuller and his businesses.  (*Id.*, ¶ 234).

- Further, Carollo uses his perceived immunity to defamation as a public official to intentionally defame Plaintiffs to harm their reputation and cause economic damages. (*Id.*, ¶ 235).

- "Carollo's conduct was reprehensible in that it was repeatedly violating the Miami City Charter's rules designed to prohibit this type of behavior, designed to preclude commissioners from threatening City employees to get them to carry out the commissioners' personal vendettas." (*Id.*, ¶ 318).

50.     The Fuller I Plaintiffs alleged a single count of First Amendment retaliation in violation of 42 U.S.C. § 1983. Plaintiffs sought monetary damages for business disruption, emotional distress, and reputational harm, punitive damages, attorneys' fees, and a permanent

injunction against Carollo enjoining him from further retaliation.

51.     The Fuller I Plaintiffs' case was tried by a jury.  The sole claim submitted to the jury was under 42 U.S.C. § 1983, charging that Carollo violated their civil rights by retaliating against them because they exercised their First Amendment right to freedom of speech.  The jury instructions explained what the Fuller I Plaintiffs had to prove to prevail on these claims, as follows:

> To succeed on this claim, Bill Fuller and Martin Pinilla must each prove each of the following facts by a preponderance of the evidence:
>
> First: That Bill Fuller and Martin Pinilla engaged in protected speech, association, and assembly by supporting Carollo's opponent in a run-off election through speech, campaign donations, and holding political rallies on property associated with them and by filing an ethics complaint against Carollo.
>
> Second: That Joe Carollo retaliated against Bill Fuller and Martin Pinilla by trespassing; by lodging fabricated and often anonymous complaints against them; by causing or commandeering City of Miami officials to selectively target Bill Fuller and Martin Pinilla or properties, businesses, tenants, festivals, or events associated with them for inspections, violations and enforcement actions; and/or by making false and defamatory statements to harm them;
>
> Third: That Bill Fuller's and Martin Pinilla's exercise of their First Amendment rights was a motivating factor in Joe Carollo's decision to retaliate against Bill Fuller and Martin Pinilla;
>
> Fourth: That Joe Carollo's alleged retaliatory acts would likely deter a similarly situated reasonable person from engaging in similar acts of protected speech and assembly, such as supporting a political candidate through speech, campaign donations, and holding political rallies on property associated with him or her, or filing an ethics complaint; and
>
> Fifth: That Joe Carollo acted under color of law.
> . . .
>
> If you find Bill Fuller and Martin Pinilla have proved each of the facts they must prove, then you must consider Joe Carollo's contention that he would have engaged in the same activity—including trespassing; lodging fabricated and often anonymous complaints against Bill Fuller and Martin Pinilla, or properties, businesses, and events associated with them; causing or commandeering City of Miami officials to selectively target Bill Fuller and

1067352\321178653.v1

Martin Pinilla or properties, businesses, tenants, festivals or events associated with them for inspections, violations and enforcement actions; and/or making false and defamatory statements to harm them —anyway. To succeed on this contention, Joe Carollo must prove by a preponderance of the evidence that he would have done the same thing if Bill Fuller and Martin Pinilla had not exercised their First Amendment rights, including, but not limited to, by supporting Carollo's political opponent in a run-off election through speech, campaign donations, and holding political rallies on property associated with them and by filing an ethics complaint against Carollo.

If you find Bill Fuller and Martin Pinilla have proved each of the facts they must prove and if you find that Joe Carollo has not proved his contention, you must then decide the issue of Bill Fuller's and Martin Pinilla's damages.

However, if you find that Bill Fuller and Martin Pinilla did not prove each of the facts they must prove, or if you find that Joe Carollo proved his contention, then you must find for Joe Carollo as to that Plaintiff.

Fuller I Lawsuit, D.E. 475 at pp. 7-9.

52.     With regard to punitive damages, the jury instructions provided as follows:

If you find for Bill Fuller and Martin Pinilla and find that Joe Carollo acted with malice or reckless indifference to Bill Fuller's and Martin Pinilla's federally protected rights, the law allows you, in your discretion, to award Bill Fuller and Martin Pinilla punitive damages as a punishment for Joe Carollo and as a deterrent to others.

Bill Fuller and Martin Pinilla must each prove by a preponderance of the evidence that they are entitled to punitive damages.

Joe Carollo acts with malice if his conduct is motivated by evil intent or motive. Joe Carollo acts with reckless indifference to the protected federal rights of Bill Fuller and Martin Pinilla when Joe Carollo engages in conduct with a callous disregard for whether the conduct violates Bill Fuller's and Martin Pinilla's protected federal rights.

If you find that punitive damages should be assessed, you may consider the evidence regarding Joe Carollo's financial resources in fixing the amount of punitive damages to be awarded.

Court's Jury Instructions, Fuller I Lawsuit, D.E. 475 at p. 11.

53.     A jury trial in the Fuller I Lawsuit took place from approximately April 10, 2023 until June 1, 2023, after which the jury entered a verdict in Plaintiffs' favor on June 1, 2023, finding

1067352\321178653.v1

as follows:

1. Did Joe Carollo intentionally commit acts that violated Bill Fuller's right to free speech or assembly?  Yes.

2. Were Joe Carollo's actions done "under color" of state law?  Yes.

. . .

4. Would Joe Carollo have taken the same actions toward Bill Fuller even if Bill Fuller had not exercised his First Amendment rights?  No.

5. Should Bill Fuller be awarded compensatory damages against Joe Carollo?  Yes. ($8.6 Million)

. . .

7. Should punitive damages be assessed against Joe Carollo and in favor of Bill Fuller?  Yes.  ($25.7 million).

8. Did Joe Carollo intentionally commit acts that violated Martin Pinillas' right to free speech or assembly?  Yes.

9. Were Joe Carollo's actions done "under color" of state law?  Yes.

. . .

11. Would Joe Carollo have taken the same actions toward Martin Pinilla even if Martin Pinilla had not exercised his First Amendment rights?  No.

12. Should Martin Pinilla be awarded compensatory damages against Joe Carollo?  Yes. ($7.3 Million)

. . .

14. Should punitive damages be assessed against Joe Carollo?  Yes.  ($21.9 million).

Verdict Form, Fuller Lawsuit D.E. 470 (**Exhibit C-2**).

54.    On June 1, 2023, the Court entered a final judgment in favor of Fuller and against Carollo in the amount of $34,300,000, with interest at the statutory rate, and in favor of Pinilla and against Carollo in the amount of $29,200,000, with interest at the statutory rate.  *See* Final Judgment, Fuller Lawsuit D.E. 479 (**Exhibit C-3**).

55.    On June 29, 2023, Carollo filed a notice of appeal of the final judgment. *See* Fuller Lawsuit, D.E. 500.  The Eleventh Circuit acknowledged the Notice of Appeal on July 5, 2023, assigning it Case No. 23-12167.

56.     On August 10, 2023, the Court entered a final judgment for attorneys' fees and costs in favor of the Fuller I Plaintiffs and against Carollo, awarding attorneys' fees in the amount of $2,650,000 and costs in the amount of $60,000, for a total award of $2,710,000, with interest at the statutory rate. *See* Final Judgment for Attorneys' Fees and Costs, Fuller I Lawsuit, D.E. 542 (**Exhibit C-4**).

57.     Plaintiffs also filed a motion asking the Court to amend or clarify the final judgment to reflect that the judgment and award of compensatory damages pertains to Carollo in both in his individual or personal capacity and in his official capacity as Commissioner of the City of Miami. *See* Fuller Lawsuit D.E. 504. The Court denied the Motion to Clarify, declining to disturb the judgment against Carollo solely in his individual or personal capacity. Fuller Lawsuit D.E. 618.

58.     QBE received notice of the Fuller I Lawsuit from the City on or around October 24, 2018.

**Mad Room Lawsuit**

59.     The Mad Room Lawsuit was filed on September 30, 2021, naming the City as the sole defendant.  The operative amended complaint was filed on November 17, 2022. (**Exhibit D**). It alleges that the City developed and implemented a "deliberate policy and plan" that was "devised by a City Commissioner [Carollo]; reified by legislative acts of the City Commissioner [Carollo]" and cultivated by the City Attorney and its officers as well as various administrative departments, "to destroy Plaintiffs' constitutionally protected rights to their property and in their businesses." Mad Room Lawsuit, D.E. 212 at ¶ 1.

60.     According to the amended complaint, the City's plan consisted of enacting two allegedly unconstitutional ordinances exclusively targeting Plaintiffs' businesses, and raiding, unlawfully seizing, and shutting down Plaintiffs' Mad Room and Taquerias businesses on a purely

1067352\321178653.v1

pretextual basis.

61.    The amended complaint in Mad Room alleges that the City engaged in willful, malicious and illegal conduct that was specifically intended to cause harm to Plaintiffs.   For example, it alleges that:

- "The City of Miami developed and deployed a deliberate policy and plan of action—devised by a City Commissioner; reified by legislative acts of the City Commission; cultivated and planned by the City Attorney and its office; implemented by all of the City's major administrative departments, including Building, Planning, Zoning, Fire, Police, Code Enforcement, and others; and effectuated through dozens of the City's professional staff and employees—to destroy Plaintiffs' constitutionally protected rights to their real property and in their businesses." (Mad Room 1st Amend. Compl., ¶ 1).

- "The City of Miami, with malicious intent, for no legitimate reason and with no lawful purpose, instituted its policy and then corrupted every organ of its municipal government in a relentless effort against Plaintiffs designed to run them and their businesses out of town." (*Id.*, ¶ 2).

- "The City's vendetta against Plaintiffs runs from top to bottom—its elected officials, lawyers, professional staff, and every single department within its administrative function. The City deliberately crafted a multi-pronged policy intended to unfold in stages and build relentlessly towards its eventual goal of destroying Plaintiffs' business and arrogating their property rights."  (*Id.*, ¶ 3).

- "Towards developing and implementing the City's plan and policy, the City Attorney, the City Manager and his Deputy, and others—initially at the request and direction of Commissioner Carollo—prepared a list of Fuller-affiliated properties (*i.e.,* including Plaintiffs and Fuller's family members). * * * The Fuller property list was then circulated to each City department, including Code Enforcement, Fire, Zoning, Building, among others, with the directive to investigate the Fuller properties for 'potential' violations with the intended goal of closing the businesses; *not* to allow compliance, as is the goal for other businesses."  (*Id.*, ¶ 38).

- "In direct response to the Resolution and the City Attorney's February 20 emails, every City department, including Building, Zoning, Planning, Fire, Police, and Code Enforcement, renewed their conduct, re-investigated the Plaintiff properties, undertook actions proactively to issue and manufacture violations regardless of the basis and with the stated intent of eventually shutting-down Plaintiffs' businesses."  (*Id.*, ¶ 60).

- "The February 14, 2019 Commission Resolution … constituted a legislative act setting a formal policy of the City to target Plaintiffs to the exclusion of any other business

and any other resident in the City, based on pretextual and arbitrary reasons and without any basis in promoting any legitimate government purpose, which resulted in the unconstitutional deprivation of Plaintiffs' protected state-created property and entitlement rights." (*Id.*, ¶ 63).

- "The City's policy emplaced by and through the Resolution was done for only pretextual and arbitrary reasons. The policy's core features—to target a specific set of businesses because of common ownership/affiliation; to proactively locate and manufacture violations; and to shut the businesses—were emplaced only because of unsupported political animus directed at perceived enemies of a City Commissioner, and for no other reason." (*Id.*, ¶ 69).

