## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CASE NO.: 1:24-cv-21854-KMW

QBE SPECIALTY INSURANCE COMPANY,

       *Plaintiffs*,

  v.

CITY OF MIAMI et al.,

       *Defendants*.

_____/

## ANSWER AND COUNTERCLAIM

Defendants, Barlington Group, LLC; Brickell Station, LLC; Calle Ocho Marketplace, LLC; Denise Galvez Turros; El Shopping, LLC; Futurama, LLC; La Gran Fiesta, LLC; Little Havana Arts Building, LLC; Little Havana Arts Building Too, LLC; Little Havana Bungalows, LLC; LHAB Tres, LLC; Martin Pinilla, II; Piedra Villas, LLC; Viernes Culturales/Cultural Fridays, Inc.; Yo Amo Calle Siete, LLC; Beatstik, LLC; Tower Hotel, LLC, and William O. Fuller, (hereinafter "Defendants"), by its undersigned counsel, answer Plaintiff as follows:

## ANSWER

1.     Admitted.

2.     Admitted in part, denied in part. Defendants admit solely the allegations that the POL Policies are claims-made policies and the LEL Policies are occurrence based. Defendants deny the rest of this allegation.

3.     Admitted in part, denied in part. Defendants admit the allegation that the City is the Named Insured under the LEL and POL Policies. Defendants are without knowledge as to Joe Carollo and "certain other defendants" claims and therefore deny this allegation.

1

4.      Admitted in part, denied in part. Defendants admit that the following related lawsuits have been filed. Defendants deny that Fuller *William O. Fuller and Martin A. Pinilla v. Joe Carollo,* Case No.: 18-cv-24190, (SDFL) ("**Fuller I Lawsuit**") is a pending lawsuit but rather *Fuller I* has reached a final judgment yet is pending appeal.

5.      Admitted.

6.      Admitted in part. Denied in part. Defendants admit that it seeks a declaration that it has no duty to indemnify. The remainder of the allegations in this paragraph sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, the remaining allegations of this paragraph are denied.

7.      Admitted.

8.      Admitted.

## JURISDICTION AND VENUE

9.      Admitted.

10.     Admitted.

11.     Admitted  in part and denied in part. Defendants admit that QBE and the Parties dispute whether QBE has a duty to defend and indemnify; and that the *Fuller I* Plaintiffs seek full policy limits of $5 million under each of five LEL Policies; and that the amount in controversy exceeds the jurisdictional threshold. Defendants are without knowledge of the cost of defense to date and therefore deny this allegation.

12.     Admitted.

13.     Defendants are without knowledge of QBE's compliance with conditions precedent to filing this lawsuit.

## THE PARTIES

14.     Admitted.

15.     Admitted.

16.     Admitted.

17.     Admitted.

18.     Admitted.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     Admitted.

27.     Admitted.

28.     Admitted.

29.     Admitted in Part. Denied in Part. Defendants admit that The Mad Room LLC is a Florida Limited Liability Company. Defendants admit that Mad Room LLC is owned by Charlie Licksterz LLC and BNZ Bar LLC. Defendants deny that Charlie Licksterz's sole member is William O. Fuller. Defendants further deny that Mad Room is a plaintiff in the Fuller II Lawsuit.

30.     Admitted in Part. Denied in Part. Defendants admit that Altos Mexicano d/b/a Taquerias el Mexicano ("Taquerias") is and was a Florida limited liability company with its

principal place of business in Miami-Dade County. Defendants deny that the members of Taquerias are as stated. Taquerias is owned by Benjamin Bush, Zachary Bush, and CL Fiesta, LLC.

31.     Admitted in Part. Denied in Part. Defendants admit that Little Havana Arts Building, LLC ("LHAB") is a Florida Limited Liability Company with its principal place of business in Miami-Dade County. Defendants deny that William O. Fuller is the sole member of LHAB.

32.     Admitted in Part. Denied in Part. Defendants admit that La Gran Fiesta ("Fiesta") is a Florida Limited Liability Company with its principal place of business in Miami-Dade County. Defendants deny that William O. Fuller and BNZ Fiesta, LLC is the sole member of LHAB.

33.     Defendants admit that Tower Hotel LLC ("Tower Hotel") is a Florida Limited Liability Company with its principal place of business in Miami-Dade County. Defendants admit that Tower Hotel is owned by Fuller and Pinilla, personally or in trust.

34.     Admitted in part. Denied in part. Defendants admit that Piedra Villas, LLC, is a Florida Limited Liability Company with its principal place of business in Miami-Dade, Florida. Defendants deny that Miriam M. Fuller is the only member of Piedra Villas, which is also owned by Defendant Fuller.

35.     Admitted in part. Denied in part. Defendants admit that Beatstik, LLC, is a Florida Limited Liability Company with its principal place of business in Miami-Dade, Florida; and that it is owned by Defendants Fuller and Pinilla, personally or in trust. Defendants deny that Benjamin Bush is a member of Beatstik.

36.     Admitted in part. Denied in Part. Defendants deny this allegation to the extent that it omits other investors who are members of  El Shopping, LLC. Defendants admit the rest of the allegations in this Paragraph.

37.     Admitted. Defendants further state that Yo Amo Calle Siete, LLC, is a Plaintiff in Fuller II, a Florida limited liability company with its principal place of business in Miami Dade County. Further, its members are William O. Fuller and Martin Pinilla, who own it personally or in trust.

38.     Admitted. Brickell Station, LLC, is a Florida limited liability company with its principal place of business in Miami Dade County. Brickell Station is owned by William O. Fuller and Martin Pinilla, personally or in trust.

39.     Admitted. Calle Ocho Marketplace, LLC ("Calle Ocho"), is a Florida limited liability company with its principal place of business in Miami Dade County. Calle Ocho is owned by William O. Fuller and Martin Pinilla, personally or in trust.

40.     Admitted. Futurama, LLC ("Futurama"), is a Florida limited liability company with its principal place of business in Miami Dade County. Calle Ocho is owned by William O. Fuller and Martin Pinilla, personally or in trust.

41.     Admitted in part. Denied in Part. LHAB Tres, LLC ("LHAB Tres"), is a Florida limited liability company with its principal place of business in Miami Dade County. Defendants deny that William O. Fuller is the sole member of LHAB Tres.

42.     Admitted in part. Denied in part. Admitted that LHAB Too is a Florida Limited Liability Company with its principal place of business in Miami-Dade County. Defendants deny that LHAB too is solely owned by William O. Fuller.

43.     Admitted. Defendants admit that Little Havana Bungalows, LLC ("Bungalows") is a Florida Limited Liability company with its principal place of business in Miami-Dade County. Defendants further admit that Bungalows is owned by Fuller, personally or in trust.

44.     Admitted.

45.     Admitted.

46.     Admitted.

## UNDERLYING LAWSUITS

### Fuller I Lawsuit

47.     Admitted.

48.     Plaintiffs' Second Amended Complaint [Fuller I DE 125] speaks for itself. Denied as to all other respects.

49.     Plaintiffs' Second Amended Complaint [Fuller I DE 125] speaks for itself. Denied as to all other respects.

50.     Admitted in part. Denied in part. Defendants admit that Plaintiffs sought monetary damages for emotional distress, punitive damages, attorneys' fees, and a permanent injunction. Defendants deny that the Fuller I Plaintiffs sought monetary damages for business disruption. *See Fuller I*, DE 559 at 6-15 (May 8, 2023 Trial Tr.); *see also id*. DE 99 at 6-7 (Court Order).

51.     Admitted.

52.     Admitted.

53.     Admitted.

54.     Admitted.

55.     Admitted.

56.     Admitted.

57.     Plaintiffs' Motion to Clarify [Fuller I DE 504] and Hon. Judge Smith's Order speak for themselves [Fuller I DE 618]. Denied as to all other respects.

58.     Admitted.

**Mad Room Lawsuit**

59.     The Mad Room operative complaint [Mad Room  DE 212] speaks for itself. Denied as to all other respects.

60.     The Mad Room operative complaint [Mad Room  DE 212] speaks for itself. Denied as to all other respects.

61.     The Mad Room operative complaint [Mad Room  DE 212] speaks for itself. Denied as to all other respects.

62.     Admitted.

**Tower Lawsuit**

63.     The Tower Hotel Third Amended Complaint [Tower DE 132] speaks for itself. Denied as to all other respects.

64.     The Tower Hotel Third Amended Complaint [Tower DE 132] speaks for itself. Denied as to all other respects.

65.     The Tower Hotel Third Amended Complaint [Tower DE 132] speaks for itself. Denied as to all other respects.

**Fuller II Lawsuit**

66.     Admitted.

67.     Admitted in part, denied in part. Defendants admit that the Fuller II Complaint notes Hon. Judge Smith's opinion upholding the damages; that Fuller II plaintiffs seek damages in excess of $100 million. Defendants admit that Plaintiffs Fuller and Pinilla seek emotional and reputational damages based on conduct occurring after Fuller I. Defendants deny Plaintiff's citation of the Second Amended Complaint as it has since been struck. *See Fuller II*, DE 184 (Court Order).

Defendants also deny Plaintiff's allegation to the extent that it omits the reputation and emotional damages asserted against other non-Carollo defendants.

68.     The Fuller II Second Amended Complaint [DE 129] speaks for itself. Denied as to all other respects.

69.     Admitted in part. Denied in part. Defendants admit that the Fuller II Second Amended Complaint pleads multiple counts of 42 USC § 1983 seeking compensatory and punitive damages. Defendants deny the allegation to the extent it omits the pleading of Civil Conspiracy counts for conspiracy to violate first amendment rights.

**Fuller III Lawsuit**

70.     Admitted.

## THE INSURANCE POLICIES

**POL Policies**

71.     Admitted.

72.     Admitted.

**LEL Policies**

73.     The LEL Policies speak for themselves. Defendants deny all other allegations, including QBE's omission of coverage of "elected and appointed officials for their law enforcement related acts[.]"

74.     The LEL Policies speak for themselves. Defendants deny all other allegations of this paragraph, including QBE's omission "Bodily Injury" as a relevant provision.

## INSURANCE APPLICATIONS FOR LEL POLICIES

75.     Admitted in part, denied in part. Defendants admit that the City submitted LEL applications to QBE. Defendants are without knowledge as to the negotiations between QBE and the City and therefore deny this allegation.

8

76.     The LEL Applications speak for themselves.

77.     The LEL Applications speak for themselves. Defendants deny the rest of this allegation.

## COMMUNICATIONS WITH QBE
## REGARDING THE UNDERLYING LAWSUITS

78.     The Initial Report of USIS, Inc. speaks for itself. Defendants deny all other allegations in this paragraph.

79.     QBE's acknowledgment speaks for itself. Defendants deny all other allegations in this paragraph.

80.     The Reservation of Rights speak for itself. Defendants deny all other allegations in this paragraph.

81.     The USIS email speaks for itself. Defendants deny all other allegations in this paragraph.

82.     The Reservation letter speaks for itself. Defendants deny all other allegations in this paragraph.

83.     Defendants are without knowledge of QBE's payment to the City and therefore denies this allegation.

## COUNT I - DECLARATORY JUDGMENT
## QBE'S DUTY TO DEFEND OR INDEMNIFY UNDER POL AND LEL POLICIES
### (No Coverage for Intentional Harm)

84.     Defendants incorporate by reference and restates Paragraphs 1-83 as if fully stated herein.

85.     This paragraph sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, the allegations of this paragraph are denied.

86.     The Fuller I Second Amended Complaint speaks for itself. Defendants deny the rest of the allegations in this paragraph.

87.     The Fuller II Second Amended Complaint speaks for itself. Defendants deny the rest of the allegations in this paragraph.

88.     Admitted in part. Denied in Part. Defendants admit that the underlying lawsuits involve deliberate, willful conduct in gross violation of first amendment rights. Defendants deny to the extent that Plaintiff omits the other first amendment conduct which would receive retaliation.

89.     Denied. QBE expressly contracted to provide insurance for intentional conduct. The LEL Policies expressly covers "assault and/or battery" (intentional conduct); "false arrest, detention or imprisonment, or malicious prosecution" (intentional conduct); "publication or utterance of libel or slander" or Defamation (intentional conduct); "violation of civil rights under 42 USC 1981 et sequentia or State Law" (intentional conduct); "wrongful entry, eviction or other invasion of the right of public occupancy" (intentional conduct). As the Underlying Lawsuits allege violations of 42 § 1983 civil rights, and QBE expressly contracted to cover those violations, QBE has a duty to both defend and indemnify in the Underlying lawsuits.

90.     Admitted in Part. Denied in Part. Defendants admit declaratory judgment is warranted as to the following lawsuits, (1) Mad Room; (2) Tower Hotel; (3) Fuller II; and (4) Fuller III. Defendants deny that declaratory judgment is warranted on Count I as to the Fuller I lawsuit, as this claim should proceed as a breach of contract claim under state law. In the alternative, should this Court decline to exercise supplemental jurisdiction over Defendant Fuller and Pinilla's state law claim, then declaratory relief is warranted as to the LEL policy, declaring QBE is liable for the intentional conduct of violation of 42 USC § 1983.