- "Part of the City's plan to harass Plaintiffs and deprive Plaintiffs of their property rights consists of laying the pre-textual groundwork to shut the businesses down through constant notices and 'violations.' The City was not acting pursuant to the City Code's legitimate purpose of maintaining the health and safety of its citizens; rather, it was all part of their scheme to run Plaintiffs out of town." (*Id.*, ¶ 74).

- "The City developed and acted on an official policy to deprive Plaintiffs of their constitutionally protected property and business rights . . . ." (*Id.*, ¶ 251).

- "In addition and in the alternative, the City's pattern and practice of similar and interlocking malicious conduct to deprive, and resulting in depriving, Plaintiffs of their constitutionally protected property and business rights, described herein, constitutes a policy and custom of the City to do so." (*Id.*, ¶ 252).

- "In addition and in the alternative, the City was deliberately indifferent to and therefore adopted the actions of its officials, agents and employees in depriving Plaintiffs of their constitutionally protected property and business rights . . . ." (*Id.*, ¶ 253).

62.     The Mad Room Lawsuit is currently pending, and discovery is underway.

**Tower Lawsuit**

63.     The Tower Lawsuit was filed on May 3, 2022.  A third amended complaint was filed on November 28, 2022. (**Exhibit E**, D.E. 132).  The Tower Plaintiffs allege that five properties are subject to reparation work necessary to avoid the City demolishing the properties. They further allege that the City's intentional acts of thwarting Plaintiffs' completion is designed to force Plaintiffs to miss the demolition deadlines, and thereby cause the properties to be

demolished and certificates of use revoked. Plaintiffs describe the City's conduct as "targeted, retaliatory actions" against them.

64.     The operative corrected third amended complaint, filed on November 28, 2022, alleges that the City engaged in willful, malicious and illegal conduct that was specifically intended to cause harm to Plaintiffs.  For example, it alleges that:

- "The latest tactic being employed by the City, with the guidance and direction of Carollo, is to place the real property owned by Plaintiffs, which are unique and possess inherent, immeasurable value, at the risk of being demolished." (Tower 3d Amend. Compl., ¶ 17).

- "This action seeks to remedy the targeted, retaliatory actions being taken by Defendant City of Miami against the Plaintiffs. * * * Fuller and Pinilla are engaged in well-publicized litigation with Commissioner Joe Carollo and the City of Miami. The City of Miami's actions which have prompted this action are the latest incarnation of the retribution being directed at Fuller and Pinilla for properly bringing claims against the City of Miami for its prior wrongful conduct." (*Id.*, ¶ 1).

- "Namely, each of the five properties which are the subject of this action are presently being repaired in order to bring them into compliance. Such reparation work is required to be completed in a specific period of time or the property may be demolished by the City of Miami. Despite Plaintiffs' substantial completion of the repairs required to bring the properties into compliance, the City of Miami refuses to timely comply with its obligations to approve the work performed by Plaintiffs so that a final inspection can be completed. The City of Miami's inaction in this regard, along with its intentional acts of changing the requirements that Plaintiffs must meet, is designed to cause Plaintiffs to miss the reparation deadline which will expose Plaintiffs' properties to being demolished." (*Id.*, ¶ 2).

65.     The Tower Plaintiffs' third amended complaint seeks damages for breach of compliance agreements and breach of the implied covenant of good faith and fair dealing, equitable estoppel, and a preliminary and permanent injunction to enjoin and prevent the City from demolishing the buildings.

**Fuller II Lawsuit**

66.     The Fuller II Lawsuit was filed on November 6, 2023.  It was brought by 17 plaintiffs consisting of Fuller, Pinilla and various businesses affiliated with them.  The original

complaint named 12 defendants including the City, Carollo and numerous employees or officials of the City. A first amended complaint, also naming 12 defendants, was filed on February 29, 2024. The operative second amended complaint (**Exhibit F**) was filed on April 19, 2024, naming 11 defendants.

67.     The second amended complaint recites that in upholding the damages award in Fuller I, the Court noted that Carollo attempted to shut down plaintiffs' businesses (or their tenants' businesses) and such "intentional and malicious" actions "continued long after Plaintiffs filed suit" [in Fuller I] and "effectively 'weaponiz[ed] the City government' against them." (Fuller II 2nd Amend. Compl., ¶¶ 1, 2). In light of this conduct that allegedly continued after Fuller I was filed, the "new plaintiffs" in Fuller II seek damages in excess of $100 million dollars for businesses that were allegedly "shut down or otherwise destroyed over the past four years." (*Id.*, ¶ 2). In addition, Plaintiffs Fuller and Pinella seek "emotional and reputational damages" based on "misconduct that occurred after Plaintiffs filed suit" against Carollo in Fuller I. (*Id.*)

68.     The second amended complaint alleges, among other things, that the defendants engaged in willful, malicious and illegal conduct that was specifically intended to cause harm to Plaintiffs, as follows:

- "By February 2020, Carollo's two-year effort to transform his retaliation campaign into an official City policy finally began to take hold." (Fuller II 2nd Amend. Compl., ¶ 86).

- "The goal of the May 27, 2020, meeting – and of the lists of Plaintiffs' properties that were circulated on a weekly basis thereafter – was to create a framework for crafting City ordinances and changing internal City policies to cause significant economic harm to Fuller, Pinilla, and their associated businesses and properties. And the reason for doing so was to shut down and discourage others from conducting business with Fuller, Pinilla, and their associated businesses in order to punish them for engaging in protected political activity, and to chill similar protected political activity." (*Id.*, ¶ 93).

- "The unconstitutional retaliation campaign resulted in a realignment of existing separation of powers, resulting in unofficial customs in which Carollo effectively ruled the City, and a restructuring of the historical operation of the City Charter, the City

Manager's Office, the City Attorney's Office, the Building Department, the Zoning Department, the Code Enforcement Board, the Fire Department, and even the activities of ordinary City personnel."  (*Id*., ¶ 109).

- "Although Carollo began the retaliation campaign independently, it became widely known throughout the City—including the officials and employees employed by the City—that the retaliation campaign was eventually adopted by top City officials, including Noriega, Mendez, and Dooley. Accordingly, all of the Defendants had actual knowledge that their actions facilitated a vicious and malicious scheme to destroy Plaintiffs and drive all of their businesses and tenants into bankruptcy as a form of First Amendment retaliation."  (*Id*., ¶ 146).

- "Not only did the City know about, and fail to stop, Carollo's retaliation, it executed it on behalf of Carollo from February 2020 onward."  (*Id*., ¶ 146).

- "Carollo's acts are reprehensible in that they repeatedly violated the City of Miami Charter and the United States Constitution. Carollo, in retaliation against Plaintiffs' Fuller and Pinilla, targeted LHAB in reckless disregard for Fuller and Pinilla's First Amendment Rights of Free Speech, and LHAB's Rights of Free Association. And Carollo was, and still is, motivated by an evil intent to drive Plaintiffs out of business and deprive them of their constitutional rights."  (*Id*., ¶ 213).

- Defendants "knowingly and directly participated in a campaign of selective enforcement that was designed to retaliate" against plaintiffs "including by following the lead of Carollo who . . . 'used his position and power to weaponize the City government against Plaintiffs because Plaintiffs chose to exercise their First Amendment rights by supporting Defendant's political opponent.'"  "As the result of the retaliatory actions that 'specifically targeted' Fuller and Pinilla's 'financial vulnerabilities by attempting to shut down their, or their tenants', businesses,' through 'continuous and unrelenting,' and 'intentional and malicious' misconduct that 'continued long after' Fuller and Pinilla 'filed suit' against Carollo . . . ."  (*Id*., ¶¶ 217, 252, 287, 317, 346, 377. 391, 421, 448, 473, 493, 512, 530, 544, 555, 571, 589, 610, 631, 651, 672, 693, 741, 791, 842, 894, 944, 990, 1031, 1049, 1068, 1089, 1112, 1133, 1152, 1173, 1195, 1241, 1289, 1337, 1386, 1433, 1476, 1517, 1558, 1600, 1640, 1677, 1712, 1749, 1786, 1801, 1815, 1834, 1863, 1894, 1925, 1956, 1987, 2017, 2047, 2066, 2089, 2109, 2130, 2146, 2161, 2175, 2207, 2240, 2268, 2296, 2332, 2373, 2413, 2449, 2482, 2500, 2518, 2537, 2557, 2574, 2592, 2610, 2624, 2638, 2653, 2669, 2697, 2726, 2755, 2784, 2804, 2824, 2843, 2856, 2870, 2884, 2898, 2913, 2947, 2982, 3017, 3053, 3090, 3120, 3154, 3168, 3182, 3194, 3247, 3273, 3325, 3366, 3407, 3447, 3487, 3510, 3531, 3557, 3582, 3635, 3661, 3717, 3754, 3795, 3835, 3875, 3898, 3919, 3945, 3970, 4006, 4046, 4086, 4126, 4167, 4207, 4246, 4286, 4326, 4367).

- Defendants were and still are "motivated by an evil intent to drive Plaintiff out of business and deprive them of their constitutional rights."  (*Id*., ¶¶ 213, 248, 283, 313, 342, 373, 387, 417, 444, 469, 489, 508, 526, 540, 551, 585, 606, 627, 647, 668, 689, 787, 838, 890, 940,

986, 1027, 1045, 1085, 1108, 1129, 1148, 1169, 1191, 1285, 1333, 1382, 1429, 1472, 1513, 1596, 1636, 1673, 1708, 1745, 1782, 1797, 1811, 1830, 1890, 1921, 1952, 1983, 2013, 2043, 2085, 2105, 2126, 2142, 2157, 2171, 2236, 2264, 2292, 2369, 2409, 2445, 2478, 2496, 2514, 2587, 2605, 2619, 2633, 2648, 2664, 2721, 2750, 2779, 2799, 2819, 2838, 2865, 2879, 2893, 2906, 2975, 3010, 3046, 3083, 3113, 3147, 3161, 3175, 3189, 3268, 3320, 3361, 3402, 3442, 3482, 3505, 3552, 3577, 3656, 3708, 3749, 3790, 3830, 3870, 3893, 3940, 3965, 4041, 4081, 4121, 4162, 4202, 4241, 4281, 4321, 4362, 4402).

69.     The second amended complaint pleads multiple counts under 42 U.S.C. § 1983 and seeks compensatory damages "in excess of $107,115,655.00" as well as punitive damages.

**Fuller III Lawsuit**

70.     The Fuller III Lawsuit was filed on January 16, 2024.  The operative first amended complaint (**Exhibit G**) pleads a single count for declaratory judgment.  Specifically, it seeks a judicial declaration that Carollo violated the City of Miami's Bill of Rights by having been found by a federal court that he willfully violated plaintiffs' right to free speech and that he has therefore forfeited his position as Commissioner and should be removed forthwith.  The Fuller III Lawsuit does not seek money damages.

## THE INSURANCE POLICIES

**POL Policies**

71.     As alleged above, the POL Policies apply, if at all, on a "claims-made" basis, *i.e.*, coverage is triggered by claims first made against the insured and reported to QBE, during the policy period.  The POL Policies span six consecutive policy periods, with the first such policy period incepting on October 26, 2016 and the last such policy period ending on November 1, 2022. Each POL Policy is subject to a limit of liability of $5 million per wrongful act and in the aggregate. Each POL Policy is subject to a $500,000 Self-Insured Retention ("SIR") except for the 2021-2022 POL Policy which is subject to a $1,000,000 SIR, applicable to each claim or suit.