**COUNT II - DECLARATORY JUDGMENT**
**QBE'S DUTY TO DEFEND OR INDEMNIFY UNDER LEL POLICIES**
**(No "Law Enforcement Activities" Within Scope of Coverage Grant)**

91.      Defendants incorporate by reference and restates Paragraphs 1-83 as if fully stated herein.

92.      Denied. The LEL policies extend coverage beyond mere acts "while conducting law enforcement activities." Specifically, the LEL policy covers "the elected and appointed officials for their law enforcement related acts." LEL Policy Section III, Definitions, Definition 6 – Insured.

93.      Admitted in part. Denied in part. Defendants admit that the statement QBE references is included in Condition No. 2 of Section IV, which speaks for itself. However, Defendants deny this allegation to the extent that QBE omits the pertinent part of Condition No. 2, stating "As respects the particulars and information contained in the written application and the policy provisions set forth herein, this policy shall be constituted as a separate agreement with each **insured**." LEL Policy Section IV, Conditions, Condition No. 2 Agreement and Severability (emphasis in original).

94.      Section IV. – Condition No. 12 of each LEL Policy speaks for itself.

95.      Each LEL Policy Application speaks for itself.

96.      Each LEL Policy application speaks for itself.

97.      Section VII of each LEL Application speaks for itself. Defendants deny the rest of the allegations in this paragraph.

98.      Section VII of each LEL Application speaks for itself. Defendants deny the rest of the allegations in this paragraph. Defendants deny that this employee list is exhaustive of all

positions to be insured as QBE's insurance policy includes various sub-groups of the Insured, including (a) employees; (b) volunteers; and (c) the public entity including the elected and appointed officials for their law enforcement related acts.

99.     Section VII of each LEL Application speaks for itself. Defendants deny the rest of the allegations in this paragraph.

100.     Denied. The Underlying Lawsuits are replete with allegations of underlying defendants conducting law enforcement, and, or, law enforcement related activities.

101.     Admitted in Part. Denied in Part. Admitted that the Fuller I, Second Amended Complaint contains such paragraph. Denied as to all other respects, including that the allegation is illustrative of QBE's theory of liability.

102.     Denied. The Underlying Lawsuits are replete with allegations of underlying Defendants conducting law enforcement activities. Further, the contract states coverage for elected and appointed officials is not "while conducting law enforcement activities" but rather for their "law enforcement related activities."

103.     Admitted in Part. Denied in Part. Declaratory judgment is warranted as to the following lawsuits, (1) Mad Room; (2) Tower Hotel; (3) Fuller II; and (4) Fuller III. Defendants deny that declaratory judgment is warranted on Count I as to the Fuller I lawsuit, as this claim should proceed as a breach of contract claim under state law. In the alternative, should this Court decline to exercise supplemental jurisdiction over Defendant Fuller and Pinilla's state law claim, then declaratory relief is warranted as to the LEL policy, declaring QBE is liable for the law enforcement and law enforcement related activities.

**COUNT III - DECLARATORY JUDGMENT**
**QBE'S DUTY TO DEFEND OR INDEMNIFY UNDER LEL POLICIES**
**(Positions to be Insured Under LEL Policy Applications)**

104.    Defendants incorporate by reference and restates Paragraphs 1-83 as if fully stated herein.

105.    Admitted in part. Denied in part. Defendants admit that the statement QBE references is included in Condition No. 2 of Section IV. Defendants deny to the extent that QBE omits the pertinent part of Condition No. 2, stating "As respects the particulars and information contained in the written application and the policy provisions set forth herein, this policy shall be constituted as a separate agreement with each **insured**." LEL Policy Section IV, Conditions, Condition No. 2 Agreement and Severability (emphasis in original).

106.    Section IV – Condition No. 12 of each LEL Policy speaks for itself. Defendants deny the rest of the allegations in this paragraph.

107.    The Application of each LEL Policy speaks for itself. Defendants deny the rest of the allegations in this paragraph.

108.    Section IV – Condition No. 12 of each LEL Policy speaks for itself. Defendants deny the rest of the allegations in this paragraph.

109.    This Paragraph sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, the allegations of this paragraph are denied.

110.    The applications of each LEL Policy speaks for themselves. Defendants deny the rest of the allegations in this paragraph.

111.    Admitted in Part. Denied in Part. Admitted that each application contains a "Section VII" regarding employee positions to be insured, which includes said various employees. Defendants deny that this employee list is exhaustive of all positions to be insured as QBE's

insurance policy includes various sub-groups of the Insured, including (a) employees; (b) volunteers; and (c) the public entity including the elected and appointed officials for their law enforcement related acts.

112.    Admitted in part. Denied in Part. Admitted solely that the LEL applications left "Other (describe)" blank. Defendants deny that this employee list is exhaustive of all positions to be insured as QBE's insurance policy includes various sub-groups of the Insured, including (a) employees; (b) volunteers; and (c) the public entity including the elected and appointed officials for their law enforcement related acts.

113.    Admitted in part. Denied in Part. Defendants admit that said positions were not listed on the application as the employee position to be insured. Defendants deny that this employee list is exhaustive of all positions to be insured as QBE's insurance policy includes various sub-groups of the Insured, including (a) employees; (b) volunteers; and (c) the public entity including the elected and appointed officials for their law enforcement related acts.

114.    Admitted in part. Denied in Part. Admitted that said individual defendants were not listed on the application as the employee positions to be insured. Defendants deny that this employee list is exhaustive of all positions to be insured as QBE's insurance policy includes various sub-groups of the Insured, including (a) employees; (b) volunteers; and (c) the public entity including the elected and appointed officials for their law enforcement related acts.

115.    Admitted in part. Denied in Part. Defendants admit that Joe Carollo is not listed as an employee on the LEL application for employees. Defendants deny that the LEL Policies do not provide coverage for his wrongful acts. The LEL Policies themselves provide coverage for said elected and appointed official for their law enforcement related acts.

116.     Admitted in part. Denied in Part. Defendants admit that Arthur Noriega is not listed as an employee on the LEL application for employees. Defendants deny that the LEL Policies do not provide coverage for his wrongful acts. The LEL Policies themselves provide coverage for said elected and appointed official for their law enforcement related acts.

117.     Admitted in part. Denied in Part. Defendants admit that Victoria Mendez is not listed as an employee on the LEL application for employees. Defendants deny that the LEL Policies do not provide coverage for her wrongful acts. The LEL Policies themselves provide coverage for said elected and appointed official for their law enforcement related acts.

118.     Admitted in part. Denied in Part. Defendants admit that Rachel Dooley is not listed as an employee on the LEL application for employees. Defendants deny that the LEL Policies do not provide coverage for her wrongful acts. The LEL Policies themselves provide coverage for said elected and appointed official for their law enforcement related acts.

119.     Admitted in part. Denied in Part. Defendants admit that Asael Marrero is not listed as an employee on the LEL application for employees. Defendants deny that the LEL Policies do not provide coverage for his wrongful acts. The LEL Policies themselves provide coverage for said elected and appointed official for their law enforcement related acts.

120.     Admitted in part. Denied in Part. Defendants admit that Daniel S. Goldberg is not listed as an employee on the LEL application for employees. Defendants deny that the LEL Policies do not provide coverage for his wrongful acts. The LEL Policies themselves provide coverage for said elected and appointed official for their law enforcement related acts.

121.     Admitted in part. Denied in Part. Defendants admit that William Ortiz is not listed as an employee on the LEL application for employees. Defendants deny that the LEL Policies do

not provide coverage for his wrongful acts. The LEL Policies themselves provide coverage for said elected and appointed official for their law enforcement related acts.

122.    Admitted in part. Denied in Part. Defendants admit that Luis Torres was a defendant in the Fuller II lawsuit but was not included as a defendant in the Second Amended Complaint. It is further admitted Torres is not listed as an employee on the LEL application for employees. Defendants deny that the LEL Policies do not provide coverage for his wrongful acts. The LEL Policies themselves provide coverage for said elected and appointed official for their law enforcement related acts.

123.    Admitted in part. Denied in Part. Defendants admit that Adrien Plasencia is not listed as an employee on the LEL application for employees. Defendants deny that the LEL Policies do not provide coverage for his wrongful acts. The LEL Policies themselves provide coverage for said elected and appointed official for their law enforcement related acts.

124.    Admitted in part. Denied in Part. Defendants admit that Rene Diaz is not listed as an employee on the LEL application for employees. Defendants deny that the LEL Policies do not provide coverage for his wrongful acts. The LEL Policies themselves provide coverage for said elected and appointed official for their law enforcement related acts.

125.    Admitted in part. Denied in Part. Admitted that Yvonne Bayona is not listed as an employee on the LEL application for employees. Defendants deny that the LEL Policies do not provide coverage for his wrongful acts. The LEL Policies themselves provide coverage for said elected and appointed official for their law enforcement related acts.

126.    Denied.

127.    Admitted in Part. Denied in Part. Declaratory judgment is warranted as to the following lawsuits, (1) Mad Room; (2) Tower Hotel; (3) Fuller II; and (4) Fuller III. Defendants

deny that declaratory judgment is warranted on Count I as to the Fuller I lawsuit, as this claim should proceed as a breach of contract claim under state law. In the alternative, should this Court decline to exercise supplemental jurisdiction over Defendant Fuller and Pinilla's state law claim, then declaratory relief is warranted as to the LEL policy, declaring QBE is liable for the law enforcement and law enforcement related activities of the underlying elected and appointed officials, and the public entity.

### COUNT IV - DECLARATORY JUDGMENT
### QBE'S DUTY TO DEFEND OR INDEMNIFY UNDER POL POLICIES
#### ("Related" Claims and Exhaustion of Policy Limit – POL Policies)

128.    Defendants incorporate by reference and restates Paragraphs 1-83 as if fully stated herein.

129.    Admitted.

130.    Denied.

131.    Admitted in Part. Denied in Part. Defendants admit that the Fuller I lawsuit was filed on October 11, 2018, reported to QBE on October 26, and began under the 2017 – 2018 POL policy period. Defendants deny all other allegations.

132.    Defendants are without knowledge of QBE's expenditures and therefore deny this allegation.

133.    Defendants are without knowledge of QBE's expenditures and therefore deny this allegation.

134.    Denied.

135.    Admitted in Part. Denied in Part. Declaratory judgment is warranted as to the following lawsuits, (1) Mad Room; (2) Tower Hotel; (3) Fuller II; and (4) Fuller III. Defendants deny that declaratory judgment is warranted on Count I as to the Fuller I lawsuit, as this claim

should proceed as a breach of contract claim under state law. In the alternative, should this Court decline to exercise supplemental jurisdiction over Defendant Fuller and Pinilla's state law claim, then declaratory relief is warranted as to the POL policy, declaring QBE is liable for the unrelated activities.

## COUNT V - DECLARATORY JUDGMENT
## <u>QBE'S DUTY TO DEFEND OR INDEMNIFY UNDER POL AND LEL POLICIES</u>
### (Criminal Acts Exclusions – POL and LEL Policies)

136.    Defendants incorporate by reference and restates Paragraphs 1-83 as if fully stated herein.

137.    The POL Policy speaks for itself. Defendants deny the remainder of this allegation.

138.    Admitted in Part. Denied in Part. The LEL Policy speaks for itself. Defendants deny all other allegations in this paragraph, including that said provision excludes coverage. Specifically, the LEL Policy covers "assault and/or battery" (intentional criminal conduct); "false arrest, detention or imprisonment, or malicious prosecution" (intentional criminal conduct); "publication or utterance of libel or slander" or Defamation (intentional criminal conduct); "violation of civil rights under 42 USC 1981 et sequentia or State Law" (intentional criminal conduct); "wrongful entry, eviction or other invasion of the right of public occupancy" (intentional criminal conduct). As the Underlying Lawsuits allege violations of 42 § 1983 civil rights, and QBE expressly contracted to cover those violations, QBE has a duty to both defend and indemnify in the all the underlying lawsuits.

139.    Admitted in Part. Denied in Part. Defendants admit that Joe Carollo caused the underlying plaintiffs damages arising out of his dishonest, criminal or malicious acts. Defendants deny that all damages were caused solely by Commissioner Carollo.

140.     This Paragraph sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, the allegations of this paragraph are denied.

141.     Admitted in Part. Denied in Part. Declaratory judgment is warranted as to the following lawsuits, (1) Mad Room; (2) Tower Hotel; (3) Fuller II; and (4) Fuller III. Defendants deny that declaratory judgment is warranted on Count I as to the Fuller I lawsuit, as this claim should proceed as a breach of contract claim under state law. In the alternative, should this Court decline to exercise supplemental jurisdiction over Defendant Fuller and Pinilla's state law claim, then declaratory relief is warranted as to the LEL Policy, declaring QBE is liable for the criminal misconduct.

**COUNT VI - DECLARATORY JUDGMENT**
**QBE'S DUTY TO DEFEND OR INDEMNIFY UNDER POL POLICIES**
**(POL Policy Exclusion No. 7)**

142.     Defendants incorporate by reference and restates Paragraphs 1-83 as if fully stated herein.

143.     The POL Policy speaks for itself. Defendants deny all other allegations in this paragraph.

144.     The complaints in the underlying lawsuits speak for themselves. The remainder of this allegation sets forth a legal conclusion to which no response is required. To the extent that a response is required, Defendants deny the remainder of this allegation.