72.     Each POL Policy contains the following relevant provisions:

**SECTION I - COVERAGE**

23

### A. Insuring Agreement

1. We will pay those sums that the Insured becomes legally obligated to pay as **damages** because of a **wrongful act** (regardless of whether or not such allegations prove to be groundless, false or fraudulent) arising out of the discharge of duties by or on behalf of the Named Insured as shown in the Declarations provided always that:

   a. the **claim**, on account of such **wrongful act**, is first made against the Insured and reported to us during the policy period, in compliance with SECTION VII - CONDITIONS - Item A, or any applicable reporting period under SECTION VI - EXTENDED REPORTING PERIODS;

   b. such **wrongful act** took place in the **coverage territory**; and

   c. as of the inception date of this policy, no Insured had any knowledge of any circumstance likely to result in or give rise to a **claim** nor could have reasonably foreseen that a **claim** might be made.

   For purposes of paragraph 1a. of SECTION I - COVERAGE A. Insuring Agreement, if, during the policy period or any applicable reporting period under SECTION VI - EXTENDED REPORTING PERIODS, the Insured gives written notice to us, in accordance with SECTION VII - CONDITIONS - Item A., of a **wrongful act** likely to result in a **claim**, then any **claim** that may subsequently be made against an Insured arising out of such **wrongful act** shall be deemed to have been made during the policy period or any applicable reporting period hereunder.

2. We will have the right and duty to defend, except where otherwise excluded, any **suit** seeking **damages** to which this insurance applies. We may, at our discretion, investigate any **claim** or **suit**. But:

   a. the amount we will pay for **damages**, including **claims expenses**, is limited as described in SECTION IV - LIMITS OF LIABILITY; and

   b. our right and duty to defend end when we have used up the applicable limit of liability in the payment of judgments, settlements, or **claims expenses.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SECTION I - COVERAGE, B. Supplementary Payments.

### B. Supplementary Payments

We will pay, in addition to the applicable limits of liability, with respect to any **claim** or **suit** we defend:

   1. all **claim expenses** we incur,

24

2. premiums on appeal bonds in any such **claim** or **suit** and the cost of bonds to release attachments, but only for bond amounts not exceeding an amount equal to the limit of liability. We do not have an obligation to furnish any such bonds.

3. all reasonable expenses incurred by any Insured at our request to assist us in the investigation or defense of the **claim** or **suit**, including actual loss of earnings up to $100 a day because of time off from work.

4. all costs taxed against the Insured in the **suit**. . .

. . .

(Form QBPO-1000 (01-16)).


**SECTION II – EXCLUSIONS**

This policy does not apply to:

**1**. **Criminal Acts**

Any **damages** arising out of any dishonest, fraudulent, criminal or malicious act or omission of any Insured or **employee.**
. . .

**5. Self-Dealing or Illegal Profit**

Any **damages** arising out of self-dealing or gaining profit or advantage to which an Insured is not legally entitled.
. . .

**7. Bodily Injury, Personal Injury, Advertising Injury or Property Damage.**

Any **damages** based upon or arising out of:

a. bodily injury including physical injury to any person, death, sickness, disease or any mental anguish associated with or arising from such bodily injury;

b. assault or battery;

c. emotional distress or mental anguish;

d. injury caused by a **wrongful act** arising from one or more of the following:

1) false arrest, detention or imprisonment;

2) malicious prosecution;

3) false or improper service of process;

25

4) publication or utterance of libel, slander, or disparaging material, or utterance in violation of an individual's right of privacy;

5) violation of right of public occupancy;

6) wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises;

7) violation of property rights;

8) misappropriation of advertising ideas or style of business;

9) infringement of copyright title or slogan.

However, exclusions 7.c. and 7.d. do not apply with respect to allegations of **a wrongful employment practice.**

e. physical injury to tangible property, including all resulting loss of use **of** that property;

f. loss of use of tangible property that is not physically injured. . .

**8**. **Law Enforcement Activities**

Any **damages** arising out of the law enforcement activities to protect the public or property including the operation of correctional or detention facilities.

(Form QBPO-1000 (01-16)).

## SECTION IV - LIMITS OF LIABILITY

A. The Limit of Liability shown in the Declarations is the most we will pay regardless of the number of:

1. Insureds

2. **Claims** made or **suits** brought; or

3. Persons or organizations making a **claim** or bringing a **suit.**

B. Our total liability for **damages** as a result of all **claims** covered under this coverage shall not exceed the amount stated in Item 3. of the Declarations as Policy Aggregate.

C. Subject to the above provision respecting Policy Aggregate Limit, our liability for **damages** as a result of any one **claim** or **suit** covered under this policy shall not exceed the amount stated in Item 3. of the Declarations as each **wrongful act.** . . .

26

(Form QBPO-1000 (01-16)).

## SECTION V - DEDUCTIBLE

The deductible amount stated in Item 4. of the Declarations is applicable to each claim or suit and shall be subtracted from the total amount of damages including: (1) payments for damages and (2) investigation, adjustment, defense and/or appeal expenses (whether or not payments for damages is made) resulting from each claim or suit If more than one claim or suit results from the same or related wrongful acts, then only one deductible amount will apply.

We are only liable for the difference between such deductible amount and the amount otherwise applicable to a claim or suit. If we pay your portion of any deductible, you will reimburse us immediately upon our request.
. . .

(Form QBPO-1000 (01-16)).

## SECTION VII- CONDITIONS

### A. Duties in the Event of a Wrongful Act, Claim or Suit

1. You must see to it that we are promptly notified of a **wrongful act** which may result in a **claim**. To the extent possible, notice should include:

   a. how, when and where the **wrongful act** took place;

   b. the names and addresses of any injured persons and any witnesses; and

   c. the nature and location of any injury or **damage** arising out of the **wrongful act**.

2. If a **claim** is made or **suit** is brought against any insured, you must:

   a. promptly record the specifics of the **claim** or **suit** and the date received; and

   b. notify us promptly.

   You must see to it that we receive written notice of the **claim** or **suit** promptly.

3. You and any other involved Insured must:

   a. immediately send us copies of any demands, notices, summonses or legal papers received in connection with the **claim** or **suit**;

   b. authorize us to obtain records and other information;

27

    c.  cooperate with us in the investigation, settlement, or defense of the **claim** or **suit**; and

    d.  assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the Insured because of injury or damage to which this insurance may also apply.

4. No Insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent . . .

(Form QBPO-1000 (01-16)).

## SECTION VIII – DEFINITIONS

**A. Claim** means:

1. a written demand for **damages** or a notice advising an Insured of an intent to sue;

2. a notice of an arbitration proceeding to which we agree; or

3. a civil proceeding commenced by the service of a summons, complaint or similar pleading; received by an Insured alleging a **wrongful act**.

**Claim** shall not include any criminal action or labor or grievance arbitration subject to a collective bargaining agreement.

More than one **claim** brought by persons or entities arising out of the same **wrongful act** or a series of acts all related to a single **wrongful act** shall be treated as a single **claim** and shall be deemed to have been made at the time that the first **claim** is made against any Insured.

**B. Claims Expenses** means:

1. reasonable and necessary fees charged by any attorney designated by us to defend the Insured;

2. reasonable and necessary fees charged by any attorney designated by the Insured with our written consent.

3. other reasonable and necessary fees, costs and expenses resulting from investigation, adjustment, defense and appeal (other than premiums on appeal bonds and the cost of bonds to release attachments) of a **claim** or **suit** if incurred by the Insured.

Claims Expenses shall not include salary expense or other charges relating to **employees** or officials of the Insured.

28

Claims Expenses also shall not include any amounts in excess of the applicable and available Limits of Liability of this policy, as set forth in the Declarations.
. . .

**D. Damages** shall mean those amounts that the Insured becomes legally obligated to pay for **claim** or **suits** arising out of a **wrongful act** and shall include **claims expenses.** Damages includes all interest on the full amount of any judgment that accrues after entry and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limits of Liability. Damages also includes an award of an opposing party's attorney fees. Damages shall law, statutory, or regulatory fines or penalties.

. . .

**H. Wrongful act** means a negligent act, error or omission, or **wrongful employment practice**.

. . .

(Form QBPO-1000 (01-16))


## ENDORSEMENT – RETROACTIVE DATE

This endorsement modifies insurance provided under the following:

   Public Officials and Employment Practices Liability Coverage Form

It is understood and agreed that that **SECTION I - COVERAGE, A. Insuring Agreement,** is deleted and replaced by the following:

## SECTION I - COVERAGE

### A. Insuring Agreement

1. We will pay those sums that the **insured** becomes legally obligated to pay as **damages** because of a **wrongful act** (regardless of whether or not such allegations prove to be groundless, false or fraudulent) arising out of the discharge of duties by or on behalf of the Named Insured as shown in the Declarations provided always that:

   a. The **claim** on account of such **wrongful act** is first made against the **insured** and reported to us during the policy period, in compliance with SECTION VII - CONDITIONS - Item A., or any applicable reporting period under SECTION VI – EXTENDED REPORTING PERIODS;

   b. Such **wrongful act** took place in the **policy territory**; and

   c. As of the inception date of this policy, no Insured had any knowledge of any circumstance likely to result in or give rise to a **claim** nor could

1067352\321178653.v1

have reasonably foreseen that a **claim** might be made; and

d.  Such **wrongful act** was first committed by the Insured on or after
<u>10/26/2009</u> and prior to the end of the policy period.

For purposes of paragraph 1a. of SECTION I - COVERAGE A. Insuring
Agreement, if, during the policy period or any applicable reporting period under
SECTION VI - EXTENDED REPORTING PERIODS, the Insured gives
written notice to us, in accordance with SECTION VII - CONDITIONS - Item
A., of a **wrongful act** likely to result in a **claim** then any **claim** subsequently
made against an insured arising out of such **wrongful act** shall be deemed to
have been made during the policy period or any applicable reporting period
hereunder.

All other terms and conditions of this Policy remain unchanged.

(Form QBPO-2014 (01-16))

## ENDORSEMENT – SELF-INSURED RETENTION

This endorsement modifies insurance provided under the following:

Public Officials and Employment Practices Liability Coverage Form

In consideration of the premium charged, it is understood and agreed that **SECTION I
– COVERAGE, B. Supplementary Payments,** paragraph 1. is deleted in its entirety
and replaced with the following:

**B. Supplementary Payments**

1.  We have the right and duty to defend the **insured(s)** against a **claim** covered by
this policy even if any of the allegations of the **claim** are groundless, false or
fraudulent.

Self-Insured Retention Provision.

Until the **insured** has paid either **damages** or **claim expenses** that equal the Self-
Insured Retention, the **insured** has the right to appoint defense counsel, subject to
our written consent and approval, to defend a covered **claim** even if any of the
allegations of the **claim** are groundless, false or fraudulent. Such counsel will be
paid at our agreed hourly rates. Upon Insured's payments for either **damages** or
**claim expenses** that equal the Self-Insured Retention, we then have the right to
appoint counsel of our choice for the defense of any such **claim.**

When the **insured** has exercised its right to appoint counsel, the **insured** or counsel
will provide us with status reports and other relevant information about the **claim**
as requested by us**.** In addition, the **insured** will provide a quarterly bordereaux, or

30

loss run, listing all **claims**, whether previously reported to us or not, along with the claimant name, date of loss, date of report, loss description, and current amounts paid and reserved for both defense and settlement.

It is further agreed and understood that, wherever the word "deductible" is used in this policy the words "Self-Insured Retention" are substituted.

All other terms and conditions of this policy remain unchanged.

(Form QBPO-2023 (04-16))

## ENDORSEMENT – NON-MONETARY SUPPLEMENTAL DEFENSE COSTS

This endorsement modifies insurance provided under the following:

Public Officials and Employment Practices Liability Coverage Form

It is understood that paragraph 13 of **SECTION II - EXCLUSIONS** is deleted in its entirety and replaced with the following:

## SECTION II - EXCLUSIONS

This policy does not apply to:

**13.     Non-monetary Damages, Fines or Penalties**

Any **claim** or **suit** seeking equitable relief or redress in any form other than money or for costs, charges, fees or expense in relation to any **claim** or **suit** seeking relief or redress in any form other than money, or for the costs of the Insured's compliance with the condition of any injunctive or equitable relief, or for any fines or penalties assessed from the failure to comply with any injunctive relief.