145.     Denied.

146.     This Paragraph sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, the allegations of this paragraph are denied.

147.     Admitted in Part. Denied in Part. Declaratory judgment is warranted as to the following lawsuits, (1) Mad Room; (2) Tower Hotel; (3) Fuller II; and (4) Fuller III. Defendants

deny that declaratory judgment is warranted on Count I as to the Fuller I lawsuit, as this claim should proceed as a breach of contract claim under state law. In the alternative, should this Court decline to exercise supplemental jurisdiction over Defendant Fuller and Pinilla's state law claim, then declaratory relief is warranted as to the POL policy, declaring QBE is liable for the misconduct.

**COUNT VII – DECLARATORY JUDGMENT**
**QBE'S DUTY TO DEFEND OR INDEMNIFY IN TOWER AND FULLER III**
**LAWSUITS**
**(Equitable and Contractual Claim Exclusions – POL and LEL Policies)**

148.    Defendants incorporate by reference and restates Paragraphs 1-83 as if fully stated herein.

149.    Admitted in Part. Denied in Part. Admitted that the POL and LEL Policies require underlying monetary damages to be alleged to invoke coverage. Denied as to all other allegations.

150.    Admitted.

151.    Admitted.

152.    Admitted.

153.    Admitted.

154.    Admitted.

155.    Admitted.

156.    The Third Amended Complaint in the Tower lawsuit speaks for itself. Defendants deny all other allegations in this paragraph.

157.    The Third Amended Complaint in the Tower lawsuit speaks for itself. Defendants deny all other allegations in this paragraph.

158.    The Third Amended Complaint in the Tower lawsuit speaks for itself. Defendants deny all other allegations in this paragraph.

159.    Admitted in Part. Denied in Part. Admitted as to QBE's duty to defend and indemnify in the Fuller III Lawsuit. Denied as to QBE's duty to defend and indemnify in the Tower Lawsuit.

160.    Admitted in Part. Denied in Part. Defendants admit that Declaratory judgment is warranted in QBE's favor as to the Fuller III lawsuit. However, Defendants deny that Declaratory judgment is warranted in QBE's favor as to the Tower Lawsuit.

**COUNT VIII – DECLARATORY JUDGMENT**
**QBE'S DUTY TO INDEMNIFY UNDER POL AND LEL POLICIES**
**(Penalties or Punitive Awards Exclusions)**

161.    Defendants incorporate by reference and restates Paragraphs 1-83 as if fully stated herein.

162.    The POL Policies speak for themselves. The remaining allegations in this paragraph are denied.

163.    The LEL Policies speak for themselves. The remaining allegations in this paragraph are denied.

164.    This Paragraph sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, the allegations of this paragraph are denied.

165.    Admitted in Part. Denied in Part. Admitted solely that the Fuller I jury awarded substantial punitive damages against Carollo. Admitted that Fuller II seeks punitive damages against some defendants. Denied to the extent that QBE does not distinguish between the various underlying lawsuits and the relief sought therein.

166.    This Paragraph sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, the allegations of this paragraph are denied.

167.     Admitted in Part. Denied in Part. Declaratory judgment is warranted as to the following lawsuits, (1) Mad Room; (2) Tower Hotel; (3) Fuller II; and (4) Fuller III. Defendants deny that declaratory judgment is warranted on Count I as to the Fuller I lawsuit, as this claim should proceed as a breach of contract claim under state law. In the alternative, should this Court decline to exercise supplemental jurisdiction over Defendant Fuller and Pinilla's state law claim, then declaratory relief is warranted.

### COUNT IX - DECLARATORY JUDGMENT
### QBE'S DUTY TO DEFEND OR INDEMNIFY UNDER CERTAIN LEL POLICIES
(Known Loss/ Loss in Progress Doctrine)

168.     Defendants incorporate by reference and restates Paragraphs 1-83 as if fully stated herein.

169.     Admitted in Part. Denied in Part. Defendants admit that in March of 2018, an ethics complaint was filed against Carollo. Defendants deny that the Fuller I lawsuit and the ethics complaint contained the same allegations as the Fuller I lawsuit encompassed allegations which extended past those alleged in the ethics complaint. *See Fuller I*, DE 125 (Second Amended Complaint).

170.     Admitted in part. Denied in part. Defendants admit that the ethics complaint alleged Carollo was harassing the Fuller I complainants. Defendants deny the rest of the allegations in this paragraph.

171.     Admitted in part. Denied in part. Defendants admit solely to the extent that the LEL policy incepted on October 26, 2018. Defendants deny the rest of the allegations in this paragraph.

172.     Admitted in part. Denied in part. Defendants admit solely that Carollo escalated his campaign of harassment and retaliation over many years after the Fuller I lawsuit was filed; and that this campaign was targeting Fuller and Pinilla and their affiliated businesses. Defendants deny

all other allegations in this paragraph, including that the continuation was substantially the same type as those previously alleged. Defendants further deny to the extent that the Fuller II includes businesses not referenced in the Fuller I complaint.  This paragraph also sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, the allegation of "known loss" and "loss in progress" in this paragraph are denied.

173.   This Paragraph sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, the allegations of this paragraph are denied.

174.   This Paragraph sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, the allegations of this paragraph are denied.

175.   This Paragraph sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, the allegations of this paragraph are denied.

176.   Admitted in Part. Denied in Part. Declaratory judgment is warranted as to the following lawsuits, (1) Mad Room; (2) Tower Hotel; (3) Fuller II; and (4) Fuller III. Defendants deny that declaratory judgment is warranted on Count I as to the Fuller I lawsuit, as this claim should proceed as a breach of contract claim under state law. In the alternative, should this Court decline to exercise supplemental jurisdiction over Defendant Fuller and Pinilla's state law claim, then declaratory relief is warranted as to the LEL policy, declaring the known loss doctrine does not apply to any of the underlying lawsuits or policies.

## COUNT X - DECLARATORY JUDGMENT
## <u>QBE'S DUTY TO DEFEND OR INDEMNIFY UNDER LEL POLICIES</u>
### (Trigger of Coverage)

177.   Defendants incorporate by reference and restates Paragraphs 1-83 as if fully stated herein.

178.   Admitted.

179.    Admitted.

180.    Admitted.

181.    Defendants solely admit that since no law enforcement and law enforcement related acts occurred between October 2016 and October of 2017, then the LEL policy for this year was not triggered.

**COUNT XI - DECLARATORY JUDGMENT**
**QBE'S DUTY TO DEFEND OR INDEMNIFY UNDER LEL POLICIES**
**(Self-Insured Retention)**

182.    Defendants incorporate by reference and restates Paragraphs 1-83 as if fully stated herein.

183.    Admitted.

184.    Admitted.

185.    Admitted.

186.    Admitted.

187.    Admitted in Part. Denied in Part. Defendants admit that the underlying lawsuits allege a multitude of "immediate injury-producing acts[.]" The remainder of this paragraph sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, the remainder of the allegations of this paragraph are denied.

188.    Admitted in Part. Denied in Part. Admitted that each occurrence would be subject to a separate SIR. It is further admitted that declaratory judgment is warranted as to the following lawsuits, (1) Mad Room; (2) Tower Hotel; (3) Fuller II; and (4) Fuller III. Defendants deny that declaratory judgment is warranted on Count I as to the Fuller I lawsuit, as this claim should proceed as a breach of contract claim under state law. In the alternative, should this Court decline to exercise

supplemental jurisdiction over Defendant Fuller and Pinilla's state law claim, then declaratory relief is warranted as to the LEL policy, declaring each occurrence to be subject to a separate SIR.

**COUNT XII - DECLARATORY JUDGMENT**
**QBE'S DUTY INDEMNIFY UNDER LEL POLICIES**
**(Allocation Between Covered and Non-Covered Damages)**

189.    Defendants incorporate by reference and restates Paragraphs 1-83 as if fully stated herein.

190.    This Paragraph sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, the allegations of this paragraph are denied.

191.    Admitted in part. Denied in Part. Defendants admit solely that the Fuller I Lawsuit allocated damages between compensatory and punitive. Defendants deny as to all other respects.

192.    Denied.

193.    Admitted in Part. Denied in Part. Defendants admit that declaratory judgment is warranted as to the following lawsuits, (1) Mad Room; (2) Tower Hotel; (3) Fuller II; and (4) Fuller III. Defendants deny that declaratory judgment is warranted on Count XII as to the Fuller I lawsuit, as this claim should proceed as a breach of contract claim under state law. In the alternative, should this Court decline to exercise supplemental jurisdiction over Defendant Fuller and Pinilla's state law claim, then declaratory relief is warranted  in Defendants' favor, declaring QBE liable.

**COUNT XIII - DECLARATORY JUDGMENT**
**QBE'S DUTY TO DEFEND OR INDEMNIFY UNDER POL POLICIES**
**(Recoupment of Claim Expense Payments)**

194.    Defendants incorporate by reference and restates Paragraphs 1-83 as if fully stated herein.

195.    The Reservation of rights speak for itself. Defendants are without knowledge and therefore deny the rest of the allegations in this paragraph.

25

196.    The Reservation of rights speak for itself. Defendants deny the rest of the allegations in this paragraph.

197.    This Paragraph sets forth a legal conclusion to which no response is required. To the extent a response is deemed required, the allegations of this paragraph are denied.

198.    Defendants are without knowledge of the underlying acceptance and therefore deny this allegation.

199.    Admitted.

## First Affirmative Defense
### (Waiver)

200.    QBE tendered insurance and provided legal assistance to Defendant Carollo in the underlying suit.

201.    QBE knew and had the advantage knowing of any alleged requirement to bifurcate or allocate damages.

202.    QBE had actual or constructive knowledge of this advantage and alleged requirement.

203.    QBE determined not to exercise this right in and thus has waived its claim.

## Second Affirmative Defense
### (Estoppel)

204.    QBE tendered insurance and provided legal assistance to Defendant Carollo in the underlying suit.

205.    QBE knew and had the advantage knowing of any alleged requirement to bifurcate or allocate damages. Indeed, QBE had actual and constructive knowledge of this  alleged requirement.

206.     In advising Defendant Carollo in connection with the underlying lawsuit, QBE concealed the alleged requirement that the Parties must bifurcate their damages.

207.     Accordingly, QBE should be estopped from claiming damages are barred based on an alleged failure to bifurcate or allocate such damages.

## COUNTERCLAIM

208.     Defendants and Counter-Plaintiffs Barlington Group, LLC; Brickell Station, LLC; Calle Ocho Marketplace, LLC; Denise Galvez Turros; El Shopping, LLC; Futurama, LLC; La Gran Fiesta, LLC; Little Havana Arts Building, LLC; Little Havana Arts Building Too, LLC; Little Havana Bungalows, LLC; LHAB Tres, LLC; Martin Pinilla, II; Piedra Villas, LLC; Tower Hotel, LLC; Viernes Culturales/Cultural Fridays, Inc.; Yo Amo Calle Siete, LLC; Beatstik, LLC; and William O. Fuller, (hereinafter "Defendants"), hereby file this counterclaim for declaratory relief; and breach of contract.

## JURISDICTION

209.     This Court has subject matter jurisdiction over Defendants' declaratory counterclaims under 28 USC § 1332 because there is complete diversity and the amount in controversy exceeds $75,000, exclusive of interest and costs.

210.     This Court has supplemental jurisdiction over Defendants' breach of contract counterclaims under 28 USC § 1367 because they are so related to the Plaintiff's claims that they form part of the same case or controversy under Article III of the United States Constitution.

211.     Under Florida law, it is "well settled" that a judgment creditor may "immediately upon the entry of a final judgment by the trial court, regardless of whether an appeal is taken, where the judgment is not superseded" pursue their claim directly against the Insurer. *Grange Mut. Cas. Co. v. Stroud*,173 So. 2d 171, 172 (Fla. 2d DCA 1965); *see also e.g. Travelers Ins. Co. v.*

*Pinkerton-Hays Lumber Co.*,120 So. 2d 448, 449-50 (Fla. 1st DCA 1960); *Cosmopolitan Mut. Ins. Co. v. Wilson*, 118 So. 2d 230, 230-31 (Fla. 3d DCA 1960); *Conley v. Singleton*,171 So. 2d 65, 68 (Fla. 1st DCA 1965); accord *Gen. Accident Fire & Life Assur. Corp. v. Harris*,117 So.2d 44 (Fla. 4th DCA 1960); *Fitzgerald v. Addison*, 287 So. 2d 151, 152 (Fla. 2d DCA 1973).[1]

### PARTIES, JURISDICTION, AND VENUE

212.     Counter-Plaintiff William O. Fuller is a resident of Miami-Dade County, Florida.

213.     Counter-Plaintiff Martin Pinilla, II, is a resident of Miami-Dade County, Florida.

214.     Counter-Plaintiff Denise Galvez Turros is a resident of Miami-Dade County, Florida.

215.     Counter-Plaintiff Barlington Group, LLC, is a Florida Limited Liability Company with its principal place of business in Miami-Dade County, Florida.

216.     Counter-Plaintiff Brickell Station, LLC, is a Florida Limited Liability Company with its principal place of business in Miami-Dade County, Florida.

217.     Counter-Plaintiff Calle Ocho Marketplace, LLC, is a Florida Limited Liability Company with its principal place of business in Miami-Dade County, Florida.