However, with respect to any **claim** or **suit** arising out of a **wrongful employment practice**, we agree to pay any **claims expenses** in regard to **claim**s or **suits** seeking relief or redress in any form other than monetary damages. We will also pay up to $100,000 in the annual aggregate for **claims expenses** in regard to **claims** or **suits** arising from **wrongful acts**, other than a **wrongful employment practice**, seeking relief or redress in any form other than monetary damages. We shall have the right, but not the duty, to investigate, or participate in the defense of, or defend any such **claim** or **suit**. We shall only be liable to pay **claims expenses** in excess of the deductible amount shown in the declarations and included within and up to the limit of liability shown in the Declarations. We shall have no obligation to pay any salary expense of an Insured.

All other terms and conditions of this policy remain unchanged.

1067352\321178653.v1

(Form QBPO-2026 (01-16)).

**LEL Policies**

73.     For the LEL Policies, coverage is triggered by a "wrongful act" during the policy period, where "wrongful act" means an actual or alleged error or omission, negligent act, neglect or breach of duty by an insured while conducting law enforcement activities, which result in personal injury, or bodily injury, or property damage, caused by an occurrence. The LEL Policies span six consecutive policy periods, with the first such policy period incepting on October 26, 2016 and the last such policy period ending on November 1, 2022.  Each LEL Policy is subject to a limit of liability of $5 million per occurrence and in the aggregate.  Each LEL Policy is subject to a $500,000 Self-Insured Retention ("SIR") applicable to each occurrence except for the 2021-2022 LEL Policy which is subject to a $1,000,000 SIR, applicable to each occurrence,

74.     Each LEL Policy contains the following relevant provisions:

**SECTION I – COVERAGE**

**A. Insuring Agreement**

The Company will pay on behalf of the **insured(s)** all **damages** resulting from a **wrongful act(s)** which arise out of the law enforcement activities. The **wrongful act(s)** must occur during the policy period and within the **policy territory**.

**B. Defense And Supplementary Payments**

~~1. The Company shall have the right and duty to defend any **claim** or **suit** against any **insured** even if the allegations of the **claim** or **suit** are groundless, false or fraudulent, and may make such investigation of any **claim** or **suit** at its discretion. * * *~~[5]

1. The **Company** has the right and duty to defend the **insured(s)** against a **claim** covered by this policy even if any of the allegations of the **claim** are groundless, false or fraudulent.

---

[5] Par. B.1 on Policy Form No. QBLE-1001 (01-16) was deleted and replaced by Endorsement #5 as shown below the stricken-out text from the policy form.

Self-Insured Retention Provision.

Until the **insured** has paid either **damages** or **claim expenses** that equal the Self-Insured Retention, the **insured** has the right to appoint defense counsel, subject to the **Company's** written consent and approval, to defend a **claim** even if any of the allegations of the **claim** are groundless, false or fraudulent. Such counsel will be paid at the **Company's** agreed hourly rates. Upon Insured's payments for either **damages** or **claim expenses** that equal the Self-Insured Retention, the **Company** then has the right to appoint counsel of its choice for the defense of any such **claim.**

When the **insured** has exercised its right to appoint counsel, the **insured** or counsel will provide the **Company** with status reports and other relevant information about the **claim** as requested by the **Company.** In addition, the **insured** will provide a quarterly bordereaux, or loss run, listing all **claims**, whether previously reported to us or not, along with the claimant name, date of loss, date of report, loss description, and current amounts paid and reserved for both defense and settlement.

It is further agreed and understood that, wherever the word "deductible" is used in this policy the words "Self-Insured Retention" are substituted.

2. No **insured**, except at its own cost and for its own account, shall, without written consent of the Company, make any payment, admit any liability, settle any **claim** or **suit**, assume any obligation, or incur any expense.

\* \* \*

4. The Company will pay in addition to the applicable Limit of Liability:

a. all **claim expenses** incurred by the Company, all costs taxed against the **insured** in any **claim** or **suit** defended by the Company, and any interest on the entire amount of any judgment therein which does not exceed the limit of the Company's liability. **Claim expenses** as used do not include salaries of officers or employees of the Company or the public entity;

## SECTION II - EXCLUSIONS

This policy does not apply and the Company has no obligation to defend any **claim** or **suit**:

## 3. Criminal Acts

For **damages** arising out of the willful violation of a penal statute or ordinance committed by or with the knowledge or consent of the **insured**, or **claims** of

33

1067352\321178653.v1

injury arising out of acts of fraud committed by or at the direction of any **insured** with affirmative dishonesty or actual intent to deceive or defraud.

**8.  Non-Monetary Damages**

For any **claims** or **suits** or demands seeking relief or redress in any form other than money **damages**, nor shall the Company have any obligation to indemnify an **insured** for any costs, fees or expenses which the insured shall become obligated to pay as a result of an adverse judgment for injunctive or declaratory relief; however, the Company will afford defense to an **insured** for such actions, **claims**, **suits** or demands, if not otherwise excluded, where compensatory **damages** are requested.

## SECTION III - DEFINITIONS

**6.  Insured** – means the **named insured**, all full or part-time employees, all auxiliary or volunteer law enforcement officers of the **named insured**, and the public entity of which the law enforcement agency is a part including the elected and appointed officials for their law enforcement related acts. The insurance afforded applies separately to each **insured** against whom a **claim** is made or a **suit** is brought, except with respect to the limits of the Company's liability.

**5.  Damages** – means any monetary amount which the **insured** is legally obligated to pay as a result of a **claim** or a **suit** for a **wrongful act** covered by this policy and shall include, but not be limited to judgments and settlements, but damages shall not include fines imposed by law, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

**13. Wrongful Act** – means an actual or alleged error or omission, negligent act, neglect or breach of duty by an **insured** while conducting law enforcement activities, which result in:
a. **personal injury**, or
b. **bodily injury**, or
c. **property damage**, caused by an **occurrence**.

**9.  Personal Injury** – means:
a.  assault and/or battery;
b.  false arrest, detention or imprisonment, or malicious prosecution;
c.  false or improper service of process;
d.  humiliation or mental distress;
e.  the publication or utterance of libel or slander or other defamatory or disparaging material, or a publication or utterance in violation of an individual's right to privacy; except publications or utterances in the

course of or related to advertising, broadcasting or telecasting by or on behalf of the **named insured**;

f.  violation of civil rights or discrimination protected under 42 USC 1981 et sequentia or State Law;

g.  wrongful entry, eviction or other invasion of the right of public occupancy; if such offense occurs during the policy period.

8.  **Occurrence** – means an event, including continuous or repeated exposure to substantially the same generally harmful conditions. All **claims** arising out of the following events constitute one **occurrence**:

a.  a riot or insurrection;

b.  a civil disturbance resulting in an official proclamation of state of emergency;

c.  a temporary curfew; or

d.  martial law.

11. **Property Damage** – means:

a.  physical injury to or destruction of tangible property, including loss of use thereof at any time resulting there from; or

b.  loss of use of tangible property which has not been physically injured or destroyed.


## SECTION IV - CONDITIONS

2.  **Agreement and Severability.**

It is agreed that the particulars and information contained in the written application, a copy of which is attached, and the Declarations are the basis of this policy and are to be considered as incorporated in and constituting a part of the policy. As respects the particulars and information contained in the written application and the policy provisions set forth herein, this policy shall be constituted as a separate agreement with each **insured**. Nothing in this paragraph shall be construed to increase the Limit of Liability of the Company as set forth in this policy.

4.  **Insureds Duties in the event of an occurrence, claim, or suit.**

a.  In the event of an **occurrence**, written notice containing particulars sufficient to identify any **insured** and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the **insured** to the Company or any of its authorized agents as soon as practicable.

35

b. If **claim** is made or **suit** is brought against any **insured**, such **insured** shall immediately forward to the Company every demand, notice, summons or other process received by the **insured** or the **insured's** representatives.

c. The **insured** shall cooperate with the Company and upon the Company's request, submit to examination and interrogation by a representative of the Company, under oath if necessary, and attend hearings, depositions and trails, and shall assist in the effective settlement, and the securing and giving of a written statement or statements to the Company representatives and defense counsel. In the event of a **claim** occurring which is likely to involve the Company hereunder, the **insured** shall not make any payment, assume any liability, or incur any expense without the consent of the Company first being obtained. The Company shall conduct in the name of the **insured** the defense of any **claim** for **damages**, or otherwise against any third party, and shall have full discretion in the handling of such **claim** or **suit**, and the **insured** shall give full information and assistance as the Company may reasonably require.

**10. Deductible.**

The Deductible amount, if any, stated in the Declarations is applicable to each **occurrence** and shall be subtracted from the total amount of money damages and **claims expenses** including (1) payments for **damages** and (2) investigation, adjustment, defense and/or appeal expenses, whether or not payment is made for **damages**, resulting from each **occurrence** and the Company shall be liable only for the difference between such Deductible amount and the amount of insurance otherwise applicable to such **claim**.

**12. Declarations.**

By acceptance of this policy, the **named insured** agrees that the information in the application is his agreement and representation, that this policy is issued in reliance upon the truth, accuracy and completeness of such representations, and that this policy embodies all agreements existing between himself and the Company or any of its agents relating to insurance.

## INSURANCE APPLICATIONS FOR LEL POLICIES

75.     QBE required the City to submit a written insurance application as a condition of issuing each LEL Policy.  To induce QBE to issue the LEL Policies, the City submitted a written application in advance of the issuance of each such policy.  True and correct copies of the City's applications for the LEL Policies are attached as **Exhibits H-1** (2016-2017 LEL Policy), **H-2**

(2017-2018 LEL Policy), **H-3** (2018-2019 LEL Policy), **H-4** (2019-2020 LEL Policy), **H-5** (2020-2021 LEL Policy) and **H-6** (2021-2022 LEL Policy).

76.     Just above the line for the Applicant's Authorized Signature, each application states: "The applicant does hereby agree that this policy, if issued, is issued in reliance upon the truth of this application, including all requested attachments, which will be incorporated into and made a part of this policy."

77.     Pursuant to the terms of each LEL Policy, the applications for each policy "are to be considered as incorporated in and constituting a part of the policy."  Likewise, each Law Enforcement Liability Application states on the first page at the top, in boldface type: "This application will be attached to and become a part of the policy."

**COMMUNICATIONS WITH QBE**
**REGARDING THE UNDERLYING LAWSUITS**

78.     QBE was first notified of the Fuller I Lawsuit on October 26, 2018 when it received the Initial Report of USIS, Inc. ("USIS"), a third-party administrator providing claims management services for the City.  The Initial Report of USIS (**Exhibit I**) summarized the allegations in the Fuller I Lawsuit, stated that the claim was first received by the City on October 18, 2018 and identified the relevant insurance policy as QBE Policy No. QPO01103-01. Policy No. QPO01103-01 is the POL Policy that applies to claims first made during the policy period of October 26, 2017 to October 26, 2018 ("2017-2018 POL Policy").  The Initial Report of USIS did not reference any other insurance policies.