218.     Counter-Plaintiff El Shopping, LLC, is a Florida Limited Liability Company with its principal place of business in Miami-Dade County, Florida.

---

[1] Defendants are asserting this state law claim herein as it is a mandatory counterclaim. This Court has supplemental jurisdiction over this matter although Honorable Judge Moore dismissed Defendants action due to ripeness. *See Fuller v. QBE Specialty Insurance Co.*, Case No.: 1:24-cv-20063-KMM (SDFL), DE 32 (Court Order). In similar instances where a state law claim is ripe in state court but unripe in federal court, a court may nevertheless exercise supplemental jurisdiction over the state law claim. *See e.g.*, *Dibbs v. Hillsborough Cnty., FL*, 8:12-CV-2851-T-23TGW, 2013 WL 12367008, at *2 (M.D. Fla. Oct. 30, 2013); *Jones v. City of McMinnville*, 244 Fed. Appx. 755, 757 (9th Cir. 2007); *Botts Marsh, LLC v. City of Wheeler*, 3:22-CV-00115-AR, 2023 WL 3615379, at *1 (D. Or. May 24, 2023).

219.     Counter-Plaintiff Futurama, LLC, is a Florida Limited Liability Company with its principal place of business in Miami-Dade County, Florida.

220.     Counter-Plaintiff La Gran Fiesta, LLC, is a Florida Limited Liability Company with its principal place of business in Miami-Dade County, Florida.

221.     Counter-Plaintiff Little Havana Arts Building, LLC, is a Florida Limited Liability Company with its principal place of business in Miami-Dade County, Florida.

222.     Counter-Plaintiff Little Havana Arts Building Too, LLC, is a Florida Limited Liability Company with its principal place of business in Miami-Dade County, Florida.

223.     Counter-Plaintiff Little Havana Bungalows, LLC, is a Florida Limited Liability Company with its principal place of business in Miami-Dade County, Florida.

224.     Counter-Plaintiff LHAB Tres, LLC, is a Florida Limited Liability Company with its principal place of business in Miami-Dade County, Florida.

225.     Counter-Plaintiff Piedra Villas, LLC, is a Florida Limited Liability Company with its principal place of business in Miami-Dade County, Florida.

226.     Counter-Plaintiff Tower Hotel, LLC, is a Florida Limited Liability Company with its principal place of business in Miami-Dade County, Florida.

227.     Counter-Plaintiff Viernes Culturales/Cultural Fridays, Inc. is a Florida Non-Profit Corporation with its principal place of business in Miami-Dade County, Florida.

228.     Counter-Plaintiff Yo Amo Calle Siete, LLC, is a Florida Limited Liability Company with its principal place of business in Miami-Dade County, Florida.

229.     Counter-Plaintiff Beatstik, LLC, is a Florida Limited Liability Company with its principal place of business in Miami-Dade County, Florida.

230.    Counter-Defendant QBE Specialty Insurance Company is headquartered in New York and incorporated under the laws of North Dakota.

231.    Venue lies in the Southern District of Florida because the cause of action accrued within this district.

232.    All conditions precedent to the filing of this lawsuit have been performed.

## FACTUAL ALLEGATIONS

233.    Each year from 2017 until 2022, QBE issued a Law Enforcement Liability Declarations Policy to the City of Miami: (1) Policy Nos.: QLO01189-01, which ran from October 26, 2017 until October 26, 2018; (2) QLO01189-02, which ran from October 26, 2018 until October 26, 2019; (3) QLO01189-03, which ran from October 26, 2019 until November 1, 2020; (4) QLO01189-04, which ran from November 1, 2020 until November 1, 2021; and (5) QLO01189-05, which ran from November 1, 2021 until November 1, 2022  (collectively, the "Law Enforcement Policy" or the "Policy"). A copy of each Law Enforcement Policy issued is attached as **Exhibits A, B, C, D, and E**, respectively.

234.    Pursuant to the Law Enforcement Policy, QBE agreed to insure "elected and appointed officials for their law enforcement related acts" and "pay on behalf of the **insured(s)** all **damages** resulting from a **wrongful act(s)** which arises out of the law enforcement activities."

235.    The Policy defines an insured as the City of Miami, plus "all full or part-time employees, all auxiliary or volunteer law enforcement officers of the named insured, and the public entity of which the law enforcement agency is a part **including the elected and appointed officials for their law enforcement related acts.** The insurance afforded applies separately to each insured against whom a claim is made or a suit is brought, except with respect to the limits of the Company's liability."

236.    Miami City Commissioner Joe Carollo is an elected official of the City of Miami who has engaged in law enforcement related acts since, at least December 2017.

237.    As defined in the Policy, wrongful acts "means an actual or alleged error or omission, negligent act, neglect or breach of duty by an insured while conducting law enforcement activities" resulting in: "battery," "malicious prosecution," "humiliation or mental distress," "the publication or utterance of libel or slander or other defamatory or disparaging material," **or "violation of civil rights or discrimination protected under 42 USC 1981 et sequential or State Law,"** or "physical injury to any person including . . . mental anguish . . .."

238.    This Policy authorizes Plaintiffs to sue QBE, stating: "Any person or organization . . . who has secured such judgment . . . shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy."

239.    The limit of each policy is $5 million per each occurrence, which is "an event, including continuous or repeated exposure to the same generally harmful conditions."

240.    The five policies together provide $25 million in coverage for occurrences during the period from 2017 to 2022.

241.    In an occurrence-based policy, the insured pays a higher premium in exchange for the insurer bearing a greater risk, which is the risk of indefinite liability for acts which occur during the life of the policy, irrespective of when the claims are actually asserted against the insured.

242.    The policy has no definition for "law enforcement activities," "elected or public officials" or "law enforcement related acts", therefore "the terms are construed to give the broadest possible coverage to the insured." *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1358 (M.D. Fla. 2001) (citations omitted).

**The Underlying Conduct**

243.    Plaintiffs Fuller and Pinilla are both local, self-made entrepreneurs with a robust portfolio of businesses and properties, and a celebrated reputation as pillars of the community.

244.    Plaintiffs Fuller and Pinilla brought significant economic growth to the Little Havana neighborhood, all while preserving its historical significance and cultural identity.

245.    Despite their best efforts, Plaintiffs Fuller and Pinilla endured years of abuse by the City, its law enforcement personnel and apparatus, because of Joe Carollo.

246.    City of Miami Commissioner Joe Carollo took office and embarked on a multi-front war to harass and punish Plaintiffs Fuller and Pinilla for various and distinct expressions of their First Amendment rights.

247.    The unconstitutional retaliation was in response to separate and distinct expressions of free speech, including, at least, the following:

   a)  In November 2017, Plaintiffs supported the election of Carollo's opponent, Alfie Leon, by supporting social media advertisements, and by planning, sponsoring and hosting rallies for his political opponent;

   b)  In March 2018, Plaintiffs filed an ethics complaint against Carollo;

   c)  In October 2018, Plaintiffs filed a federal lawsuit against Carollo;

   d)  In February 2019, Plaintiff Fuller exposed Carollo's abuse of power at the City Commission meeting;

   e)  In May 2019, Plaintiffs hosted a press conference to expose Carollo's history of code violations at his home in Coconut Grove;

   f)  In 2020, Plaintiffs supported an effort to recall Carollo;

g) In 2021, Plaintiff Fuller's company, the MadRoom, filed a second lawsuit in 2021 against the City of Miami based on Carollo's actions.

248. Retaliation against any one of these actions would constitute a separate cause of action – and a separate occurrence under the Law Enforcement Policy – for all persons harmed. Here, however, there were literally hundreds of instances of political retaliation involving law enforcement related acts by Carollo and the City of Miami.

**The Fuller I Lawsuit**

249. On June 1, 2023, a federal jury found City of Miami Commissioner Joe Carollo liable under 42 U.S.C. § 1983 for violating Plaintiffs' First Amendment rights by orchestrating hundreds of police raids, code inspections, and otherwise mobilizing city law enforcement resources and law enforcement personnel against them over the course of five years, from December 2017 through April 2023.

250. The jury awarded Plaintiff Fuller $8.6 million in compensatory damages and $25.7 million in punitive damages, and Plaintiff Pinilla $7.3 million in compensatory damages and $21.9 million in punitive damages. *Fuller v. Carollo*, ECF No. 470.

251. This Court entered the final judgment accordingly and awarded Plaintiff Fuller $34.3 million and Plaintiff Pinilla $29.2 million. *Fuller v. Carollo*, ECF No. 479.

252. In addition, under 42 U.S.C. § 1988, Plaintiffs obtained a judgment for attorneys' fees for which Carollo and the City of Miami (and, by extension, Defendant here) are liable, in the amount of $2,650,000 in fees and $60,000 in costs.

253. In sum, the amount QBE is liable to pay under its Law Enforcement Policies is $15,900,00 in compensatory damages, $2,650,000 in attorneys' fees, and $60,000 in costs, for a

total of $18,610,000. The fees continue to accrue with post-trial motions and efforts to collect on the judgment.

254. The underlying facts set forth in Fuller I were all proven at the trial and formed the basis of the final judgment.

**The Fuller II Lawsuit**

255. On November 6, 2023, Defendants filed a lawsuit against the City of Miami, Joe Carollo, Arthur Noriega, Victoria Mendez, Rachel Dooley, Asael Marrero, Daniel S. Goldberg, William Ortiz, Adrian Plasencia, Rene Diaz, Yvonne Bayona, and Luis Torres. The operative Second Amended Complaint was filed on April 19, 2024. *See Fuller v. City of Miami*, Case No.: 1:23-cv-24251 (SDFL) ("Fuller II").

256. The Fuller II lawsuit was brought based on the evidence discovered through the Fuller I litigation, showing the underlying defendants involvement in the unconstitutional retaliation and harassment of Fuller and Pinilla, and any businesses they were involved with or related to.

257. Fuller, Pinilla, and their related businesses, were targeted for their rallies in support of Carollo's political opponent; because of the tortfeasors' false belief that Fuller and Pinilla were (a) financing a lawsuit challenging Carollo's right to run for Commissioner and (b) organizing efforts to recall Carollo; filing of an ethics complaint against Carollo, filing of lawsuits; hosting press conferences; promotion of African-American and Afro-Cuban culture; and general expressions of different visions for Calle Ocho and Little Havana in opposition to underlying defendants' political preferences.

258.    The Fuller II complaint is replete with allegations of law enforcement related conduct by elected and appointed officials, which constitute occurrences and damages to be covered by QBE's LEL policies.

### The Mad Room Lawsuit

259.    The Mad Room Lawsuit was filed on September 30, 2021 against the City of Miami on behalf of The Mad Room LLC D/B/A Ball and Chain; Altos Mexicano, LLC D/B/A Taquerias El Mexicano, Little Havana Arts Building, LLC; and La Gran Fiesta. *See Mad Room v. City of Miami*, Case No.: 1:21-cv-23485 (SDFL) ("Mad Room").

260.    The *Mad Room* Lawsuit asserts claims for substantive and procedural due process violations; an equal protection violation; unlawful search and seizure; and violation of the City charter. The *Mad Room* Lawsuit tracks how the City of Miami harassed and shut down the *Mad Room* Plaintiffs' businesses.

### The Tower Lawsuit

261.    The Tower Lawsuit was filed on May 3, 2022 and the operative complaint was filed on November 28, 2022. *See Tower Hotel v. City of Miami*, Case No. 2022-008069-CA-44 (Fla. 11th Cir.) ("Tower"), Third Amended Complaint.

262.    The Tower complaint sets forth claims for the City of Miami's Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing and for equitable relief.

263.    While the Tower Complaint seeks equitable relief from demolition, it also asserts claims for damages and all relief just and proper against the City.

**COUNT I**
**BREACH OF CONTRACT**
**FOR THE 2017 TO 2018 INSURANCE POLICY**

264.     Counter-Plaintiffs Fuller and Pinilla restate and reallege paragraphs 208 through 263 above as though fully set forth herein.

265.     QBE contracted with the City of Miami to insure and indemnify Joe Carollo, as an elected official, through the Law Enforcement Policy, for damages Carollo became legally obligated to pay as a result of his law enforcement related acts.

266.     The policy period of this contract (Policy No. QLO01189-01) ran from October 26, 2017 until October 26, 2018, and Defendant is liable for damages caused by Carollo's law enforcement related acts during this period. *See* Exhibit A.

267.     Immediately upon taking office in December 2017, Carollo used his position as an elected official to pressure a state law enforcement agency—in particular the Florida Department of Law Enforcement–to investigate Plaintiffs. Carollo went up to the FDLE to accuse Plaintiff Fuller of voter fraud and money laundering.

268.     According to the FDLE report, Carollo alleged that "Fuller . . . is still active in South Florida, engaged in a protracted pattern of criminal conduct, which involves private persons and public officers," and that "according to Carollo, Fuller has been identified as the nominal head of a cabal of Venezuelan investors, whose goal is to buy large parcels of land in and around Little Havana; they also wish to fund and control local elections in Miami; and ultimately they want to control the planning, zoning, and permitting in the City to enable their unobstructed expansion."

269.     Code enforcement, tasked with regulating licenses, building permits, and compliance, is properly characterized as law enforcement.