79.     QBE acknowledged the claim on October 30, 2018 by and through third-party administrator Summit Risk Services, which wrote: "Unless we hear from you to the contrary we will assume that coverage is being tendered to the Company only under the referenced Policy and is being tendered on behalf of only those to whom our coverage letter is addressed." (**Exhibit J**)

37

80.    On December 28, 2018, QBE formally offered to provide a defense subject to a complete reservation of rights, under the 2017-2018 POL Policy.  The reservation of rights letter, sent by Summit Risk Services, stated:

> *No other insurance policies were considered. If you assert a right to coverage under another policy issued by QBE Specialty Insurance Company or any QBE North America member company, please submit notice pursuant to the notice provisions contained in that policy.*
> *…*
>
> *We are evaluating a tender for insurance coverage to the Company on behalf of the individual and or entity to whom this letter is addressed. Unless we hear from you to the contrary we will assume that coverage is being tendered to the Company only under the referenced Policy and is being tendered on behalf of only those to whom our coverage letter is addressed."*

(12/28/2018 ROR Letter, **Exhibit K**).

81.    QBE was first notified of the Mad Room Lawsuit on October 22, 2021 via email from USIS.  The email enclosed the Mad Room complaint, which it described as setting forth "Public Officials claims" and instructed that they "should be handled as companion claims" to the Fuller I Lawsuit.  (10/22/2021 email from USIS, **Exhibit L**).

82.    On December 15, 2021, QBE formally offered to provide a defense to the City in the Mad Room Lawsuit subject to a complete reservation of rights, also under the 2017-2018 POL Policy.  The reservation of rights letter, sent by Summit Risk Services (**Exhibit M**) once again emphasized that the defense was being offered only under the 2017-2018 POL Policy:

> *No other insurance policies were considered. If you assert a right to coverage under another policy issued by QBE Specialty Insurance Company or any QBE North America member company, please submit notice pursuant to the notice provisions contained in that policy.*
> *…*
>
> *We are evaluating a tender for insurance coverage to the Company on behalf of the individual and or entity to whom this letter is addressed. Unless we hear from you to the contrary, we will assume that coverage is being tendered to the Company*

1067352\321178653.v1

> only under the above referenced Policies and is being tendered on behalf of only
> those to whom our coverage letter is addressed.

(12/15/2021 ROR Letter, **Exhibit M**). The letter explained why QBE was providing a defense in

the Mad Room Lawsuit under the 2017-2018 POL Policy when that suit was filed years after that

policy expired, on December 30, 2021. This was because all the POL Policies defined "Claim"

such that "[m]ore than one **claim** brought by persons or entities arising out of the same **wrongful**

**act** or a series of acts all related to a single **wrongful act** shall be treated as a single **claim** and

shall be deemed to have been made at the time that the first **claim** is made against any Insured."

The letter further explained:

> The allegations in the Fuller and Mad Room Lawsuits are based on the same set of
> circumstances, which over time have evolved from a personal dispute between Bill,
> Martin and Carollo where they relied on their professional positions as real estate
> owners and the Commissioner of the City of Miami, to a larger scale dispute
> causing greater interference to Bill and Martin's businesses. In the Fuller Lawsuit
> Plaintiffs allege Carollo orchestrated and put into effect a plan to harass Bill and
> Martin by conducting illegal searches and raids of their business, and illegally
> implementing certain City Ordinances with the sole intent of damaging Bill's and
> Martin's real estate enterprise. In the Mad Room Lawsuit Plaintiffs allege the same
> plan, specifically developed by the Commissioner of the City of Miami (Carollo),
> is being carried out through the various layers of the City of Miami government
> with the sole purpose of putting Bill and Martin out of business.
>
> Because both lawsuits seek damages based on the same alleged plan developed by
> Carollo in his role as the Commissioner of the City of Miami, to manipulate city
> codes and ordinances in order to damage Bill and Martin's business, the lawsuits
> arise out of a series of acts all related to the same wrongful conduct, thereby
> constituting a single claim first made during the 2017 Policy. As such, the Fuller
> and Mad Room Lawsuits are subject to one deductible and one per wrongful act
> limit of liability.

83.     On January 4, 2024, QBE's claims administrator wired to the City payment of

$4,512,383.78 as reimbursement for claim expenses (legal defense costs) incurred in the Fuller I

and Mad Room Lawsuits.  This payment exhausted the remaining amount of the $5 million limit

of the 2017-2018 POL Policy.

1067352\321178653.v1

## COUNT I - DECLARATORY JUDGMENT
## <u>NO DUTY TO DEFEND OR INDEMNIFY UNDER POL AND LEL POLICIES</u>
### (No Coverage for Intentional Harm)

84.    Plaintiff QBE incorporates by reference and restates Paragraphs 1-83 as if fully stated herein.

85.    The Florida Supreme Court has declared that "one should not be able to insure against one's own intentional misconduct." *Ranger Ins. Co. v. Bal Harbour Club, Inc.*, 549 So. 2d 1005, 1007 (Fla. 1989). The reason for this rule is the public policy concern that the insured's conduct may be of "a type that will be encouraged by insurance." *Id.* "Florida courts have long held that the public policy of this state prohibits an insured from being indemnified from a loss resulting from its own true intentional acts." *Griffin Bros. Co. v. Mohammed*, 918 So. 2d 425, 430 (Fla. Dist. Ct. App. 2006), citing *Ranger Ins. Co.*, supra.

86.    The fundamental premise underlying each and every one of the Underlying Lawsuits is that Carollo – through his own actions and by conscripting others to do his bidding –engaged in a years-long campaign of retaliation and harassment with the conscious objective of inflicting harm on the underlying plaintiffs. As alleged in the Fuller I Lawsuit:

- "Carollo put the City on notice of his intentions to selectively target and harass Plaintiffs as retaliation." (Fuller I 2nd Amend. Compl., ¶ 64).

- "Carollo's stated intention is to drive Plaintiffs out of business even if he has to destroy the life savings and work of the businesses who rent from Plaintiffs." (*Id.*, p. 3).

- "Carollo knows that such retaliation for exercising one's right to free speech is not only morally wrong but also illegal . . . ." (*Id.*, p. 3).

- "Carollo's conduct was reprehensible in that it was repeatedly violating the Miami City Charter's rules designed to prohibit this type of behavior, designed to preclude commissioners from threatening City employees to get them to carry out the commissioners' personal vendettas." (*Id.*, ¶ 318).

1067352\321178653.v1

87.     The Fuller II Lawsuit Second Amended Complaint also alleged that Carollo, the City and the other defendants therein intentionally and maliciously sought to inflict harm upon the Fuller II Plaintiffs, as set forth in Paragraphs 67 and 68 above and Exhibit F to this Complaint.

88.     None of the Underlying Lawsuits allege negligence as an alternate basis of liability. They are all predicated solely upon allegations of deliberate, willful conduct that was intended to deprive plaintiffs of their property and harm plaintiffs' reputations to punish and retaliate against plaintiffs for their support of Carollo's political opponent.

89.     Because the conduct alleged in the Underlying Lawsuits is of the type that is uninsurable as a matter of public policy in Florida, there is no potential for coverage under the POL Policies or the LEL Policies.  As such, QBE has no duty to defend the City or any of those individual defendants in the Underlying Lawsuits and consequently there is no duty to indemnify them in the Underlying Lawsuits.

90.     An actual, present, and justiciable controversy exists between QBE and one or more of the Defendants that warrants the entry of declaratory judgment on Count I.

### COUNT II - DECLARATORY JUDGMENT
### NO DUTY TO DEFEND OR INDEMNIFY UNDER LEL POLICIES
#### (No "Law Enforcement Activities" Within Scope of Coverage Grant)

91.     Plaintiff QBE incorporates by reference and restates Paragraphs 1-83 as if fully stated herein.

92.     Each LEL Policy provides coverage only with respect to acts, errors, omissions, neglect or breach of duty by an insured "while conducting law enforcement activities."  See LEL Policy Section III, Definitions, Definition 13 – Wrongful Act.

93.     Section IV. – Condition No. 2 of each LEL Policy provides, in pertinent part, that "the particulars and information contained in the written application . . . are the basis of this policy and are to be considered as incorporated in and constituting a part of the policy."

94.     Section IV. – Condition No. 12 of each LEL Policy provides, in pertinent part, that "the named insured agrees that the information in the application is his agreement and representation" and that "this policy is issued in reliance upon the truth, accuracy and completeness of such representations."

95.     Each LEL Policy Application states on the first page at the top, in boldface type: "This application will be attached to and become a part of the policy."

96.     Just above the line for the Applicant's Authorized Signature, each LEL Policy Application states: "The applicant does hereby agree that this policy, if issued, is issued in reliance upon the truth of this application, including all requested attachments, which will be incorporated into and made a part of this policy."

97.     Each insurance application for an LEL Policy contains a section ("Section VII") with a table requiring the City to identify the "Positions To Be Insured" by designating the number of individuals holding each such position.

98.     The table in Section VII has a list of potential "Positions To Be Insured" which includes, for example, "*Full-time armed* officers with arrest authority (non-ranking)"; "Other ranking officers (Captains, Lieutenants, Sergeants)"; "*armed part-time*, auxiliary, or reserve officers"; "*unarmed* part-time, auxiliary, or reserve officers"; and "District Attorney Investigators."  The table also contains a box labeled, "Other (describe):" in which the applicant must identify any "Other" position to be insured and disclose the number of employees holding such "other" position to be insured.

1067352\321178653.v1

99.     In each of the LEL Policy applications, the City disclosed the number of employees holding each Position To Be Insured, with one exception: in each and every LEL Policy application the box labeled, "Other (describe):" was left blank, both with respect to the position itself and the number of individuals holding such "other" position. See **Exhibits H-1**, **H-2**, **H-3**, **H-4**, **H-5** and **H-6**.

100.     The Underlying Lawsuits fail to allege that any of the defendants therein committed acts, errors, omissions, neglect or breach of duty "while conducting law enforcement activities." On the contrary, the Underlying Lawsuits allege that defendants misused their positions, acting outside their scope of employment, to wage a campaign of harassment, retribution and retaliation designed to ruin plaintiffs' businesses and reputations.

101.     Illustrative of plaintiffs' theory of liability is the following excerpt from the operative pleading in the Fuller I Lawsuit:

> For eighteen months, Miami City Commissioner Joe Carollo has obliterated these fundamental rights by using the power and influence of his government office to engage in a campaign of harassment, retribution and retaliation against Plaintiffs. Carollo's actions, designed to destroy Plaintiffs' businesses and reputations, is pure political ***payback***—targeting Plaintiffs simply because they dared to support Carollo's opponent in a run-off election, and because they filed an Ethics Complaint against Carollo.

(Fuller I 2d Amend. Compl., Intro., p. 1).

102.     There is no potential for coverage under any LEL Policy because the Underlying Lawsuits fail to allege that defendants are liable for committing wrongful acts "while conducting law enforcement activities."  QBE therefore has no duty to defend, and consequently no duty to indemnify, under any of the LEL Policies.

103.     An actual, present, and justiciable controversy exists between QBE and one or more of the Defendants that warrants the entry of declaratory judgment on Count II.

43

### COUNT III - DECLARATORY JUDGMENT
### NO DUTY TO DEFEND OR INDEMNIFY UNDER LEL POLICIES
### (Positions to be Insured Under LEL Policy Applications)

104.    Plaintiff QBE incorporates by reference and restates Paragraphs 1-83 as if fully stated herein.

105.    Section IV. – Condition No. 2 of each LEL Policy provides, in pertinent part, that "the particulars and information contained in the written application . . . are the basis of this policy and are to be considered as incorporated in and constituting a part of the policy."

106.    Section IV. – Condition No. 12 of each LEL Policy provides, in pertinent part, that "the named insured agrees that the information in the application is his agreement and representation" and that "this policy is issued in reliance upon the truth, accuracy and completeness of such representations."

107.    Each LEL Policy Application states on the first page at the top, in boldface type: "This application will be attached to and become a part of the policy."