270.     Throughout Carollo's tenure, he repeatedly acted to influence, direct, and weaponize code enforcement against Plaintiffs.

271.     Former Director of Code Compliance, Orlando Diez, testified that, as early as December 2017, Carollo "wanted [him] to issue, or [his] inspectors [to] issue violations," and to "shut down the business" associated with Plaintiffs. Mr. Diez explained that he was afraid he would lose his job if he did not comply with this City custom to target Plaintiffs for retaliatory reasons, and that "Commissioner Carollo [was] still directing code enforcement through other people like Steven Miro, Mary Lugo, to target Mr. Fuller's businesses."

272.     Carollo also personally acted as law enforcement and conducted law enforcement related acts, such as investigating Plaintiffs.

273.     On February 18, 2018, when Carollo was caught sneaking around in the dark at 1:30 in the morning outside of Plaintiff's nightclub, he claimed he was doing an "official investigation" on behalf of the City, flashed a badge and said "I am the law." This was confirmed both by Carollo's Chief of Staff at the time, Mr. Steve Miro, as well as the owner of the valet parking company who caught Carollo there (with Miro in Carollo's car). Mr. Alain Garcia testified that Carollo said "I am the law," meaning "I'm going to close your company" and he also testified that the City complied with Joe Carollo's law, not the City law. *Fuller v. Carollo*, ECF No. 549 at 235, 256. The Chief of Police of the City of Miami, Mr. Art Acevedo, would later agree that Carollo was acting not only in his capacity as law enforcement but also as if "he's judge [and] jury," expecting City officials to follow "whatever he thinks is right."

274.     On Saturday, March 3, 2018, Carollo requested that a Code Enforcement officer meet him in Little Havana. When Code Enforcement Officer Dennis Uriarte ("Uriarte") arrived, Carollo then asked if he could ride with him in the City Code Compliance vehicle, in order to point

out properties with potential code violations, all of which belonged to or were associated with Plaintiffs (the "Uriarte Ride Along").

275.     After the Uriarte Ride Along, Carollo called Uriarte to inquire if Uriarte had issued citations to the Plaintiffs for the alleged code violations Carollo had claimed existed.

276.     In March 2018, shortly after the Uriarte Ride Along, Plaintiffs filed an ethics complaint against Carollo based upon the above described behavior. Once the ethics complaint was filed, Carollo's harassment subsided for a period of months but did not cease.

277.     When Plaintiffs voluntarily dismissed the ethics complaint in August 2018, Carollo immediately resumed his campaign.

278.     Beginning on August 27, 2018, Carollo began investigating Plaintiffs' properties by sending public records requests for all properties and permits along SW 8th St. from 17th Ave to 1st Ave.

279.     Carollo also sent Code Enforcement to inspect Plaintiffs' Ball & Chain property on August 31, 2018 and again on September 14, 2018.

280.     Despite no violations being found or issued at Ball & Chain on either August 31 or September 14, 2018, on September 15, 2018, Carollo next sent both Code Enforcement and Miami Police to Plaintiffs' property Ball & Chain, this time issuing a violation without any basis.

281.     Twelve days later, on September 27, 2018, both Code Enforcement and Miami Police surrounded Ball & Chain again, but again found no violations.

282.     One day later, September 28, 2018, Miami Police and Code Enforcement together raided Ball & Chain, again finding no violations.

283.    In light of these relentless attacks by Carollo and the City of Miami's Police and Code Enforcement acting on behalf of Carollo, Plaintiffs filed a 28 U.S.C. § 1983 First Amendment retaliation case against Carollo.

284.    In response to this lawsuit, Carollo issued a string of public records requests in October 2018 to determine if any violations had been issued that he had claimed existed during the Uriarte Ride Along, and found that none had been.

285.    The filing of the lawsuit, and the fact that the City had not been able to find violations on Plaintiffs' properties, greatly infuriated Carollo, leading to even greater retaliation.

286.    Also in that first year, Commissioner Carollo's retaliation included a campaign of very public defamation, which he launched with devastating effect. This was not a private individual defaming another private individual. This was a powerful governmental official abusing his power and the power of his office and using his bully pulpit to defame private individuals.  On the radio, television, on the City of Miami Dais, and in Domino Park, Commissioner Carollo defamed Plaintiffs by:

- Claiming they were associated with the corrupt Venezuelan Maduro communist government;

- Claiming they were money launderers and criminals of the worst kind;

- Claiming Mr. Fuller had committed "voter fraud";

- Claiming Mr. Fuller and Pinilla were de-Latinizing and de-Cubanizing the neighborhood;

- Claiming Mr. Fuller was the Godfather of Calle Ocho; and

- Claiming they were associated with prostitution and other criminal actions.

287.    All of Carollo's conduct as described above constitutes wrongful acts as defined by the Policy.

288.     For the policy period of October 26, 2017 to October 26, 2018, both Plaintiffs

testified at trial not only as to the number of "occurrences" detailed above, as well as others, but

also as to the significant reputational damage and mental anguish caused by Carollo's use of the

City of Miami's law enforcement departments, including the Miami Police and Code Enforcement,

to target them for political retaliation, as well as the damages caused by Carollo's relentless

defamation.

289.     As of the date of this filing, QBE has failed to pay for Carollo's law enforcement

related acts during that policy period.

### COUNT II
### BREACH OF CONTRACT
### FOR THE OCTOBER 26, 2018, TO OCTOBER 26, 2019, INSURANCE POLICY

290.     Counter-Plaintiffs Fuller and Pinilla reallege paragraphs 208 through 263 above as

though fully set forth herein.

291.     Beginning in November 2018, Carollo expanded his law enforcement activity as an

elected official by devising a plan to get the City of Miami Police and Code Enforcement into

Plaintiffs' establishments without a warrant in order to a) harass Plaintiffs and scare Plaintiffs'

customers, and b) search for any possible code or building violations or any other violations of

laws.

292.     Florida's Bureau of Law Enforcement, Division of Alcohol, Beverage and Tobacco

("ABT"), normally conducts a "dry hour" inspection of bars in the City an average of twice per

year, during which they enter an establishment and check for a valid liquor license.

293.     Carollo urged ABT to repeatedly inspect Plaintiffs' Taquerias and Los Altos

properties, bringing with them Miami Police and Code Enforcement.

294.     Michael B. Kunert, former Captain of ABT, has submitted a declaration detailing that Carollo's requests to investigate Plaintiffs were "being advanced by the City as part of its policy targeting the Plaintiffs' businesses ultimately because of Commissioner Carollo's vendetta."

295.     On December 15, 2018, Miami Police joined ABT and Code Enforcement in deploying a multidisciplinary task force to raid Plaintiffs' businesses, called "Operation Dry Hour." City personnel reported information at Taquerias and no other establishment. The raid took place between 11:00 p.m. on Saturday night and 1:00 a.m. on Sunday morning and involved at least a dozen armed police, fire inspection, code compliance, and ABT personnel.

296.     It produced no violations noted and no action was taken by ABT.

297.     But, following the raid, the City issued a series of Code citations, claiming that Taquerias: (1) required a separate Business Tax Receipt ("BTR") for a "souvenir shop" allegedly separate from the restaurant; (2) required a warrant (zoning entitlement) for outside patio seating; (3) was operating a "lounge" (ostensibly, a type of alcohol service establishment, as opposed to a restaurant) in violation of its CU; (4) served alcohol after closing service/consumption of food; and (5) "was unable to provide documentation" supporting its compliance with the 51% of revenue regulation.

298.     The very next night, December 16, 2018, the City again conducted an on-site raid and inspection of Taquerias with the Fire Marshall and ABT, and asked for a "sketch" of the establishment, but found no violations.

299.     On January 24, 2019, the City of Miami Police and Fire Marshall conducted yet another on-site raid and inspection of Taquerias, again finding no violations.

300.     The next night, January 25, 2019, the Fire Marshall returned with an improper load occupancy notice.

301.     Throughout this time period, Carollo was monitoring each of these raids and issuing public records requests to determine if any violations were issued to Plaintiffs.

302.     Becoming even more enraged that the Miami Police and Code Enforcement were not issuing violations to Plaintiffs, Carollo demanded that the individual police officers and code enforcement officers who had raided Plaintiffs' properties appear before him on the Dais at the City Commission meeting on February 14, 2019.

303.     Leading up to the Commission Meeting, on February 6, 2019, the City conducted another on-site raid and inspection of Taquerias with the City's Code Enforcement posting violations for (1) failure to obtain a valid CU, (2) failure to obtain a tax receipt, (3) failure to obtain a warrant for the back patio, and (4) failure to obtain a BTR for a souvenir shop and CU for upstairs lounge.

304.     On February 14, 2019, at the City Commission meeting, former City Manager Emilio Gonzalez and the former Chief of Police Jorge Colina appeared at the hearing, refusing to subject their employees to Carollo's wrath and public humiliation, Colina told Carollo that he could not "bully" him as he did others in the City.

305.     Nevertheless, Carollo proceeded to demand that the City Commission issue a formal request to the Governor of Florida to appoint a special prosecutor to prosecute the members of the Miami Police Department and the Code Enforcement Department who had not issued citations to Plaintiffs.

306.     Although the Commission denied his request to request a special prosecutor, Carollo prevailed at the hearing with passage of Resolution 4-1 that authorized the City Attorney to establish a task force, including police, to investigate Plaintiffs' properties. *Fuller v. Carollo*,

ECF No. 506-2, Pl. Ex. 150. Carollo himself confirmed that Resolution 4-1 became an **Official Law Enforcement City Policy**. *Fuller v. Carollo*, ECF No. 555 at 197.

307.    The Resolution took Carollo's efforts to use City of Miami Law Enforcement departments to target Plaintiffs out from under the purview of the City Manager, and placed them under a Carollo ally, City Attorney Victoria Mendez, who was to oversee a task force consisting of the Police, Fire Department, and Code Enforcement Department to target Plaintiffs and their properties.

308.    The Chief of Police confirmed that this official City policy amounted to Carollo, as an elected official, using the resolution creating the task force to direct the Miami Police to "target[] the particular business owner … for new investigations," and "exercise … powers beyond the limits of his legislative power as a city commissioner to intentional cause harm to a business owner …" *Fuller v. Carollo*, ECF No. 506-2, Pl. Ex 146.

309.    The City Manager also confirmed that this official City policy – using the Miami Police – "was tantamount to targeting a business" and doing so "with the intention of essentially finding a way to shut them down…." *Fuller v. Carollo*, ECF No. 547 at 43, 47.

310.    The Miami Police along with ABT again raided Taquerias on March 4 and 8, 2019.

311.    After the March 4, 2019 raid on Plaintiffs' properties, and each week thereafter, assistant City Manager would provide a report directly to Carollo's office.  In effect, Carollo, through the task force headed by the City Attorney, was directing and controlling the Miami Police and Code Enforcement and getting regular updates on their targeting of Plaintiffs' properties (and only Plaintiffs' properties).

312.    Despite these ABT investigations revealing no violations, on March 6, 2019, Carollo again requested further investigations, directly requesting this from ABT's Chief of

Licensing, Larry Damon. This request was "advanced by the City as part of its policy targeting the Plaintiffs' businesses ultimately because of Commissioner Carollo's vendetta."

313.    These raids continued.

314.    On March 10, 2019, Miami Police again raided and inspected Taquerias with no violations found.

315.    On March 23, 2019, Miami Fire Department did the same intrusion and inspection, finding nothing wrong.

316.    On March 25, 2019, the City sent ABT inspectors to Taquerias for "informational purposes." The inspector stated that Taquerias had no license to sell alcohol, but when Taquerias presented its license, the inspector retracted his statement.

317.    On March 28, 2019, the Miami Police again conducted an on-site raid and inspection of Taquerias, this time issuing a violation for work performed without a finalized permit and failure to provide minimum off-street parking in SD2 zone.

318.    In April 2019, Carollo forced his Chief of Staff and former Chief of Police of Doral, Mr. Richard Blom, to spend an entire weekend analyzing the entire history of all of Plaintiffs' properties to find additional ways to cite them and shut them down.  Mr. Blom resigned in protest a mere two months later, citing Carollo's obsession with Fuller as a primary reason.

319.    In May 2019, Plaintiffs again exercised their protected First Amendment rights by holding a press conference outside of Miami City Hall, during which they exposed the hypocrisy of Carollo searching for any possible work that had been done on any of Plaintiffs' properties by them or by the properties' former owners so that Carollo could fine them, when Carollo himself had performed work without permits on his own house in Coconut Grove for years.

320.     The publicity that Plaintiffs' press conference generated put pressure on City Hall to have Code Enforcement inspect Carollo's home, which they did and which resulted in a number of code violations being found.

321.     This led to a month's long standoff between Carollo and the City Manager, with Carollo: a) hiring private investigators to track the City Manager's every move, including the time he arrived at work, left for lunch, returned from lunch, and left for the evening; b) investigating every aspect of the City Manager's home and then falsely accusing the City Manager of forging a document to build a wooden deck in the back of his house; and c) launching a surprise attack seeking to terminate the City Manager when we was out of the office attending to his wife who was gravely ill.

322.     As City Manager Gonzalez testified, Carollo "was trying to terminate me because I would not weaponize city government against Mr. Fuller." *Fuller v. Carollo*, ECF No. 547 at 63.