108.    Just above the line for the Applicant's Authorized Signature, each LEL Policy Application states: "The applicant does hereby agree that this policy, if issued, is issued in reliance upon the truth of this application, including all requested attachments, which will be incorporated into and made a part of this policy."

109.    Under Florida law, the insurance application and the policy together constitute the insurance contract.  *Extreme Emergency Fire & Water Rest. LLC v. Certain Underwriters at Lloyd's of London*, 314 So. 3d 559, 561 (Fla. 3d DCA 2020) (citing § 627.419(1), Fla. Stat.); *Mathews v. Ranger Ins. Co.*, 281 So. 2d 345, 348 (Fla. 1973).

44

110.     Each insurance application for an LEL Policy contains a section ("Section VII") with a table requiring the City to identify the "Positions To Be Insured" by designating the number of individuals holding each such position.

111.     The table in Section VII has a list of potential "Positions To Be Insured" which includes, for example, "*Full-time armed* officers with arrest authority (non-ranking)"; "Other ranking officers (Captains, Lieutenants, Sergeants)"; "*armed part-time*, auxiliary, or reserve officers"; "*unarmed* part-time, auxiliary, or reserve officers"; and "District Attorney Investigators."  The table also contains a box labeled, "Other (describe):" in which the applicant must identify any "Other" position to be insured and disclose the number of employees holding such "other" position to be insured.

112.     In each of the LEL Policy applications, the City disclosed the number of employees holding each Position To Be Insured, with one exception: in each and every LEL Policy application the box labeled, "Other (describe):" was left blank, both with respect to the position itself and the number of individuals holding such "other" position. See **Exhibits H-1**, **H-2**, **H-3**, **H-4**, **H-5** and **H-6**.

113.     None of the applications for LEL Policies disclose City Commissioner, City Manager, City Attorney, Assistant City Attorney, Building Director, Zoning Director, Staffer for City Commissioner, Assistant Director of Building, Assistant Fire Chief, Fire Marshal, Senior Chief of the Unsafe Structures Department, or Code Enforcement Board member, as a "Position To Be Insured."  See **Exhibits H-1**, **H-2**, **H-3**, **H-4**, **H-5** and **H-6**.

114.     None of the individual defendants (natural persons) in the Underlying Lawsuits hold any of the "Positions to be Insured" that are listed on the applications for the LEL Policies.

115.   Joe Carollo, a defendant in the Fuller I Lawsuit, Fuller II Lawsuit and Fuller III Lawsuit, is and was the City Commissioner for District 3 of the City of Miami.  None of the applications for the LEL Policies disclose Joe Carollo by name or position.  Accordingly, the LEL Policies do not provide (or potentially provide) coverage for damages resulting from the wrongful acts of Joe Carollo.

116.   Arthur Noriega, a defendant in the Fuller II Lawsuit, is and was City Manager for the City of Miami.  None of the applications for the LEL Policies disclose Arthur Noriega by name or position.  Accordingly, the LEL Policies do not provide (or potentially provide) coverage for damages resulting from the wrongful acts of Arthur Noriega.

117.   Victoria Mendez, a defendant in the Fuller II Lawsuit, is and was the City Attorney for the City of Miami.  None of the applications for the LEL Policies disclose Victoria Mendez by name or position.  Accordingly, the LEL Policies do not provide (or potentially provide) coverage for damages resulting from the wrongful acts of Victoria Mendez.

118.   Rachel Dooley, a defendant in the Fuller II Lawsuit, is and was the Assistant City Attorney for the City of Miami.  None of the applications for the LEL Policies disclose Rachel Dooley by name or position.  Accordingly, the LEL Policies do not provide (or potentially provide) coverage for damages resulting from the wrongful acts of Rachel Dooley.

119.   Asael Marrero, a defendant in the Fuller III Lawsuit, is and was the Building Director for the City of Miami. None of the applications for the LEL Policies disclose Asael Marrero by name or position.  Accordingly, the LEL Policies do not provide (or potentially provide) coverage for damages resulting from the wrongful acts of Asael Marrero.

120.   Daniel S. Goldberg, a defendant in the Fuller II Lawsuit, is and was the Zoning Director for the City of Miami. None of the applications for the LEL Policies disclose Daniel S.

Goldberg by name or position.  Accordingly, the LEL Policies do not provide (or potentially provide) coverage for damages resulting from the wrongful acts of Daniel S. Goldberg.

121.    William Ortiz, a defendant in the Fuller II Lawsuit, is and was a staffer of Joe Carollo. None of the applications for the LEL Policies disclose William Ortiz by name or position. Accordingly, the LEL Policies do not provide (or potentially provide) coverage for damages resulting from the wrongful acts of William Ortiz.

122.    Luis Torres was named as a defendant in the original complaint and amended complaint in the Fuller II Lawsuit but was not included as a defendant in the second amended complaint.  According to the original complaint and amended complaint, he is and was the Assistant Director of Building. None of the applications for the LEL Policies disclose Luis Torres by name or position.  Accordingly, the LEL Policies do not provide (or potentially provide) coverage for damages resulting from the wrongful acts of Luis Torres.

123.    Adrien Plasencia, a defendant in the Fuller II Lawsuit, is and was the Assistant Fire Chief and the Fire Marshal of the City of Miami.  None of the applications for the LEL Policies disclose Adrien Plasencia by name or position.  Accordingly, the LEL Policies do not provide (or potentially provide) coverage for damages resulting from the wrongful acts of Adrien Plasencia.

124.    Rene Diaz, a defendant in the Fuller II Lawsuit, is and was the Senior Chief of the Unsafe Structures Department of the City of Miami.  None of the applications for the LEL Policies disclose Rene Diaz by name or position.  Accordingly, the LEL Policies do not provide (or potentially provide) coverage for damages resulting from the wrongful acts of Rene Diaz.

125.    Yvonne Bayona, a defendant in the Fuller II Lawsuit, is and all relevant times was a member of the City of Miami Code Enforcement Board.  None of the applications for the LEL Policies disclose Yvonne Bayona by name or position.  Accordingly, the LEL Policies do not

47

provide (or potentially provide) coverage for damages resulting from the wrongful acts of Yvonne Bayona.

126.     Because there is no potential for coverage under the LEL Policies for damages resulting from the wrongful acts of the individuals identified in Paragraphs 115 – 125, QBE has no duty to defend any of those individuals and consequently there is no duty to indemnify them in the Underlying Lawsuits.

127.     An actual, present, and justiciable controversy exists between QBE and one or more of the Defendants that warrants the entry of declaratory judgment on Count III.

**COUNT IV - DECLARATORY JUDGMENT**
**<u>NO DUTY TO DEFEND OR INDEMNIFY UNDER POL POLICIES</u>**
**("Related" Claims and Exhaustion of Policy Limit – POL Policies)**

128.     Plaintiff QBE incorporates by reference and restates Paragraphs 1-83 as if fully stated herein.

129.     Each POL Policy provides that "[m]ore than one claim brought by persons or entities arising out of the same wrongful act or a series of acts all related to a single wrongful act shall be treated as a single claim and shall be deemed to have been made at the time that the first claim is made against any Insured."

130.     The claims brought in the Underlying Lawsuits (Fuller I Lawsuit, Mad Room Lawsuit, Tower Lawsuit, Fuller II Lawsuit and Fuller III Lawsuit) all arise out of the same wrongful act or series of acts related to a single wrongful act.  As such, those claims shall be treated as a single claim deemed to have been made at the time that the first claim was made.  The first such claim was made in the Fuller I Lawsuit.

131.     The Fuller I Lawsuit was filed on October 11, 2018 and was first reported to QBE on October 26, 2018.  These events occurred during the policy period of the 2017-2018 POL

48

Policy, Policy No. QPO01103-01, which has a policy period of October 26, 2017 to October 26, 2018. Accordingly, there is no duty to defend under any other POL Policy with respect to the Underlying Lawsuits. Moreover, there can be no duty to indemnify under any POL Policy for which there is no duty to defend.

132.    As alleged in Paragraph 83, the $5 million limit of liability of the 2017-2018 POL Policy has been exhausted by payment of claim expenses.

133.    The 2017-2018 POL Policy provides that QBE's "right and duty to defend end when we have used up the applicable limit of liability in the payment of judgments, settlements, or claims expenses." Accordingly, QBE's duty to defend under the 2018-2018 POL Policy ended when it paid the remaining amount of its $5 million policy limit ($4,512,383.78) on January 4, 2024.

134.    QBE therefore has no duty to defend, and no duty to indemnify, under any of the POL Policies with respect to any of the Underlying Lawsuits.

135.    An actual, present, and justiciable controversy exists between QBE and one or more of the Defendants that warrants the entry of declaratory judgment on Count IV.

### COUNT V - DECLARATORY JUDGMENT
### NO DUTY TO DEFEND OR INDEMNIFY UNDER POL AND LEL POLICIES
(Criminal Acts Exclusions – POL and LEL Policies)

136.    Plaintiff QBE incorporates by reference and restates Paragraphs 1-83 as if fully stated herein.

137.    Each POL Policy contains an exclusion for "Criminal Acts" which are defined as "Any damages *arising out of* any dishonest, fraudulent, criminal or malicious act or omission of any Insured or employee." (Exclusion No. 1) (emphasis added).

138.    Each LEL Policy excludes coverage for "damages *arising out of* the willful

violation of a penal statute or ordinance committed by or with the knowledge or consent of the insured . . . ."  (Exclusion No. 3) (emphasis added).

139.    With respect to those Underlying Lawsuits that seek money damages, all such damages are "arising out of" alleged dishonest, criminal and/or malicious acts or omissions or "willful violation of a penal statute or ordinance."  Specifically, all damages sought by the underlying plaintiffs are alleged to arise out of the alleged dishonest, criminal or malicious acts of Commissioner Carollo.

140.    The Criminal Acts exclusion (Exclusion No. 1) in each POL Policy, and the Criminal Acts exclusion (Exclusion No. 3) in each LEL Policy, preclude any potential for coverage of damages sought in the Underlying Lawsuits.  QBE therefore has no duty to defend, and consequently no duty to indemnify, under any of the POL Policies or LEL Policies with respect to the Underlying Lawsuits seeking money damages (Fuller I, Mad Room and Fuller II Lawsuits).

141.    An actual, present, and justiciable controversy exists between QBE and one or more of the Defendants that warrants the entry of declaratory judgment on Count V.

### COUNT VI - DECLARATORY JUDGMENT
### NO DUTY TO DEFEND OR INDEMNIFY UNDER POL POLICIES
#### (POL Policy Exclusion No. 7)

142.    Plaintiff QBE incorporates by reference and restates Paragraphs 1-83 as if fully stated herein.

143.    Exclusion No. 7 in each POL Policy provides that the policy does not apply to any damages based upon or arising out of emotional distress or mental anguish, or based upon or arising out of injury caused by a wrongful act arising from false arrest, detention or imprisonment, malicious prosecution, publication or utterance of libel, slander, or disparaging material, or utterance in violation of an individual's right of privacy; violation of right of public occupancy;

wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises; violation of property rights; or loss of use of tangible property that is not physically injured.

144.    The Underlying Lawsuits are replete with allegations falling within the scope of Exclusion No. 7.  For example, the operative corrected second amended complaint in the Fuller II Lawsuit alleges that plaintiffs "have suffered through more than five years of emotional distress and mental anguish" (Fuller II 1st Amend. Compl. ¶ 629); Carollo was "repeatedly going on radio shows and maliciously defaming Plaintiffs by falsely stating they were criminals with ties to corrupt South American politicians, mafiosos, leasing to pimps and prostitutes, among other falsehoods" (*id.* ¶ 128); "Defendant Diaz recently instructed their personnel to trespass onto Calle Siete, ignoring not one but two property fences, to search for violations;" "the City refuses to this day to issue any certificates of use for the property, thereby depriving Plaintiffs of the ability to rent the property to generate income, causing losses well in excess of $200,000 in rental income, and preventing Plaintiffs from selling the property for $2.5 million." (*Id.* ¶ 421).