323.     All of Carollo's conduct as described above constitutes wrongful acts as defined by the Policy.

324.     Defendant contracted with the City of Miami to insure and indemnify Joe Carollo, as an elected official, for his law enforcement related acts through the Law Enforcement Policy for damages Carollo became legally obligated to pay.

325.     The policy period of this contract (Policy No. QLO01189-02) ran from October 26, 2018 until October 26, 2019 and Defendant is liable for damages caused by Carollo's law enforcement related acts during this period. *See* Exhibit B.

326.     For the policy period of October 26, 2018 to October 26, 2019, both Plaintiffs testified at trial not only as to the number of "occurrences" detailed above, as well as others, but also as to the significant reputational damage and mental anguish caused by Carollo's use of the

City of Miami's law enforcement departments, including the Miami Police and Code Enforcement, to target them for political retaliation, as well as the damages caused by Carollo's relentless defamation.

327.    As of the date of this filing, QBE has failed to pay for Carollo's law enforcement related acts during that policy period.

**COUNT III**
**BREACH OF CONTRACT**
**FOR THE OCTOBER 26, 2019, TO NOVEMBER 1, 2020, INSURANCE POLICY**

328.    Counter-Plaintiffs Fuller and Pinilla reallege paragraphs 208 through 263 above as though fully set forth herein.

329.    The events of the next policy period, October 26, 2019, to November 1, 2020, were even more egregious.

330.    They begin with Carollo's efforts to fire the City Manager who was trying to prevent Carollo from weaponizing code against Plaintiffs. The former City Manager ultimately resigned simply because he was disgusted with the City of Miami government.

331.    Simultaneously, Carollo continued to orchestrate Miami Police and Code Enforcement raids of Plaintiffs' properties.

332.    On November 8, 2019, the City of Miami Police and Code Enforcement again raided and inspected Taquerias.

333.    On December 15, 2019, the City of Miami, along with ABT, again raided and inspected Taquerias, and again confirmed that the second floor area was consistent with Taquerias' license file and sketch allowing for the sale and consumption of alcoholic beverages on the second floor, as well as the first floor, of Taquerias' licensed premises. ABT made explicit that its agents found no violations.

334.     January 8, 2020 saw Miami Code Enforcement conduct a health inspection at Ball & Chain with no violation found, and January 13, 2020 saw another on-site raid and inspection of Taquerias by both the Miami Police and Code Enforcement. This was followed by another one on March 7, 2020 at Taquerias (with Police) and, on the same date, another inspection by Miami Fire Department at Ball & Chain.

335.     The resignation of City Manager Gonzalez opened the door for Carollo to orchestrate the hiring of the head of the Miami Parking Authority, Arthur Noriega, as the next City Manager.

336.     Noriega had supported Carollo's harassment of Plaintiffs from the beginning, compliantly shutting down the parking operations for Plaintiffs' businesses and funding Carollo's efforts to shutter a 20-year celebration of Latin culture known as Viernes Culturales.

337.     While the COVID-19 Pandemic shut down all businesses, as well as the City of Miami government functions for a number of months, thus putting a temporary halt on the law enforcement raids of Plaintiffs' properties, Carollo and the City enacted a **Second Official Law Enforcement Policy.**

338.     At Carollo's insistence, the City revised its policies to target Plaintiffs. On May 27, 2020, the Director of the City of Miami Building Department, Ace Marrero, wrote an email recording that he "**Just had a lengthy meeting with the manager and almost the entire City Attorney office plus [the Director of Code Enforcement] talking about Bill Fuller.** The Manager wants us to **revise and update our policies to be more stringent** …**and shut down all structures that don't comply**. . . . ." *Fuller v. Carollo*, ECF No. 506-7, Pl. Ex 601 (emphases added).

339.    The next day, on May 28, 2020, City staff circulated an email with a subject line of "Copy of Fuller Properties" containing an attachment that had all of Plaintiffs' properties listed along with whether each property had any code violations and the status of any such violations. This list of Plaintiffs' properties then continued to be updated and circulated throughout the summer of 2020, culminating in an email on October 19, 2020, with the City Staff providing updates on the "progress of Carollo Investigation" which was limited to Plaintiffs' properties.

340.    On October 22, 2020, Carollo sponsored a new Ordinance that provided "for inclusion of building violations as a reason for revocation of certificates of use." That morning, at 8 am, the City Manager sent an email to the Building Director and the City Attorney stating: "let's get this done today before noon today." Of course, what the City Manager wanted done before noon was the issuance of a building violation at Ball & Chain, resulting in Ball & Chain being the first ever business to have its Certificate of Use ("CU") revoked in the history of Miami.  Carollo also sponsored a second ordinance on October 22, 2020, which banned outdoor music in any restaurants that did not have a CU as of October 22, 2020, which of course applied only to Ball & Chain, since Ball & Chain was the only restaurant to have its CU revoked that day.

341.    Thus, less than five months after the May 27, 2020 meeting, Carollo, Noriega, and Mendez had accomplished their goal of passing new ordinances to shut down one of Fuller's most prominent properties. Examples of some of these Ordinances are below:

ORDINANCE LIST

| Ordinances 13941 | 11-19-20 | Amending Section 36-4 (Noise) | Prohibiting outdoor music b/w hours of 10:00 pm to 8:00 am. |
|---|---|---|---|
| Ordinance 13936 | 10-22-20 | Amending Section 2-211 (Certificate of Use) | Mandatory revocation of CU for violations of Chapter 10 (Building Code). |

| Ordinance 14057 | 3-10-22 | Amending Section 2-817(d) (Mitigation) | Capping the amount the code enforcement board could mitigate fines after compliance. |
|---|---|---|---|
| Ordinance 14115 | 10-13-22 | Amending Chapter 31 by adopting Section 31.51(Food Trucks) | Establishing Section 31.51, Food Trucks, prohibiting District 3 from Ordinance. |
| Ordinance 14118 | 10-27-22 | Amending (Historic Preservation) | Providing further penalties and enforcement options for property owners that allow historically designated structures to decay requiring demolition. |
| Policy | | Compliance Agreements | Revoked policy permitting unsafe structures to enter into compliance agreements with property owners. |
| Policy | | Dual Occupancies | Revoked policy permitting dual occupancies within one venue. |

342.    The City thereafter revised its policies and used those revised policies to shut down Plaintiffs' most famous business, the Ball & Chain club, keeping it either entirely or mostly closed for more than two years.

343.    The City also managed to shut down Plaintiffs' Taquerias restaurant and club, resulting in "staff members that worked 33 years, 26 years, 19 years, 18 years, nine years, seven years, all and ha[ving] to lose their job because of Commissioner Carollo." *Fuller v. Carollo*, ECF No. 553 at 22.

344.    All of Carollo's conduct as described above constitutes wrongful acts as defined by the Policy.

345.    QBE contracted with the City of Miami to insure and indemnify Joe Carollo, as an elected official, for his law enforcement related acts through the Law Enforcement Policy for damages Carollo became legally obligated to pay.

346.    The policy period of this contract (Policy No. QLO01189-03) ran from October 26, 2019 until November 1, 2020, and Defendant is liable for damages caused by Carollo's law enforcement related acts during this period. *See* Exhibit C.

347.    For the policy period of October 26, 2019 to November 1, 2020, both Plaintiffs testified at trial not only as to the number of "occurrences" detailed above, as well as others, but also as to the significant reputational damage and mental anguish caused by Carollo's use of the City of Miami's law enforcement departments, including the Miami Police and Code Enforcement, to target them for political retaliation, as well as the damages caused by Carollo's relentless defamation.

348.    As of the date of this filing, QBE has failed to pay for Carollo's law enforcement related acts during that policy period.

**COUNT IV**
**BREACH OF CONTRACT**
**FOR THE NOVEMBER 1, 2020 TO NOVEMBER 1, 2021 INSURANCE POLICY**

349.    Counter-Plaintiffs Fuller and Pinilla reallege paragraphs 208 through 263 above as though fully set forth herein.

350.    QBE contracted with the City of Miami to insure and indemnify Joe Carollo, as an elected official, for his law enforcement related acts through the Law Enforcement Policy for damages Carollo became legally obligated to pay.

351.     The policy period of this contract (Policy No. QLO01189-04) ran from November 1, 2020 until November 1, 2021, and Defendant is liable for damages caused by Carollo's law enforcement related acts during this period. *See* Exhibit D.

352.     As of the date of this filing, Defendant has failed to pay for Carollo's law enforcement related acts during that policy period.

353.     Miami's new Police Chief, Art Acevedo, was sworn in April 2021. Miami's top cop testified that he was warned that he and the Police Department would "be very busy dealing with Mr. Carollo and his obsession with Mr. Fuller, and it will be basically required to inspect and to be going into his businesses on a regular basis," subject to "the wrath of Joe Carollo" if they refused to fall in line with this custom and practice of First Amendment retaliation. *Fuller v. Carollo*, ECF No. 567 at 86-88.

354.     In May of 2021, Carollo created another official City policy using the Miami Police to target Plaintiffs.  Specifically, Carollo passed **another resolution**, creating another task force that was to investigate a list of bars and clubs that Carollo would create and provide to the Police. This is **Official Law Enforcement Policy No. 3.**

355.     On the Dias, Carollo noted that legally he was "not supposed to go with the police . . . and point out to them, like I do, places they should look at," and so, as a work-around, Carollo asked City Manager Noriega: "Mr. Manager, would you have any problems whatsoever if I could sit down with the police chief, and give him a list of places that he should begin going to in my district and even if they want to invite me to happily go with them?" to which the new, compliant City Manager, Art Noriega, responded, "of course not."

356.     Thereafter, Carollo delivered to the new Police Chief Art Acevedo a list of establishments associated with Plaintiffs for inspection. Acevedo "was incredulous" over this

"open[ ] violat[ion]" of the City Charter, which prohibits Commissioners like Carollo from "giving direction to the police department," and doing so outside the presence and without the involvement of the City Manager. *Fuller v. Carollo*, ECF No. 548 at 98-99.

357.    Carollo's law enforcement activity was evident the middle of the night on Easter Sunday, April 3, 2021, in the form of a multi-departmental City raid, complete with heavy armor and SWAT gear, of one of Plaintiffs' properties—a small, modest Mexican taco restaurant and lounge. Then-Police Chief Acevedo testified about how "highly unusual" he found it that City Manager Noriega and soon-to-be Police Chief Manny Morales were presiding over this dead-of-night show of force while "talk[ing] very openly about the disdain [Carollo] had for Bill Fuller," and the fact that the City was targeting "Mr. Fuller and any Fuller[-]related business at the direction of" Carollo in "retaliation for Mr. Fuller's simple exercising [of] his Constitutional rights[.]" *Id.* at 86-89 ("It's not speculation, it is well known, spoken about openly in the city government about how Joe Carollo has absolute[ ] disdain for Mr. Fuller").

358.    These raids were not limited to just Easter Sunday, but as the managers of Plaintiffs' businesses testified, they had lost count of "how many times" they had been "harassed by police officers, code enforcement, fire marshal where they're coming into the location, back to back to back," in harrowing—and potentially dangerous—raids involving "SWAT cars outside with lights on." *Fuller v. Carollo*, ECF No. 553 at 16-17.

359.    A few hours later, six police officers come, two more code enforcement, two more fire department people within two hours . . . . Two hours later, ten more people from the city come. They're in full SWAT gear, they have their badge, bullet proof vests, guns. They surround the entrance[.]" *Id.*

360.    On May 1, 2021, the Miami Police along with Code Enforcement again raided Plaintiffs' Taquerias and Los Altos property. When the police arrived, Taquerias' owner firmly instructed the **police** that **Code Enforcement** was not permitted to enter without a warrant. Yet, in keeping with the City's policy, the police disregarded the instruction and commanded **Code Enforcement** and the rest of their task force to enter the business. While the venue was full of patrons that evening, **police** stormed inside wearing bullet proof vests with weapons in tow, turned on all of the lights, shut off the music, and began threatening arrests. This raid was executed pursuant to the May 2021 resolution.

361.    Four days later, on May 5, 2021, Miami Police and Code Enforcement once again raided Taquerias knowing that Taquerias, a Mexican restaurant, and its patrons, were celebrating Cinco de Mayo. In fact, Taquerias was one of the only two Mexican restaurants in the entire City that were raided on Cinco de Mayo, and both of those restaurants were Fuller-affiliates.

362.    Code Enforcement and the Police Department showed up to Taquerias again, alleging Taquerias did not have a valid BTR. The general manager showed them the current receipt for the BTR, but the police officers and code inspectors remained at Taquerias for approximately 30 minutes. Taquerias was only missing an official BTR permit because the City refused to mail it to Taquerias. Plaintiffs were unable to get it in-person as the offices were closed due to the COVID-19 pandemic. Ultimately, the City acknowledged that the entire BTR issue was the City's fault.

363.    However, the City still refused to remove the violation from its system and refused to send a print-only version of the BTR permit for Taquerias to display. Taquerias was again cited for only displaying the receipt, even though this was clearly due to the City's own incompetence and malfeasance. It took Plaintiffs' attorneys many hours with the City's and BTR's employees to

release the BTR permit, which ultimately only happened the day after the court ruled against Commissioner Carollo's Motion to Dismiss in the related case.