145.    With respect to those Underlying Lawsuits that seek money damages, all such damages are allegedly based upon or arising out of emotional distress or mental anguish; malicious prosecution, publication or utterance of libel, slander, or disparaging material, or utterance in violation of an individual's right of privacy; violation of right of public occupancy; wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises; violation of property rights; or loss of use of tangible property that is not physically injured.

146.    Exclusion No. 7 precludes any potential for coverage of damages sought in the Underlying Lawsuits.  QBE therefore has no duty to defend, and consequently no duty to

indemnify, under any of the POL Policies with respect to the Underlying Lawsuits seeking money damages (Fuller I, Mad Room and Fuller II).

147.     An actual, present, and justiciable controversy exists between QBE and one or more of the Defendants that warrants the entry of declaratory judgment on Count VI.

**COUNT VII – DECLARATORY JUDGMENT**
**NO DUTY TO DEFEND OR INDEMNIFY IN TOWER AND FULLER III LAWSUITS**
**(Equitable and Contractual Claim Exclusions – POL and LEL Policies)**

148.     Plaintiff QBE incorporates by reference and restates Paragraphs 1-83 as if fully stated herein.

149.     The duty to indemnify under each POL Policy and each LEL Policy is limited to indemnification of "damages."  The duty to defend under each POL Policy is limited to suits seeking "damages."  The duty to defend under each LEL Policy is limited to claims demanding money damages and suits claiming monetary damages.

150.     Exclusion No. 13 in each POL Policy provides that the policy does not apply to non-monetary damages, fines or penalties, including any claim or suit seeking equitable or injunctive relief.

151.     Exclusion No. 16 in each POL Policy provides that the policy does not apply to any "damages the Insured is obligated to pay by reason of assumption of liability in a contract or agreement."

152.     Exclusion No. 8 in each LEL Policy provides that the policy does not apply to claims or suits seeking relief or redress in any form other than money damages, and there is no obligation to indemnify for any costs, fees or expenses which the insured shall become obligated to pay as a result of an adverse judgment for injunctive or declaratory relief; however, QBE will afford a defense to an insured for such suits (if not otherwise excluded) where compensatory

52

damages are requested.

153.    Exclusion No. 4 in each LEL Policy provides that the policy does not apply to "liability assumed by the insured under any contract or agreement whether written, oral, or implied except mutual law enforcement assistance agreements between political subdivisions."

154.    The First Amended Complaint in the Fuller III Lawsuit contains one count only, for declaratory judgment.  Specifically, it seeks "a declaration that Joe Carollo has violated the City of Miami's Bill of Rights by having been found by a federal court of willfully violating Plaintiffs' right to free speech, and that Carollo has therefor forfeited is position as a Commissioner for the City of Miami and is hereby removed 'forthwith' - i.e., immediately."  (Ex. G, pp. 6-7). The Fuller III Lawsuit seeks no "damages."

155.    Because the Fuller III Lawsuit seeks no "damages," it falls outside the scope of the Insuring Agreement (Section I.A.) of each POL Policy and falls outside the scope of the Insuring Agreement (Section I.A.) and the Defense and Supplementary Payments section (Section I.B.) of each LEL Policy.  For the same reason, Exclusion No. 13 in each POL Policy and Exclusion No. 8 in each LEL Policy apply to bar coverage.  Consequently, there is no duty to defend and no duty to indemnify in the Fuller III Lawsuit under any POL Policy or LEL Policy.

156.    The third amended complaint in the Tower Lawsuit seeks only equitable or injunctive relief (in Counts VI, VII, VIII, IX, X and XI) and damages for contractual liability (in Counts I, II, III, IV and V).

157.    Because the counts in the Tower Lawsuit seeking equitable or injunctive relief (Counts VI, VII, VIII, IX, X and XI) do not seek "damages," they fall outside the scope of the Insuring Agreement (Section I.A.) of each POL Policy and fall outside the scope of the Insuring Agreement (Section I.A.) and the Defense and Supplementary Payments section (Section I.B.) of

each LEL Policy.  For the same reason, Exclusion No. 13 in each POL Policy and Exclusion No. 8 in each LEL Policy apply to bar coverage.  Consequently, there is no duty to defend and no duty to indemnify under any POL Policy or LEL Policy.

158.    The remaining counts in the Tower Lawsuit (Counts I, II, III, IV and V) seek damages based on contractual liability.  As such, Exclusion No. 16 in each POL Policy and Exclusion No. 4 in each LEL Policy apply to bar coverage.

159.    Because there is no potential for coverage for the Tower Lawsuit or for the Fuller III Lawsuit, QBE has no duty to defend, and consequently no duty to indemnify, under any of the POL Policies or LEL Policies, in those actions.

160.    An actual, present, and justiciable controversy exists between QBE and one or more of the Defendants that warrants the entry of declaratory judgment on Count VII.

**COUNT VIII – DECLARATORY JUDGMENT**
**NO DUTY TO INDEMNIFY UNDER POL AND LEL POLICIES**
**(Penalties or Punitive Awards Exclusions)**

161.    Plaintiff QBE incorporates by reference and restates Paragraphs 1-83 as if fully stated herein.

162.    Each POL Policy excludes "common law, statutory, or regulatory fines or penalties."  (Definition D. – "Damages").

163.    Each LEL Policy excludes "fines imposed by law, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed."  (Definition 5 – "Damages").

164.    Florida public policy and law prohibit insuring awards of punitive or exemplary damages against an active tortfeasor.

165.    The jury in the Fuller I Lawsuit awarded plaintiffs substantial punitive damages

based on Carollo's active misconduct.  Other Underlying Lawsuits that have not yet gone to judgment also seek punitive damages.

166.    To the extent that punitive or exemplary damages or fines or penalties are awarded in any Underlying Lawsuit that goes to final judgment, coverage would be precluded for such damages under POL Policy Definition D, LEL Policy Definition 5 and the public policy of Florida.

167.    To the extent that a final, non-appealable judgment awarding punitive or exemplary damages or fines or penalties is entered against an insured in any Underlying Lawsuit, an actual, present, and justiciable controversy will exist between QBE and one or more of the Defendants regarding this issue would warrant the entry of declaratory judgment on Count VIII.

### COUNT IX - DECLARATORY JUDGMENT
### NO DUTY TO DEFEND OR INDEMNIFY UNDER CERTAIN LEL POLICIES
#### (Known Loss/ Loss in Progress Doctrine)

168.    Plaintiff QBE incorporates by reference and restates Paragraphs 1-83 as if fully stated herein.

169.    In March of 2018, Fuller filed a complaint against Carollo with the Miami-Dade Commission on Ethics and Public Trust.  The ethics complaint included the same allegations that were made subsequently in the Fuller I Lawsuit, which was filed on October 11, 2018.

170.    The ethics complaint alleged a scheme to harass and retaliate against the underlying plaintiffs that Carollo is alleged to have orchestrated.  This scheme became public knowledge no later than October 11, 2018, upon the filing of the Fuller I Lawsuit.

171.    The 2018-2019 LEL Policy incepted on October 26, 2018, sixteen days after Carollo's alleged scheme became public knowledge.

172.    As alleged in the Fuller II Lawsuit, Carollo allegedly continued (and escalated) his campaign of harassment and retaliation over many years after the Fuller I Lawsuit was filed.  This

continuation involved the alleged commission of wrongful acts that were: (i) of substantially the same type as those previously alleged in the Fuller I Lawsuit; and (ii) directed at Fuller and Pinilla and their affiliated business interests as was previously alleged in the Fuller I Lawsuit. As such, the injuries that allegedly continued to occur on or after October 26, 2018 constituted a "known loss" and a "loss in progress" under Florida law.

173.    The known loss doctrine "explicitly forbid(s) insureds from saddling insurers with known losses, as opposed to covering the risk of loss." *Normandy Ins. Co. v. Sorto*, 276 So. 3d 337, 339-40 (Fla. 1st DCA 2018). This doctrine reflects the universal principle that insurance should cover only fortuitous losses and is based in public policy as opposed to the terms and conditions of the insurance contract itself. *Id.* at 340. Specifically, if the insured "knows or has reason to know" when it purchases a policy of liability insurance that there is a "substantial probability that it will suffer a loss, the risk ceases to be contingent and becomes a probable or known loss that will not be covered by the policy." *Interstate Fire & Cas. Co. v. Abernathy*, 93 So. 3d 352, 359 (Fla. 1st DCA 2012).

174.    As of October 26, 2018, the alleged ongoing scheme of retaliation that lies at the heart of all the Underlying Lawsuits was well known to the City and to the individual defendants that are alleged to be involved in it. As of that date, there was a substantial probability that the City would suffer a loss, which in fact it did suffer in the form of paying millions of dollars in legal expenses for Carollo's team of defense attorneys pursuant to the SIR provision in the 2017-18 POL Policy.

175.    Accordingly, the known loss doctrine and/or the loss in progress doctrine preclude a duty to defend (and consequently a duty to indemnify) under each and every LEL Policy incepting on or after October 26, 2018.

176.     An actual, present, and justiciable controversy exists between QBE and one or more of the Defendants that warrants the entry of declaratory judgment on Count IX.

## COUNT X - DECLARATORY JUDGMENT
## NO DUTY TO DEFEND OR INDEMNIFY UNDER LEL POLICIES
### (Trigger of Coverage)

177.     Plaintiff QBE incorporates by reference and restates Paragraphs 1-83 as if fully stated herein.

178.     Coverage under the LEL Policies is triggered, if at all, by a wrongful act during the policy period, where "wrongful act" means an actual or alleged error or omission, negligent act, neglect or breach of duty by an insured while conducting law enforcement activities, which result in personal injury, or bodily injury, or property damage, caused by an occurrence.  Accordingly, each one of the six LEL Policies applies only to wrongful acts committed by an insured during its policy period and does not apply to wrongful acts committed before the policy period incepted or after it expired.

179.     None of the Underlying Lawsuits allege the commission of any "wrongful act" between October 26, 2016 and October 26, 2017.  Accordingly, there is no potential for coverage under the 2016-2017 LEL Policy and QBE has no duty to defend, and consequently no duty to indemnify, under the 2016-2017 LEL Policy.

180.     To the extent that the Underlying Lawsuits allege the commission of "wrongful acts" between October 26, 2017 and November 1, 2022, no LEL Policy has an obligation to indemnify for damages resulting from a wrongful act that was committed either before, or after, the policy period of that particular LEL Policy.

181.     To the extent that a final, non-appealable judgment awarding damages is entered against an insured in any Underlying Lawsuit, an actual, present, and justiciable controversy will

exist between QBE and one or more of the Defendants regarding this issue would warrant the entry of declaratory judgment on Count X.

### COUNT XI - DECLARATORY JUDGMENT
### NO DUTY TO DEFEND OR INDEMNIFY UNDER LEL POLICIES
#### (Self-Insured Retention)

182.    Plaintiff QBE incorporates by reference and restates Paragraphs 1-83 as if fully stated herein.

183.    Each LEL Policy is subject to a $500,000 Self-Insured Retention ("SIR") applicable to each occurrence except for the 2021-2022 LEL Policy which is subject to a $1,000,000 SIR, applicable to each occurrence.

184.    Pursuant to Condition 10 (Section IV.10 – Deductible) and the Self-Insured Retention Endorsement, each LEL Policy provides that the SIR "is applicable to each occurrence" and applies to both "money damages" and "claims expenses."