364. On June 19, 2021, Miami Police, Fire and Code Enforcement again raided Taquerias, again finding no wrongdoing.

365. On the night of August 20, 2021, hours before ever stepping foot at the property, the police sergeant in charge of the inspection worked with his superior officer to craft a fake account of the future inspection and draft his supposed "findings" (that had not yet occurred), including that they justified shutting down the business.

366. The false narrative stated that the business had been shut down for violating its restaurant license by operating as a "nightclub"—the same pretextual reason the City used to previously raid and cite Taquerias (notwithstanding that the City had to void all prior violations after ABT's inspection and the City's own audit demonstrated Taquerias' full compliance).

367. City police filled out their report with those falsehoods, and then headed to the property to carry out their fake inspection. The police simply classified Taquerias as a "nightclub" because patrons were dancing and standing up—neither of which are relevant factors under the City of Miami Code, and which the **police** later conceded were not sufficient to shut down the business All of these raids done under the warrantless search exception for alcohol violations with Taquerias informing the inspectors that they cannot come in without a warrant.

368. Pictured below are at least three police cars on August 21, 2021, with at least two armed police officers on their way to shut down Taquerias.



369.    Pictured below is Fuller talking with at least three armed police officers as they shut down Taquerias.



370.    Pictured below are at least three police cars outside of Ball & Chain on December 17, 2021.



371.    On September 21, 2021, the Miami Police came to Taquerias again, this time to shut it down permanently after the City revoked its Certificate of Use, thereby cutting off another major source of income for Fuller and Pinilla and putting out of work a family of employees who had worked there for decades.

372.    As a result of these dozens of unconstitutional actions by the Miami Police, Plaintiff Fuller testified that, despite growing up in the City of Miami and having his business headquarters and most operations in the City of Miami, he feared to even drive in the City, never drinking a drop of alcohol for fear of a false arrest, started opening businesses in Fort Lauderdale instead, and would actually drive around the City of Miami to avoid any encounters with the Miami Police force.

373.    All of Carollo's conduct as described above constitutes wrongful acts as defined by the Policy.

374.    For the policy period of November 1, 2020 to November 1, 2021, both Fuller and Pinilla testified at trial not only as to the number of "occurrences" detailed above, as well as others, but also as to the significant reputational damage and mental anguish caused by Carollo's use of the City of Miami's law enforcement departments, including the Miami Police and Code

Enforcement, to target them for political retaliation, as well as the damages caused by Carollo's relentless defamation.

375. As of the date of this filing, QBE has failed to pay for Carollo's law enforcement related acts during that policy period.

**COUNT V**
**BREACH OF CONTRACT**
**FOR THE NOVEMBER 1, 2021 TO NOVEMBER 1, 2022 INSURANCE POLICY**

376. Counter-Plaintiffs Fuller and Pinilla reallege paragraphs 208 through 263 above as though fully set forth herein.

377. QBE contracted with the City of Miami to insure and indemnify Joe Carollo, as an elected official, for his law enforcement related acts through the Law Enforcement Policy for damages Carollo became legally obligated to pay.

378. The policy period of this contract (Policy No. QLO01189-05) ran from November 1, 2021 until November 1, 2022 and Defendant is liable for damages caused by Carollo's law enforcement related acts during this period. *See* Exhibit E.

379. From November 1, 2021 to November 1, 2022, Carollo ordered a number of law and code enforcement raids and investigations as detailed below.

380. On November 21, 2021, an Inspector from the Fire Department arrived at Ball & Chain to take a decibel reading with a measuring wheel instrument. He was then joined by five (5) members of the Police Department, including Commander Chin-Quee, who also joined on the decibel reading with a measuring wheel instrument. Commander Chin-Quee accosted Plaintiffs' employees and called them disrespectful and argumentative simply for respectfully asking questions regarding the nature of the City's visit and defending the business, as it was clear no noise violation had occurred. Nevertheless, the Police issued a noise violation

arguing the music was "audible" beyond one-hundred (100) feet. Plaintiffs' employees tested the levels themselves and confirmed no music was audible beyond one-hundred (100) feet so that the violation should not be issued. Nevertheless, the City subsequently posted a noise violation at Ball & Chain.

381.    On December 3, 2021, the Miami Fire Department came to Ball & Chain to inspect occupancy levels, finding no violations.

382.    On December 16, 2021, Miami Police again raided Ball & Chain, again at peak occupancy time.

383.    On December 17, 2021, multiple police cars again raided Ball & Chain at peak occupancy time.

384.    All of Carollo's conduct as described above constitutes wrongful acts as defined by the Policy.

385.    For the policy period of November 1, 2021 to November 1, 2022, both Plaintiffs testified at trial not only as to the number of "occurrences" detailed above, as well as others, but also as to the significant reputational damage and mental anguish caused by Carollo's use of the City of Miami's law enforcement departments, including the Miami Police and Code Enforcement, to target them for political retaliation, as well as the damages caused by Carollo's relentless defamation.

386.    As of the date of this filing, QBE has failed to pay for Carollo's law enforcement related acts during that policy period.

<u>**COUNT  VI**</u>
**DECLARATORY JUDGMENT**
<u>**QBE MUST DEFEND AND INDEMNIFY IN FULLER II, TOWER, & MADROOM**</u>
**(Application of the LEL Policy: Named Insured and Insured Individuals engaging in Law
Enforcement Related Acts)**

387.   Counter-Plaintiffs Fuller, Pinilla, Barlington Group, LLC; Calle Ocho Marketplace,

LLC; Yo Amo Calle Siete, LLC; Little Havana Arts Building, LLC; Little Havana Arts Building

Too, LLC; Tower Hotel, LLC; Brickell Station Partners, LLC; Piedra Villas, LLC; Futurama, LLC;

El Shopping, LLC; Beatstik, LLC; Viernes Culturales/Cultural Fridays, Inc.; Little Havana

Bungalows, LLC; LHAB Tres, LLC; Tower Hotel, LLC, and La Gran Fiesta, LLC reallege

paragraphs 208 through 263 above as though fully set forth herein.

388.   QBE contracted with the City of Miami to insure and indemnify elected and

appointed officials for their law enforcement related acts. *See* LEL Policies, Section III,

Definitions, Definition – 6 Insured (denoting various categories of insured persons, other than the

named insured).

389.   The Fuller II, Tower, and Mad Room lawsuits are all pending.

390.   Section VII of the LEL Applications designate "**each employee**" position to be

insured. *See* LEL Applications, Section VII (emphasis in original).

391.   Further, pursuant to the LEL Policy, "As respects the particulars and information

contained in the written application and the policy provisions set forth herein, this policy shall be

constituted as a separate agreement with each **insured**." LEL Policy, Section IV – Conditions,

Condition No. 2 Agreement and Severability (emphasis in original).

392.   The City of Miami is the Named Insured under the LEL Policies and caused

substantial damage to Counter Plaintiffs through its law enforcement activities. As the Named

Insured and public entity that facilitated the acts to target Counter-Plaintiffs, QBE cannot

unironically argue it is not covered. *See generally* Fuller II (DE 129), Mad Room (DE 212), Tower (Third Amended Complaint) (all alleging claims against the City of Miami for its law enforcement activities, e.g., its enforcement of ordinances and demolition orders).

393.    The individual defendants are all elected or appointed officials insured under the policies.

394.    Joe Carollo is an elected official who engaged in numerous law enforcement related acts causing substantial damage to Counter-Plaintiffs.

395.    Indeed, Fuller II is replete with allegations of Carollo engaging in law enforcement related acts. *See e.g.* Fuller II, DE 129 ¶¶ 170 (Carollo investigating and harassing Little Havana Arts Building and claiming he was the Law), 398-403 (Carollo investigating the distance between La Gran Fiesta and another building so as to selectively enforce a policy against it).

396.    Arthur Noriega is an appointed official who engaged in numerous law enforcement related acts causing substantial damage to Counter-Plaintiffs.

397.    Noriega was engaged in law enforcement related acts including investigations and enforcement. *See e.g.*, Fuller II, DE 129 ¶¶ 263-264 (Noriega selectively enforcing code against Little Havana Arts Building); 398-403 (Noriega investigating the distance between La Gran Fiesta and another building so as to selectively enforce a policy against it).

398.    Victoria Mendez is an appointed official who engaged in numerous law enforcement related acts causing substantial damage to Counter-Plaintiffs.

399.    Mendez was engaged in law enforcement related acts including investigations and enforcement. *See e.g.*, Fuller II, DE 129 ¶¶ 255 (Mendez working with Carollo to create a multi-department task force to target properties relating to fuller and Pinilla), 263-264 (Mendez

selectively enforcing code against Little Havana Arts Building); 4090 (Mendez discussing selectively targeting Counter-Plaintiffs).

400.    Rachel Dooley is an appointed official who engaged in numerous law enforcement related acts causing substantial damage to Counter-Plaintiffs.

401.    Dooley was engaged in law enforcement related acts including investigations and enforcement. *See e.g.*, Fuller II, DE 129 ¶¶ 897, 1096-1101 (Dooley assisting to create ordinances to selectively enforce against Counter-Plaintiffs and Dooley pursuing frivolous litigation against Calle Siete only to later admit the City had erred in the underlying issue).

402.    Asael Marrero is an appointed official who engaged in numerous law enforcement related acts causing substantial damage to Counter-Plaintiffs.

403.    Marrero was engaged in law enforcement related acts including investigations and enforcement. *See e.g.*, Fuller II, DE 129 ¶¶ 4171 – 4173 (Marrero assisting to create lists of properties to target and create ordinances to selectively enforce against Counter-Plaintiffs).

404.    Daniel S. Goldberg is an appointed official who engaged in numerous law enforcement related acts causing substantial damage to Counter-Plaintiffs.

405.    Goldberg was engaged in law enforcement related acts including investigations and enforcement. *See e.g.*, Fuller II, DE 129 ¶¶ 3947-3949. (Goldberg citing El Shopping three times for the same alleged violation, and cruelly revoking Certificates of Occupancy for a whole building because allegedly there was insufficient parking).

406.    William Ortiz is an appointed official who engaged in numerous law enforcement related acts causing substantial damage to Counter-Plaintiffs.

407.     Ortiz was engaged in law enforcement related acts including investigations and enforcement. *See e.g.*, Fuller II DE 129 ¶¶ 3876-3879 (Ortiz maliciously working in tandem with the Code Enforcement Board).

408.     Adrian Plasencia is an appointed official who engaged in numerous law enforcement related acts causing substantial damage to Counter-Plaintiffs.

409.     Plasencia was engaged in law enforcement related acts including investigations and enforcement. *See e.g.*, Fuller II DE 129 ¶¶ 1033-1038 (Plasencia maliciously imposing his own set of fire code and laws against Piedra Villas).

410.     Rene Diaz is an appointed official who engaged in numerous law enforcement related acts causing substantial damage to Counter-Plaintiffs.

411.     Diaz was engaged in law enforcement related acts including investigations and enforcement. *See e.g.*, Fuller II, DE 129 ¶¶ 514-517, 3462-3467 (Diaz investigating properties related to Fuller and Pinilla, and issuing meritless citations).

412.     Yvonne Bayona was an appointed official who engaged in numerous law enforcement related acts causing substantial damage to Counter-Plaintiffs.

413.     Bayona was engaged in law enforcement related acts while serving as a Code Enforcement Board Member. *See e.g.*, Fuller II, DE 129 ¶¶ 546-548, 1792, 4060 (Bayona improperly issuing penalties as a code enforcement board member).

414.     Because the City of Miami, as the Named Insured, is an underlying defendant in Fuller II, Mad Room, and Tower, QBE has a duty to indemnify and defend.

415.     Similarly, because the underlying defendants in Fuller II were insured as Elected or Appointed Officials to be insured, and said Insured was engaged in law enforcement activities or

law enforcement related acts, QBE has a duty to defend and indemnify under the applicable yearly LEL Policy.

416.     Accordingly, an actual, present, and justiciable controversy exists between the parties that warrants the entry of declaratory judgment and Counter Plaintiffs are entitled to a declaration that QBE has a duty to defend and indemnify for Fuller II, Mad Room, and Tower.

**COUNT  VII**
**DECLARATORY JUDGMENT**
**QBE MUST DEFEND AND INDEMNIFY IN FULLER II, MAD ROOM, & TOWER**
**(No LEL Exclusions Apply)**

417.     Counter-Plaintiffs Fuller, Pinilla, Barlington Group, LLC; Calle Ocho Marketplace, LLC; Yo Amo Calle Siete, LLC; Little Havana Arts Building, LLC; Little Havana Arts Building Too, LLC; Tower Hotel, LLC; Brickell Station Partners, LLC; Piedra Villas, LLC; Futurama, LLC; El Shopping, LLC; Beatstik, LLC; Viernes Culturales/Cultural Fridays, Inc.; Little Havana Bungalows, LLC; LHAB Tres, LLC; Tower Hotel, LLC; and La Gran Fiesta, LLC reallege paragraphs 208 through 263 above as though fully set forth herein.