185.    The LEL Policies define "Occurrence" as "an event, including continuous or repeated exposure to substantially the same generally harmful conditions."  The LEL Policies further provide that all claims arising out of a riot or insurrection, a civil disturbance resulting in an official proclamation of state of emergency, a temporary curfew, or martial law, constitute one occurrence.

186.    None of the Underlying Lawsuits arises out of a riot or insurrection, civil disturbance resulting in an official proclamation of state of emergency, temporary curfew, or martial law.

187.    In addition, the Florida Supreme Court has declared that "'occurrence' is defined by the immediate injury-producing act and not by the underlying tortious omission" under a similarly worded insurance policy.  The Underlying Lawsuits allege a multitude of "immediate

1067352\321178653.v1

injury-producing acts" consisting of the wrongful acts allegedly committed by Carollo and the other individual defendants.

188.    Accordingly, if it is determined that the Underlying Lawsuits involve an "occurrence," each wrongful act committed by each defendant would be subject to a separate SIR. To the extent that a final, non-appealable judgment awarding damages is entered against an insured in any Underlying Lawsuit, an actual, present, and justiciable controversy will exist between QBE and one or more of the Defendants regarding this issue would warrant the entry of declaratory judgment on Count XI.

**COUNT XII - DECLARATORY JUDGMENT**
**<u>NO DUTY INDEMNIFY UNDER LEL POLICIES</u>**
**(Allocation Between Covered and Non-Covered Damages)**

189.    Plaintiff QBE incorporates by reference and restates Paragraphs 1-83 as if fully stated herein.

190.    Under Florida law, the party seeking insurance coverage has a duty to allocate or apportion between covered, and non-covered, damages in any judgment or settlement for which insurance indemnity is sought.  If that party fails to carry its burden of allocation or apportionment, there may be no coverage for any part of such judgment or settlement.  *QBE Specialty Inc. Co. v. Scrap Inc.*, 806 F. App'x 692 (11th Cir. 2020).

191.    The judgment in the Fuller I Lawsuit is allocated only between compensatory damages and punitive damages, with no further allocation or apportionment.  While punitive damages are not insurable, the compensatory damages awarded include substantial sums that are not covered by insurance for other reasons.  This includes, for example, damages resulting from wrongful acts committed outside the period of a particular LEL Policy, damages resulting from

59

wrongful acts committed after loss became known, and damages resulting from wrongful acts that were not committed "while conducting law enforcement activities."

192.    As set forth elsewhere in this Complaint, QBE denies that any of the damages sought by or awarded to plaintiffs in the Underlying Lawsuits are covered by the LEL Policies. However, to the extent that the Court determines that any part of such damages is covered, the parties seeking coverage cannot satisfy their burden to allocate between the covered, and the non-covered, amounts.

193.    To the extent that a final, non-appealable judgment awarding damages is entered against an Insured in any Underlying Lawsuit, an actual, present, and justiciable controversy will exist between QBE and one or more of the Defendants regarding this issue would warrant the entry of declaratory judgment on Count XII.

## COUNT XIII - DECLARATORY JUDGMENT
## NO DUTY TO DEFEND OR INDEMNIFY UNDER POL POLICIES
### (Recoupment of Claim Expense Payments)

194.    Plaintiff QBE incorporates by reference and restates Paragraphs 1-83 as if fully stated herein.

195.    QBE offered to defend the City and Carollo in the Fuller I Lawsuit and in the Mad Room Lawsuit, under full reservations of rights.  See 12/28/2018 ROR Letter (**Exhibit K**); 12/15/2021 ROR Letter (**Exhibit M**); 1/26/2023 ROR Letter (**Exhibit N**) (incorporating by reference 12/15/2021 ROR Letter and 12/28/2018 ROR Letter).  The City and Carollo accepted QBE's offers and accepted QBE's payments of claim expenses (legal defense costs) totaling $5 million.

196.    QBE's reservations of rights included, among other things, reserving QBE's right to seek reimbursement of defense costs paid on behalf of the City and/ or Carollo if information

1067352\321178653.v1

later establishes that the claims against them are not covered under QBE's policy.  See 12/28/2018 ROR Letter (**Exhibit K**); 12/15/2021 ROR Letter (**Exhibit M**).

197.    Under Florida law, an insurer that has reserved the right to seek reimbursement of defense cost payments "is entitled to recover fees and costs once it is determined that the insurer has no duty to defend" if the insured accepts the defense offered under the reservation of rights. *Certain Interested Underwriters at Lloyd's, London v. Halikoytakis*, 556 F. App'x 932, 932-33 (11th Cir. 2014); *Colony Insurance Co. v. G & E Tires & Service, Inc*., 777 So. 2d 1034, 1038-39 (Fla. 1st DCA 2000); *Jim Black & Assocs., Inc. v. Transcontinental Ins. Co*., 932 So. 2d 516, 518 (Fla. 2d DCA 2006).

198.    Because QBE reserved its right to seek reimbursement of defense cost payments on behalf of the City and Carollo in the Fuller I Lawsuit and Mad Room Lawsuit; the insured accepted the defense as offered; and for the reasons set forth above there was no duty to defend, QBE is entitled to recover from the City and Carollo its payments totaling $5 million for the City's and Carollo's legal defense expenses.

199.    An actual, present, and justiciable controversy exists between QBE and one or more of the Defendants that warrants the entry of declaratory judgment on Count XIII.

WHEREFORE, Plaintiff requests that this Court:

a.      Enter judgment in QBE's favor on Counts I through XIII of this Complaint;

b.      Enter judgment in QBE's favor declaring that that QBE has no duty to defend or indemnify in any of the Underlying Lawsuits under any POL Policy or LEL Policy;

c.      Enter judgment for all other and further relief to which QBE may be entitled.

Date: May 13, 2024

_s/ Rory Eric Jurman_

Rory Eric Jurman
Florida Bar No. 194646
rjurman@hinshawlaw.com
vharris@hinshawlaw.com

Jenelle E. La Chuisa
Florida Bar No. 0539988
jlachuisa@hinshawlaw.com
vharris@hinshawlaw.com

Alfred L. Buchanan (PHV app. to be filed)
Illinois Bar (ARDC) No.: 6203889
abuchanan@hinshawlaw.com
sarnold@hinshawlaw.com

HINSHAW & CULBERTSON LLP
201 E. Las Olas Blvd
Suite 1450
Ft. Lauderdale, FL 33301
Telephone: 954-467-7900
Facsimile: 954-467-1024

And

Patricia A. McLean
Fla. Bar No. 129143
Email: patricia.mclean@phelps.com
Erin M. Raschke
Fla. Bar No. 13397
Email: erin.raschke@phelps.com
PHELPS DUNBAR LLP
100 South Ashley Drive, Suite 2000
Tampa, Florida  33602
Telephone:  813 472 7550
Facsimile:  813 472 7570

_Attorneys for Plaintiff QBE Specialty_
_Insurance Company_

62

JS 44 (Rev. 04/21) FLSD Revised 12/02/2022

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a) PLAINTIFFS
QBE Specialty Insurance Company

**DEFENDANTS**
(See attachment)

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*
Dane County, Wisconsin

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Rory Eric Jurman, Esq., Jenelle E. La Chuisa, Esq., Alfred L. Buchanan, Esq.
Hinshaw & Culbertson, LLP, 201 E. Las Olas Blvd., Suite 1450
Fort Lauderdale, FL  33301; (954) 467-7900

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☒ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*
☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)* *(For Diversity Cases Only)* and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Pharmaceutical Personal Injury | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | ☐ 340 Marine / ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excl. Veterans) | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act (TCPA) |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Med. Malpractice | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | **PERSONAL PROPERTY** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | ☐ 370 Other Fraud | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 371 Truth in Lending | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 380 Other Personal Property Damage | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 385 Property Damage Product Liability | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | **CIVIL RIGHTS** / **PRISONER PETITIONS** | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights / **Habeas Corpus:** | | | |
| ☐ 290 All Other Real Property | ☐ 441 Voting / ☐ 463 Alien Detainee | | | |
| | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | | |
| | ☐ 443 Housing/Accommodations / ☐ 530 General | | | |
| | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | ☐ 446 Amer. w/Disabilities - Other / **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | ☐ 550 Civil Rights | | | |
| | ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee – Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed *(See VI below)*
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation Transfer
☐ 7 Appeal to District Judge from Magistrate Judgment
☐ 8 Multidistrict Litigation – Direct File
☐ 9 Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)
*(See instructions):* a) Re-filed Case ☐YES ☒NO   b) Related Cases ☒YES ☐ NO  Fuller and Pinilla vs. QBE Specialty Insurance Co.
JUDGE: Judge K. Michael Moore
DOCKET NUMBER: 1:24-cv-20063

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §2201 and 28 U.S.C. §1332(a)(1). Relief sought to declare the rights and obligations of the parties under the Policies of Insurance.
LENGTH OF TRIAL via **ten(10)** days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
DATE
May 13, 2024
SIGNATURE OF ATTORNEY OF RECORD
/s/ Rory Eric Jurman, Esq.

FOR OFFICE USE ONLY : RECEIPT #          AMOUNT          IFP          JUDGE          MAG JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

I.       (a) **Plaintiffs-Defendants**.  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence**.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys**.  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.      **Jurisdiction**.  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.  Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

III.     **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

IV.      **Nature of Suit**.  Nature of Suit. Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V.       **Origin**.  Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Refiled (3) Attach copy of Order for Dismissal of Previous case. Also complete VI.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

Remanded from Appellate Court. (8) Check this box if remanded from Appellate Court.

VI.      **Related/Refiled Cases**. This section of the JS 44 is used to reference related pending cases or re-filed cases. Insert the docket numbers and the corresponding judges name for such cases.

VII.     **Cause of Action**.  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity**. Example: U.S. Civil Statute: 47 USC 553
                               Brief Description: Unauthorized reception of cable service

VIII.    **Requested in Complaint**.  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**Date and Attorney Signature**.  Date and sign the civil cover sheet.

## ATTACHMENT TO CIVIL COVER SHEET

### DEFENDANTS:

1. City of Miami

2. City of Miami
   Carollo, Joe – Commissioner of the City of Miami

3. City of Miami
   Noriega, Arthur – City Manager

4. City of Miami
   Mendez, Victoria – City Attorney

5. City of Miami
   Dooley, Rachel – Assistant City Attorney

6. City of Miami
   Marrero, Asael – Building Director

7. City of Miami
   Goldberg, Daniel S. – Zoning Director

8. City of Miami
   Ortiz, William – Staffer of Joe Carollo

9. City of Miami
   Torres, Luis – Assistant Director of Building

10. City of Miami
    Plasencia, Adrian - Assistant Fire Chief and the Fire Marshal

11. City of Miami
    Diaz, Rene – Senior Chief of the Unsafe Structures Department

12. City of Miami
    Bayona, Yvonne – Member of Code Enforcement Board

13. Altos Mexicano, LLC d/b/a Taquerias El Mexicano

14. Beastik, LLC

15. Brickell Station, LLC

16. Calle Ocho Marketplace, LLC

17. El Shopping, LLC

18. Fuller, William O.

19. Futurama, LLC

20. La Gran Fiesta, LLC

1

21. LHAB Tres, LLC

22. Little Havana Arts Building, LLC

23. Little Havana Arts Building Too, LLC

24. Little Havana Bungalows, LLC

25. Piedra Villas, LLC

26. El Shopping, LLC

27. Pinilla II, Martin

28. The Barlington Group, LLC

29. The Mad Room LLC d/b/a Ball and Chain

30. Tower Hotel, LLC

31. Viernes Culturales / Cultural Fridays, Inc.

32. Yo Amo Calle Siete, LLC

33. Turros, Denise Galvez