418.     QBE's LEL policies expressly cover intentional misconduct which transcends the bounds of the law. Specifically, the LEL Policy covers "assault and/or battery" (intentional criminal conduct); "false arrest, detention or imprisonment, or malicious prosecution" (intentional criminal conduct); "publication or utterance of libel or slander" or Defamation (intentional criminal conduct); "violation of civil rights under 42 USC 1981 et sequentia or State Law" (intentional criminal conduct); "wrongful entry, eviction or other invasion of the right of public occupancy" (intentional criminal conduct).

419.     The Fuller II lawsuit alleges violations of 42 USC § 1983 civil rights.

420.     The Mad Room lawsuit alleges violations of procedural and substantive due process, equal protection, 42 USC § 1983, and City Charter.

421.    The Tower lawsuit does not allege intentional misconduct, rather its claims include breach of contract and the covenant of good faith and fair dealing.

422.    QBE expressly contracted to cover 42 USC 1981 et sequentia violations.

423.    Accordingly, QBE has a duty to defend and indemnify under the applicable yearly LEL policy.

424.    An actual, present, and justiciable controversy exists between the parties that warrants the entry of declaratory judgment and Counter Plaintiffs are entitled to a declaration that QBE has a duty to defend and indemnify for Fuller II, Mad Room, and Tower.

### COUNT  VIII
### DECLARATORY JUDGMENT
### QBE MUST DEFEND AND INDEMNIFY IN FULLER II, TOWER, & MAD ROOM
(No Public Policy Exclusions Apply)

425.    Counter-Plaintiffs Fuller, Pinilla, Barlington Group, LLC; Calle Ocho Marketplace, LLC; Yo Amo Calle Siete, LLC; Little Havana Arts Building, LLC; Little Havana Arts Building Too, LLC; Tower Hotel, LLC; Brickell Station Partners, LLC; Piedra Villas, LLC; Futurama, LLC; El Shopping, LLC; Beatstik, LLC; Viernes Culturales/Cultural Fridays, Inc.; Little Havana Bungalows, LLC; LHAB Tres, LLC; Tower Hotel, LLC; and La Gran Fiesta, LLC reallege paragraphs 208 through 263 above as though fully set forth herein.

426.    The known loss doctrine requires the insured to be substantially certain that a loss would occur at the time of a policy's inception.

427.    At the start of each policy period, there was no ability to know or predict the misconduct that the underlying defendants would engage in.

428.    Rather, throughout each policy period, the cast of underlying Defendants grew, as did the acts and tools that they used to utilize law enforcement related acts in violation of 42 USC § 1983.

429.    Further, illustrative of this uncertainty, is at and during each policy period, the underlying defendants were not bound to continue any "loss in progress" but rather undertook their own, independent acts to continue.

430.    As QBE rightfully pleads (without conviction), the underlying lawsuits "allege a multitude of immediate injury-producing acts consisting of the wrongful acts" and each act would entitle QBE to a separate Self-Insured Retention payment from the City. *See* DE 1 at ¶ 187-88. Each multitude of acts immediately produced an injury.

431.    Accordingly, there was no loss in progress or known loss and QBE is not entitled to escape indemnification or coverage under this argument.

432.    An actual, present, and justiciable controversy exists between the parties that warrants the entry of declaratory judgment and Counter Plaintiffs are entitled to a declaration that QBE has a duty to defend and indemnify for Fuller II, Mad Room, & Tower.

**COUNT IX**
**DECLARATORY JUDGMENT**
**QBE MUST DEFEND AND INDEMNIFY IN TOWER**
**(The Contractual Claim Exclusion Does Not Apply)**

433.    Counter-Plaintiffs Tower Hotel, LLC; Piedra Villas, LLC; Beatstik, LLC; El Shopping, LLC; and Yo Amo Calle Siete, LLC, reallege paragraphs 208 through 263 above as though fully set forth herein.

434.    Counter-Plaintiffs entered into Compliance Agreements with the City and, or, worked to follow the City's Unsafe Structure Order for alleged issues; and the City operated in bad faith to frustrate the Tower plaintiffs' ability to comply. *See generally Tower*, Third Amended Complaint (alleging the City has frustrated the purpose of its compliance agreements so as to make performance impossible; and threatened properties with demolition).

435.     Neither the Compliance Agreement nor the Unsafe Structure Order involve an "assumption of liability" to make the City liable so as to invoke QBE's Policy exclusions. *See* POL Policy Exclusion No. 16; and LEL Policy exclusion No. 4 (excluding liability where such liability was assumed under a contract).

436.     Accordingly, the LEL and POL Policies apply to the Tower Lawsuit.

437.     An actual, present, and justiciable controversy exists between the parties that warrants the entry of declaratory judgment and Counter Plaintiffs are entitled to a declaration that QBE has a duty to defend and indemnify for the Tower lawsuit.

### COUNT X
### DECLARATORY JUDGMENT
### QBE MUST DEFEND AND INDEMNIFY IN FULLER I
**(The LEL Policies Apply to Carollo, a Named Insured, engaged in Law Enforcement Related Acts)**

438.     Counter-Plaintiffs Fuller and Pinilla reallege paragraphs 208 through 263 above as though fully set forth herein.

439.     Counter-Plaintiffs bring this claim as a mandatory counter-claim in the event that this Court, in its discretion, declines supplemental jurisdiction over the state law claim and wishes Counter-Plaintiffs adjudicate said breach of contract in state court.

440.     QBE contracted with the City of Miami to insure and indemnify elected and appointed officials for their law enforcement related acts. *See* LEL Policies, Section III, Definitions, Definition – 6 Insured (denoting various categories of insured persons, other than the named insured).

441.     Section VII of the LEL Applications designate "**each employee**" position to be insured. *See* LEL Applications, Section VII (emphasis in original).

442.     Further, pursuant to the LEL Policy, "As respects the particulars and information contained in the written application and the policy provisions set forth herein, this policy shall be constituted as a separate agreement with each **insured**." LEL Policy, Section IV – Conditions, Condition No. 2 Agreement and Severability (emphasis in original).

443.     Joe Carollo is an elected official who engaged in numerous law enforcement related acts causing substantial damage to Counter-Plaintiffs.

444.     Indeed, Fuller I is replete with allegations of Carollo engaging in law enforcement related acts. *See generally Fuller v. Carollo*, DE 125 (alleging, *inter alia*, Carollo engaging in various investigations of Plaintiffs; using his official capacity to conduct intra-agency investigations with FDLE and ABT; and using City Police to harass Counter-Plaintiffs).

445.     Because Carollo is and was an Elected or Appointed Officials to be insured and he was engaged in law enforcement related acts, QBE has a duty to defend and indemnify under the applicable yearly LEL Policy.

446.     An actual, present, and justiciable controversy exists between the parties that warrants the entry of declaratory judgment and Counter Plaintiffs are entitled to a declaration that QBE has a duty to defend and indemnify for the Fuller I suit.

### COUNT XI
### DECLARATORY JUDGMENT
### QBE MUST DEFEND AND INDEMNIFY IN FULLER I
#### (No LEL Exclusions Apply)

447.     Counter-Plaintiffs Fuller and Pinilla  reallege paragraphs 208 through 263 above as though fully set forth herein.

448.     Counter-Plaintiffs bring this claim as a mandatory counter-claim in the event that this Court, in its discretion, declines supplemental jurisdiction over the state law claim and wishes Counter-Plaintiffs adjudicate said breach of contract in state court.

449. QBE's LEL policies expressly cover intentional misconduct which transcends the bounds of the law. Specifically, the LEL Policy covers "assault and/or battery" (intentional criminal conduct); "false arrest, detention or imprisonment, or malicious prosecution" (intentional criminal conduct); "publication or utterance of libel or slander" or Defamation (intentional criminal conduct); "violation of civil rights under 42 USC 1981 et sequentia or State Law" (intentional criminal conduct); "wrongful entry, eviction or other invasion of the right of public occupancy" (intentional criminal conduct).

450. The Fuller I lawsuit alleges a violation of 42 § 1983 civil rights.

451. QBE expressly contracted to cover 42 USC 1981 et sequentia violations.

452. Accordingly, QBE has a duty to defend and indemnify under the applicable yearly LEL policy.

453. An actual, present, and justiciable controversy exists between the parties that warrants the entry of declaratory judgment and Counter Plaintiffs are entitled to a declaration that QBE has a duty to defend and indemnify for the Fuller I suit.

**COUNT XII**
**DECLARATORY JUDGMENT**
**QBE MUST DEFEND AND INDEMNIFY IN FULLER I**
**(No Public Exclusions Apply)**

454. Counter-Plaintiffs Fuller and Pinilla reallege paragraphs 208 through 263 above as though fully set forth herein.

455. Counter-Plaintiffs bring this claim as a mandatory counter-claim in the event that this Court, in its discretion, declines supplemental jurisdiction over the state law claim and wishes Counter-Plaintiffs adjudicate said breach of contract in state court.

456.     Over five years, with great temporal distance, Carollo utilized various direct and indirect methods to retaliate against Plaintiffs; involving different parties, agencies, and actors; various factual bases; no single method of conduct; and various goals.

457.     The known loss doctrine requires the insured to be substantially certain that a loss would occur at the time of a policy's inception.

458.     At the start of each policy period, there was no ability to know or predict the misconduct that the underlying defendants would engage in.

459.     Rather, throughout each policy period, Carollo's conduct, tools, and strategies used to utilize his law enforcement related acts in violation of 42 USC § 1983 grew and expanded each year.

460.     Further, illustrative of this uncertainty, is at and during each policy period, the underlying defendants were not bound to continue any "loss in progress" but rather undertook their own, independent acts to continue.

461.     As QBE rightfully pleads (without conviction), the underlying lawsuits "allege a multitude of immediate injury-producing acts consisting of the wrongful acts" and each act would entitle QBE to a separate Self-Insured Retention payment from the City. *See* DE 1 at ¶ 187-88. Each multitude of acts immediately produced an injury.

462.     Accordingly, there was no loss in progress or known loss and QBE is not entitled to escape indemnification or coverage under this argument.

463.     An actual, present, and justiciable controversy exists between the parties that warrants the entry of declaratory judgment and Counter Plaintiffs are entitled to a declaration that QBE has a duty to defend and indemnify for the Fuller I suit.

**COUNT XIII**
**DECLARATORY JUDGMENT**
**QBE MUST DEFEND AND INDEMNIFY IN FULLER I**
(Bifurcation or Allocation of the Jury Award)

464.     Counter-Plaintiffs Fuller and Pinilla  reallege paragraphs 208 through 263 above as though fully set forth herein.

465.     Counter-Plaintiffs bring this claim as a mandatory counter-claim in the event that this Court, in its discretion, declines supplemental jurisdiction over the state law claim and wishes Counter-Plaintiffs adjudicate said breach of contract in state court.

466.     QBE tendered insurance and provided legal assistance to Defendant Carollo in the underlying suit. QBE concealed the alleged requirement that the Parties must bifurcate their damages. Accordingly, QBE should be estopped from claiming damages are barred based on an alleged failure to bifurcate or allocate such damages.

467.     QBE knew and had the advantage knowing of any alleged requirement to bifurcate or allocate damages. QBE knew and had the advantage knowing of any alleged requirement to bifurcate or allocate damages. Indeed, QBE had actual and constructive knowledge of this  alleged requirement.

468.     QBE determined not to exercise this right in and thus has waived its claim and, or, should be estopped as to asserting a failure to allocate or bifurcate the damages bars recovery .

469.     To the extent that only the LEL Policy applies as QBE seeks to recoup its tender under the POL Policies, QBE's assertion of a failure to allocate or bifurcate damages fails.

470.     And, as neither the known loss nor loss in progress doctrine applies here, QBE's assertion of a failure to allocate or bifurcate damages fails.

471.    An actual, present, and justiciable controversy exists between the parties that warrants the entry of declaratory judgment and Counter Plaintiffs are entitled to a declaration that QBE has a duty to defend and indemnify for the Fuller I suit.

**WHEREFORE**, Counter-Plaintiffs respectfully request that this Court:

(1)    Enter Judgment in Counter-Plaintiffs' favor based on their breach of contract claims, based on the Fuller I jury verdict, awarding them $18,610,000 in compensatory damages, attorneys' fees, and costs; plus attorneys' fees in bringing this action; or in the alternative, should this Court decide not to exercise supplemental jurisdiction, enter declaratory relief in their favor based on Counts X and through XIII.

(2)    Enter Declaratory Judgment in their favor on Counts VI through IX of this Counter-Claim, and declare that QBE has a duty to defend and indemnify under the LEL Policies for the Fuller II lawsuit; and

(3)    Award any other relief this Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Counter-Plaintiffs hereby demand a jury trial of all claims so triable.

Dated: July 29, 2024

        Respectfully submitted,

        **AXS LAW GROUP, PLLC**
        2121 NW 2nd Ave, Suite 201
        Wynwood, Florida 33127
        Telephone: (305) 297-1878

        By: */s/ Samuel J. Etkin Kramer*
        Jeffrey W. Gutchess, Esq.
        (FBN 702641)
        Samuel Jacob Etkin Kramer, Esq.

(FBN 1049581)
jeff@axslawgroup.com
sam@axslawgroup.com
eservice@axslawgroup.com

*Counsel for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on July 29, 2024, a true and correct copy of the foregoing was

served on all counsel of records via the CM-ECF.

<u>*/s/ Samuel Jacob Etkin Kramer*</u>
Samuel Jacob Etkin Kramer